Thomas G. Foley, Jr., State Bar No. 65812
tfoley@foleybezek.com
Kevin Gamarnik, State Bar No. 273445
kgamarnik@foleybezek.com
**FOLEY, BEZEK, BEHLE & CURTIS, LLP**
15 West Carrillo Street
Santa Barbara, CA 93101
Telephone: (805) 962-9495
Facsimile: (805) 962-0722

Attorneys for James Reed, Carolynn Reed, Charles Prince, Brij Sharma, Bernard Daos, and as Interim Class Counsel on the Class Action Causes of Action

Additional counsel on following page.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES REED, CAROLYNN REED, CHARLES PRINCE, BRIJ SHARMA, and BERNARD DAOS, on behalf of themselves and all others similarly situated;<br><br>*Plaintiffs,*<br><br>GWENDALYN DOUGLASS As Trustee of RAYMOND E. DOUGLASS REVOCABLE TRUST, Executor of The Raymond E. Douglass Estate, and as Successor In Interest;<br><br>*Plaintiff,*<br><br>V.<br><br>RELIANT LIFE SHARES, LLC. A California Limited Liability Company; ~~RLS FINANCIAL SERVICES, INC.,~~ | Case No. 2:23-Cv-08577-SB-AGR (Lead Case) Consolidated With Case No. 2:23-Cv-00460 SB (Agrx)<br><br>Judge Hon. Stanley Blumenfeld, Jr.<br><br>**CLASS ACTION**<br><br>**SECOND AMENDED COMPLAINT CLASS CAUSES OF ACTION:**<br><br>**Causes of Action Against <u>Reliant Defendants</u>**<br>　1. **Negligence Against Reliant Defendants;**<br>　2. **Gross Negligence;**<br>　3. **Violation Of Corporations Code §§ 25401 & 25501;**<br>　4. **Breach Of Fiduciary Duty;**<br>　5. **Financial Elder Abuse (WIC § 15600 Et Seq.); and** |

A California Corporation; RELIANT LIFE SHARES SERIES TRUST, aka RLS Trust, A Trust; RMS TRUST, A Trust; SEAN MICHAELS, An Individual; SCOTT GRADY, An Individual; WILMINGTON SAVINGS FUND SOCIETY, A Federal Savings Bank Doing Business As CHRISTIANA TRUST, Individually And As Trustee; UMB BANK, N.A., A Federally Chartered Bank, Individually And As Trustee; BOU BANCORP, INC. Doing Business As BANK OF UTAH; BANK OF UTAH, Individually And As Trustee; FIRST WESTERN TRUST BANK, A Colorado Corporation, Individually And As Trustee; RLS, Grantor, LLC, A California Limited Liability Company, ANDREW MURPHY, An Individual, And DOES 1-20,

_Defendants._

6.  **Unfair Business Practices (Bus. & Prof Code § 17203 Et Seq.);**

**Causes of Action against <u>Trustee Defendants</u>**

7.  **Negligence**
8.  **Gross Negligence**
9.  **Breach Of Fiduciary Duty**
10. **Violation Of California Corporations Code § 25504.1**
11. **Aiding And Abetting Breach Of Fiduciary Duty**

**DOUGLASS' CAUSES OF ACTION AGAINST ANDREW MURPHY**

12. **Violation Of Corporate Code §§ 25401 & 25501;**
13. **Breach Of Fiduciary Duty;**
14. **Financial Elder Abuse;**
15. **Selling Unregistered Securities And Insurance; and**
16. **Negligence**

**REQUEST FOR JURY TRIAL**

**<u>FILED UNDER SEAL PURSUANT TO ORDER OF THE COURT DATED MARCH 13, 2024</u>**

2

SECOND AMENDED CLASS ACTION COMPLAINT

Richard E. Donahoo, State Bar No. 186957
rdonahoo@donahoo.com
Sarah L. Kokonas, State Bar No. 262875
skokonas@donahoo.com
William E. Donahoo, State Bar No. 322020
**DONAHOO & ASSOCIATES, PC**
440 West First Street, Suite 101
Tustin, CA 92780
Telephone: (714) 953-1010


Attorneys for James Reed, Carolyn Reed, Charles Prince, Brij Sharma, Bernard Daos and as Interim Class Counsel

John O. Murrin. State Bar No. 75329
jmurrin@murrinlawfirm.com
**MURRIN LAW FIRM**
7040 E. Los Santos Drive
Long Beach, CA 90815
Telephone: (562)-342-3011


Attorneys for Plaintiff Gwendolyn Douglass as Trustee of RAYMOND E. DOUGLASS REVOCABLE TRUST, executor of Raymond E. Douglass' estate, and as successor in interest

SECOND AMENDED CLASS ACTION COMPLAINT

COME NOW Plaintiffs James Reed and Carolynn Reed, Charles Prince, Brij Sharma and Bernard Daos (collectively "Plaintiffs") on behalf of themselves and all others similarly situated, who complain and allege based on both personal knowledge and information and belief, the Class Action Causes of Action **Nos. 1 through 5** against Defendants RELIANT LIFE SHARES, LLC, RLS GRANTOR, LLC, SCOTT GRADY, RMS TRUST; and SEAN MICHAELS (collectively "Reliant Defendants"), and Class Action Causes of Action **Nos. 6 through 11** against WILMINGTON SAVINGS FUND SOCIETY, a federal savings bank doing business as CHRISTIANA TRUST, individually and as trustee; UMB BANK, N.A., a federally chartered bank, individually and as trustee; BANK OF UTAH, a Utah corporation, individually and as trustee; and FIRST WESTERN TRUST BANK, a Colorado corporation, individually and as trustee (collectively Trustee Defendants").

In addition, COMES now Plaintiff GWENDALYN DOUGLASS as Trustee of RAYMOND E. DOUGLASS REVOCABLE TRUST, executor of Raymond E. Douglass' estate, and as successor in interest ("Douglass") who complains and alleges on both personal knowledge and information and belief against Defendant Andrew Murphy Causes of Action **Nos. 12 through 16** below:

## JURISDICTION

1.     This case was originally filed in the Los Angeles Superior Court. It was removed to this Court based on subject matter jurisdiction pursuant to the Class Action Fairness Act. 28 U.S.C. §1332(d). 28 U.S.C. §1453. Dkt. 1, p.2.

## VENUE

2.     The facts and circumstances that give rise to this action occurred in the State of California and in this District. All investors who purchased Reliant Life Shares were required to attest in their Purchase Agreements that they were residents of California, and that they agreed that California law applied to any disputes.

## THE PARTIES

### Plaintiffs and Their Investments in Reliant's Investment Program

SECOND AMENDED CLASS ACTION COMPLAINT

3.     Plaintiffs James Reed and Carolynn Reed were residents of California at the time they invested in Reliant Life Shares "life settlement" program. They entered into a Fractional Life Settlement Purchase Agreement with Reliant Life Shares, LLC ("Reliant") on July 29, 2014 and paid $50,000.00 to acquire an interest in Series 2014-1, life insurance policy number 60163540. James Reed was over age 65 at the time of investment.  Defendant Christina Trust was the initial trustee of the Reliant trust which held policy number 60163540. When Christina Trust resigned, Reliant sent the Reeds notices that at different times both Defendant UMB Bank ("UMB") and Defendant First Western Trust Bank ("FWT") were successor trustees of that trust. Subsequently FWT acted as trustee of the Series 2014-1 under the Reliant-FWT trust.  Having invested in 2014, Plaintiffs James Reed and Carolynn Reed are members of the proposed Class and members of each of the subclasses and James Reed is one of the members of the Elder Abuse Subclass.  A true and correct copy of the Reeds Purchase Agreement is attached hereto as **Exhibit GG**.

4.     Plaintiff Charles Prince is and was a resident of the State of California at the time he invested $50,000.00 in Reliant Life Shares Series MH8921 for policy number 178921 and $50,000 in Series SJ2361 for policy number US00012361 on April 20, 2022. Plaintiff Prince was over age 65 at the time he invested in Reliant's program. Defendant UMB was the trustee, and is named in Plaintiff Prince's Purchase Agreement as the trustee, of the Reliant-UMB trust which held the policies in which he invested. Defendant UMB as trustee of the UMB trust signed Plaintiff Prince's Beneficial Interest Certificate. Plaintiff Prince is a member of the Class and the UMB and BOU subclasses and a member of the Elder Abuse Subclass. A true and correct copy of the Reeds Purchase Agreement is attached hereto as **Exhibit HH**.

5.     Plaintiff Brij Sharma is and was a resident of the State of California at the time he invested $50,000.00 in Reliant Life Shares in policy number MH8921 on October 6, 2022. Plaintiff Sharma was over the age of 65 when he invested in Reliant's program and he is a member of the Elder Abuse Subclass. According to Plaintiff Sharma's

Purchase Agreement, his policy was held in a trust administered by Defendant Bank of Utah ("BOU") as Successor Trustee. Sharma is a member of the Class and the BOU Subclass and a member of the Elder Abuse Subclass. A true and correct copy of the Reeds Purchase Agreement is attached hereto as **Exhibit II**.

6.     Plaintiff Bernard Daos is and was a resident of the State of California. On or about February 13, 2018 invested $20,000 for a fractional ownership interest in Series HA7233, a sub-trust of the Reliant-UMB Trust, its asset being a life insurance policy on the life of Anita Hacker, issued by ReliaStar Life Insurance as policy no. 4007233 ("Hacker policy"). Daos is member of the Class and the UMB Subclass and BOU Subclass. A true and correct copy of the Reeds Purchase Agreement is attached hereto as **Exhibit JJ**.

7.     On or about February 26, 2018 Daos received a Beneficial Interest Certificate from UMB Bank signed by Vice President Douglas Hare of UMB evidencing his ownership interest in the Hacker policy. The face value of the Hacker policy was $10 million. As will be further alleged, the Hacker policy is one of 13 life insurance policies that were sold on April 20, 2023 to Superior Life Finance, LLC by BOU. Plaintiff Daos was never provided notice by BOU of the dissipation of Series HA7233 assets as required by Section 5.4 (a)(vi) of the Reliant-BOU trust.

8.     On or about February 13, 2018, Plaintiff Daos invested $20,000 for a fractional ownership interest in Series WV4951, a sub-trust of the Reliant-UMB Trust, its asset being a life insurance policy on the life of Vivian Waldman, issued by Nassau Life Insurance Company as policy no. 97404951 ("Waldman policy"). On or about February 26, 2018 Daos received a Beneficial Interest Certificate signed by UMB Bank Vice President Douglas Hare evidencing his ownership interest in the Waldman policy. The face value of the Waldman policy was $4.5 million. The Waldman policy is one of the 13 policies sold to Superior Life Finance, LLC by BOU as trustee of the trust on or about April 20, 2023. Plaintiff Daos was never provided notice by BOU of the dissipation of Series WV4951 assets as required by Section 5.4 (a)(vi) of the Reliant-BOU trust.

9. On or about February 13, 2018 Plaintiff Daos invested $20,000 for a fractional ownership interest in Series MR8412, a sub-trust of the Reliant-UMB Trust, its asset being a life insurance policy on the life of Robert MacGregor, issued by Beneficial Life Insurance Company as policy no. BL2198412 ("MacGregor policy"). On or about February 26, 2018 Daos received a Beneficial Interest Certificate signed by UMB Bank Vice President Douglas Hare evidencing his ownership interest in the MacGregor policy. The face value of the MacGregor policy was $10 million. The MacGregor policy is one of at least 8 life policies that on or about June 2023 lapsed for non-payment of premiums, extinguishing the trust asset. Plaintiff Daos was never provided notice as required by Section 5.4(a)(vi) of the UMB trust agreement by UMB as trustee or BOU as successor trustee of the lapse of the policy or dissipation of Series MR8412 assets.

10. On or about February 13, 2018 Plaintiff Daos invested $20,000 for a fractional ownership interest in Series JY3252, a sub-trust of the Reliant-UMB Trust, its asset being a life insurance policy on the life of Jang Yock, issued by Beneficial Life Insurance Company as policy no. JY3252 ("Yock policy"). On or about February 26, 2018 Daos received a Beneficial Interest Certificate signed by UMB Bank Vice President Douglas Hare evidencing his ownership interest in the Yock policy. The face value of the Yock policy was $10 million. The Yock policy is one of several life policies that on or about June 2023 lapsed for non-payment of policy premiums. Plaintiff Daos was never provided any notice by UMB as trustee, or BOU as successor trustee of the lapse of the policy or dissipation of Series JY3252 assets as required by Section 5.4(a)(vi) of the BOU trust agreement.

## **Defendants**

11. Defendant Reliant Life Shares, LLC ("Reliant") is a California limited liability company which since on or about 2013 solicited investors to invest in life settlements. The headquarters of Reliant at all times referenced in this Complaint was in the City of Los Angeles, County of Los Angeles. Until March 16, 2023, Reliant was the Grantor on versions of the Reliant Life Shares Series Statutory Trust ("Reliant Trust"),

the trusts in which trust assets including the insurance policies and investors' funds were deposited in operating accounts and premium reserve accounts ("PRA"), were held and of which each investor was a beneficiary.

12.     Defendant RLS, Grantor, LLC is purported to be a California limited liability company as reflected in the most recent Reliant trust agreement entitled Second Amended and Restated Agreement and Declaration of Trust dated effective as of March 16, 2023. (**Exhibit CC**)  However, there is no record with the California Secretary of State of RLS Grantor, LLC as being registered as a limited liability company in the State of California. Plaintiffs are informed and believe that RLS Grantor, LLC is a sham entity formed by Defendant Scott Grady to act as a shell company and alter-ego of Reliant for the purpose of engaging in the Superior Life Finance transaction in March and April 2023, directing BOU to sell policies to Superior Life Finance, and was also created specifically to conceal the proceeds of that sale from investors and judgment creditors, including but not limited to Daniel B. Cooper, a former owner of Reliant who obtained a large judgment in 2019 and amended in 2020, against Defendants Reliant, Grady and Michaels as further described herein.

13.     During relevant times herein alleged, between on or about 2013 thru June 15, 2015, Wilmington Savings Fund Society, FSB dba Christiana Trust ("Christiana Trust") is and was a federal savings bank that acted as the trustee for the Reliant Trust, the transactions between Reliant and investors, and accepted investors funds to be used to purchase a fractionalized interest in life insurance policies. On Reliant's website and in its marketing materials Reliant held Christiana Trust out as an institutional independent bank trustee which duties included, but were not limited to, accepting investment funds, manage premium reserve accounts, make payments to carriers, and to distribute policy benefits to each of the investors upon policy maturity.  A copy of Reliant's website touting Defendant Christiana Trust as escrow agent and trustee is attached hereto as **Exhibit A**.

14.     Defendant UMB Bank, n.a., ("UMB") is a national banking association

SECOND AMENDED CLASS ACTION COMPLAINT

headquartered in the State of Missouri. On June 15, 2015 after Christina Trust resigned, UMB executed an Agreement and Declaration of Trust with Reliant as Grantor which appointed UMB as the trustee of the Reliant Trust. ("Reliant-UMB Trust"). A true and correct copy of that trust agreement is attached hereto as **Exhibit B.** UMB acted as the trustee of the Reliant-UMB Trust from on or about June 15, 2025 until UMB's resignation became effective June 29, 2022.

15.     Defendant First Western Trust Bank ("FWT") is headquartered in Colorado. On June 16, 2015 FWT executed an agreement entitled "Reliant Life Shares Series Statutory Trust 2 Agreement and Declaration of Trust" with Reliant as Grantor which agreement appointed FWT as the trustee of the Reliant 2 trust. ("Reliant-FWT Trust") A copy of the Reliant-FWT Trust agreement is attached hereto as **Exhibit C.** FWT acted as the trustee of the Reliant-FWT Trust from on or about June 16, 2025 until FWT's resignation became effective December 21, 2022.

16.     Defendant Bank of Utah ("BOU") is a national bank headquartered in Utah. On or about December 1, 2014 BOU entered into a trust agreement as trustee with Reliant as Grantor for a Series known as GN4954 ("Reliant GN4954 Trust"). A true and correct copy of the Reliant GN4954 Trust agreement is attached hereto as **Exhibit D.** BOU acted as trustee of the Reliant GN4954 Trust from December 1, 2014 thru all relevant times alleged herein.

17.     On June 29, 2022, upon the resignation of UMB as trustee of the Reliant-UMB Trust, BOU entered into a tri-party agreement with Reliant and UMB to act as the "successor" trustee to the Reliant-UMB trust pursuant to an Instrument Of Termination, Appointment And Acceptance dated 06/29/2022. A copy of that trust agreement is attached hereto as **Exhibit E**. BOU has acted as successor trustee on the Reliant-UMB Trust since June 29, 2022.

18.     On December 21, 2022, upon the resignation of FWT as trustee of the Reliant-FTW trust, Reliant appointed BOU as the successor trustee. A copy of the Instrument Of Termination, Appointment And Acceptance dated as of 12/21/2022 is

attached hereto as **Exhibit F.** BOU has acted as successor trustee on the Reliant-FWT Trust since June 29, 2022.

19.     Defendant Scott Grady ("Grady") is a resident of the State of California and President of Reliant.

20.     According the State Bar of California website, Grady had several complaints filed against him resulting in Orders that he was ineligible to practice law in 2001, 2003, 2004, 2006, 2008, and he was permanently disbarred on July 10, 2009. Defendant Sean Michaels was also a founder of Reliant with Grady and Daniel B. Cooper.

21.     Defendant Sean Michaels was an owner of Reliant who subsequently sold his interest in Reliant to Grady in February of 2018 for $1.5 Million.

22.     Plaintiffs are unaware of the true names and capacities of DOE Defendants sued herein as DOES 1-20, and therefore sue those Defendants by such fictitious names. Plaintiffs will seek leave to amend this Second Amended Complaint ("SAC") to allege their true and accurate names and capacities when ascertained.

<strong>CLASS ACTION ALLEGATIONS</strong>

23.     Plaintiffs allege the existence of an ascertainable class, and specific subclasses, of all those similarly situated defined as:

> All persons, trusts, or entities which invested in a life settlement investment by or thru the Reliant Defendants between 2011 and 2023. Excluded from the Class are any entities or persons associated or identified with Reliant Defendants or their officers and directors or within the network of their related companies. ("the Class").

24.     **Christiana Subclass**. A subclass of the Class is defined as all persons who were investors in a life settlement investment by or thru Reliant during the time when Defendant Christina Trust acted as a trustee of the Reliant Life Shares Series Statutory Trust. When Reliant sent capital call letters to the Reeds to fund additional money to pay premiums they were directed to send their checks to Defendant FWT as the trustee of

10

Series 2014-1. Plaintiffs James Reed and Carolynn Reed will serve as the class representatives for the Christiana Subclass.

25.    **UMB Bank Subclass**. A subclass of the Class is defined as all persons who were investors in a life settlement investment by or thru Reliant during the time when Defendant UMB acted as a trustee of the Reliant Life Shares Series Statutory Trust dated as of June 15 2015. Plaintiff Charles Prince and Plaintiff Bernard Daos invested in Reliant Life Shares when Defendant UMB Bank served as trustee of the Reliant Trust and both will serve as the class representatives for investors in the UMB Bank subclass..

26.    **Bank of Utah Subclass**. A subclass of the Class is defined as all persons who were investors in a life settlement investment by or thru Reliant during the time when Defendant BOU acted as a trustee of the Reliant trusts. Plaintiffs James Reed, Carolyn Reed, Charles Prince, Brij Sharma and Bernard Daos were investors during the time that BOU served as a trustee of the GN4954 trust, or served as successor trustee of the Reliant-UMB Trust, or served as successor trustee of the Reliant-FWT Trust or when BOU was the trustee of the Seconded Amended and Restated Agreement and Declaration of Trust dated as of March 16, 2023.

27.    **First Western Trust Bank Subclass**. A subclass of the Class is defined as all persons who were investors in a life settlement investment by or thru Reliant when Defendant FWTB acted as a trustee of the Reliant Life Shares Series Statutory Trust. Plaintiffs James Reed and Carolyn Reed were investors in Series 2014-1 when FWTB was a trustee on or about June 16, 2025 and FWTB acted as a trustee of the Reliant-FWTB trust.

28.    **Elder Abuse Subclass**. A subclass of the Class, and each Subclass, is defined as all persons who were 65 years or older at the time they invested. ("the Elder Abuse Subclass") Plaintiff James Reed, Charles Prince, and Brij Sharma were all over the age of sixty five (65) at the time of their investment in Reliant Life Shares, and will serve as the class representatives of the Elder Abuse Subclass.

29.    Plaintiffs are informed and believe based on the Reliant Receiver's pleadings

before the state court in the receivership proceeding that there are 1,700-2,000 members of the Class. The members of the Class are so numerous that joinder of all members is impracticable. The exact number of Class members and their identify of all such members is unknown to Plaintiffs at this time but can be ascertained through appropriate discovery.

30.   Plaintiffs' claims are typical of the claims of the members of the Class and the Subclasses as all members of the Class and Subclasses are similarly affected by Reliant Defendants' conduct as alleged herein, which Defendants Christiana, UMB, BOU, and FWT aided and abetted.

31.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and Subclasses and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

32.   Common questions of law and fact exist as to all members of the Class and subclasses and predominate over any questions solely affecting individual members of the Class and subclasses. Among the questions of law and fact common to the Class are:

(i)   Whether written statements in Defendant Reliant's marketing materials contained misleading statements, misrepresentations of fact or the omission of a material fact, inducing investors to invest in the Reliant investment program;

(ii)   Whether Christiana, UMB, BOU or FWT aided and abetted Reliant Defendants' inducement of investors by their knowledge of the Reliant Defendants' conduct and by substantial assistance or encouragement by permitting Reliant to market its program based on the credibility of the financial institutions acting as trustee;

(iii)   Whether Reliant Defendants breached duties to the Class and each subclass by (1) commingling trust funds and using investor trust funds for unauthorized purposes; (2) directing trustees in Direction Letters

to transfer, and therefore dissipate, trust funds by wiring funds to Reliant's bank account, or to other third parties, including to alter-egos of Scott Grady, to judgment creditors of Reliant, to attorneys of Reliant or judgment creditors, or to others, thereby depleting trust funds, including reserves held in trust for payments of premiums, without the investors' knowledge, in violation of the trust agreements; (3) requesting trustees to transfer investor trust funds from one sub-trust Series to other sub-trust Series in violation of the trust agreement without disclosure to the investors as required by the trust agreement;

(iv)   Whether Christiana, UMB, BOU or FWT aided and abetted Reliant Defendants' breach of duties by their knowledge of the Reliant Defendants' conduct and by substantial assistance or encouragement;

(v)   Whether Reliant Defendants looted the trust accounts on deposit with the Trustee Defendants by making demands on the trustees to wire money to Reliant for alleged "reimbursement" or for alleged "Policy Servicing Fees" or "Policy Costs" or alleged "Premium Finance Reimbursement," which depleted trust funds such that Trustee Defendants could not make premium payments on policies held by each trustee in trust for the benefit of the beneficiaries of each trust.

(vi)   Whether Christiana, UMB, BOU or FWT aided and abetted Reliant Defendants' breach of duties in the preceding paragraph by their knowledge of the Reliant Defendants' conduct and by substantial assistance or encouragement;

(vii)   Whether Christiana, UMB, BOU or FWT Christiana, UMB, BOU, and FWT owed each member of the Class and Subclass who were beneficiaries of the trusts administered by Christiana, UMB, BOU, and FWT a fiduciary duty under California law;

(viii)   Whether Defendants Christiana, UMB, BOU, or FWT breached their

fiduciary duties to members of the Class and the Subclasses based on California law by knowingly dissipating trust assets without written disclosure to each beneficiary as required by the trust agreements;

(ix)   Whether Reliant Defendants, or Defendants UMB, BOU, and FWT engaged in business practices the violate California's unfair competition law. (Bus. & Prof. Code §17203 et seq.)

33.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be little difficulty in the management of this action as a class action.

## GENERAL ALLEGATIONS

34.   From on or about 2013 Defendant Reliant sold investments to investors who resided in California structured as "life settlements" up until August of 2023 when a receiver was appointed to take over management of the company. California Insurance Code Sections 10113.1 through 10113.3 state that all life settlement brokers and providers are required to obtain a license from the California Insurance Commissioner to transact life settlement business in California and are subject to both licensing and consumer disclosure requirements. Code Sections 10113.1 through 10113.3 apply to all life settlement transactions beginning on July 2, 2010.

35.   Based on a review of licensed Life Settlement Brokers and Providers on the Department of Insurance's website, Plaintiffs are informed and believe that Defendant Reliant has never been licensed to transact life settlement transactions in California and operated unlicensed in violation of California law.

**"HOW WE EARN INVESTOR CONFIDENCE THROUGH OUR STRUCTURE"**

36.   Reliant marketed its investment program by touting its "trust structure" identifying defendants Christiana, UMB and BOU as experienced trustees of life

SECOND AMENDED CLASS ACTION COMPLAINT

settlement trusts on its website and by including pages of executive profiles and implicit endorsements by Defendants UMB and BOU in its Brochures, including large color photos and profiles of the banks and their CEO's overseeing billions in assets. A copy of Reliant's Brochure is attached **Exhibit G**. A copy of Reliant's reference to UMB in its marketing brochure is at **Exhibit G**, pages 30-40. A copy of Reliant's website touting Defendants UMB and BOU as trustees are attached hereto as **Exhibit H** and **I,** respectively.

37.   On its website Reliant made uniform misrepresentations regarding how its trust structure using UMB and BOU as escrow account holders and trustees "safeguarded" investors' funds by appointing UMB and BOU as trustees. "In order to ensure safekeeping of the assets placed in trust, Reliant Life Shares as authorized UMB to act as custodian and trustee, with sole signatory authority on this account." (**Exhibit H**)  An identical description touting BOU as a trustee was featured on Reliant's BOU website.

38.   At least one of the trustees, UMB, actively monitored Reliant's website.  In June of 2016, Defendant UMB's Compliance Department reviewed Reliant's website, which touted UMB as acting as trustee of the UMB trust.  UMB requested Reliant to make changes to its website, which changes Reliant made as is confirmed in **Exhibit J** attached hereto. Plaintiffs are informed and believe that UMB was aware of the references to UMB on Reliant's website and allowed Reliant, at all times,  to continue represent that UMB, as trustee of the UMB trust, would "safeguard" their assets as the sole signatory on UMB's trust accounts.

39.   The statement that Reliant's trustees had "sole authority" as trustee was a deceit as described in Civil Code section 1710 in that it was a suggestion of a fact of that which is not true by one who does not believe it to be true. It was also a suppression of a fact by one who gives information of other facts which are likely to mislead for want of communication of that fact. The true facts (undisclosed to investors) were that in Section 4.1 (e) of each Reliant trust agreement provided that the trustees <u>could not</u> make any

payments of any nature, including payments of premiums on policies held by UMB, BOU and FWT as trustees, <u>except as directed by Reliant as the Grantor</u>.

40.     Further, the statement was a deceit in that, in truth, UMB and BOU did not act to "safeguard" investor funds from the wrongdoing of Reliant and Grady, nor questioned any of the Direction Letters emailed by Reliant and Grady requesting trust funds be wired to Reliant or other third parties. As will be explained in further detail below, and in the exhibits to be referenced below, UMB and BOU systemically allowed Reliant and Grady to improperly dissipate the trust assets held in their institutions. Beginning at least as early as January 2, 2019 Reliant sent Direction Letters to UMB, including to UMB Relationship Manager Scott Mathews, and to BOU, including to BOU manager Tammy Glover, directing the trustees   to wire funds from trust account. Hundreds of transactions were directed to UMB and numerous others to BOU and FWT. The Direction Letters instructed UMB to wire trust funds to Reliant's bank account, or to third parties, or to other trusts, in contradiction of the trust agreemenst. Under information and belief, after review of thousands of pages documents, including hundreds of Direction Letters, UMB nor BOU questioned any of the Direction Letters and routinely wired funds wherever Reliant directed. As a result, millions of dollars of trust funds were depleted from trust accounts. Similar, though fewer, "red-flag" transactions occurred FWT giving FWT notice that Reliant was improperly commingling investor funds.

41.     After BOU became successor trustee in 2022 of all Reliant trusts, BOU knowingly participated in a sham amendment of the trust and a sale of 13 of the policies- all trust assets- resulting in huge losses to the investors. Further specific allegations as to each trustee are set forth below.

42.     Neither Reliant nor trustees UMB, BOU or FWT provided a copy of their respective trust agreements to investors. Instead, in Section 4.6(g) of each trust identical trust agreement, agreements appointing UMB, BOU and FWT as trustee, it stated that if a beneficiary wanted to "examine" a copy of the trust agreement of which they were a beneficiary, the Beneficiary had to go to the trustee's office. UMB's office is in Kansas

City, Missouri, BOU's office is in Ogden, Utah, and FTW's office is in Los Angeles.

43.     Defendants UMB, BOU and FWT each issued an identical Beneficial Interest Certificates ("Certificate") signed by the trustee and provided to each beneficiary who purchased a fractionalize interest in a policy in the UMB trust, the BOU trust and the FWT; a copy of that standard uniform Certificate from Plaintiff Sharma is attached hereto as **Exhibit L**.

44.     Reliant defendants misled potential investors by failing to disclose that they were unlicensed to engage in sales of life policies in California.

45.     Reliant, Grady and Michaels misled potential investors about material facts in the marketing brochure Reliant provided to salespersons to provide to potential investors, including, *inter alia*, the investors' likely annual return when the insured who sold his or her policy died. The earliest public knowledge of Reliant's misrepresentations to investors was on December 14, 2022 when the California Department of Financial Protection and Innovation ("DFPI") issued a Desist and Refrain Order to Reliant ("Order"). That Order stated:

> Based on the forgoing findings, the Commissioner is of the opinion that Reliant offered or sold securities in California by means of oral and written communications which included untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, in violation of Corporations Code section 25401. A true and correct copy of the Desist and Refrain Order is attached hereto as **Exhibit K**.

### THE COOPER LITIGATION AND COLLAPSE OF RELIANT

46.     In December of 2015 Reliant, Grady and Michaels filed a complaint with the Los Angeles Superior Court against a third owner of Reliant, Daniel B, Cooper. (*Reliant et al v. Cooper*, Case Number BC604858 (the "Cooper Litigation ") Cooper filed a cross

complaint against Reliant, Grady and Michaels. Cooper prevailed and in 2019 obtained a judgment against Reliant, Grady and Michaels. After amendments the 2020 judgment was in excess of $10 million.

47.    In April 2023 the judgment was affirmed on appeal. It was found that Grady and Michaels "used the corporate coffers of Reliant as their own personal piggy banks." (*Reliant v. Cooper* (2023) 90 Cal App 5th 14, 19) "The jury heard evidence of millions of dollars that the other members funneled from the LLC to themselves and the entities they owned, of one member's extravagant lifestyle purchasing of luxury cars, expensive jewelry, renting a mansion for $20,000 per month and the like." (Id at 15) The person who rented the mansion for $20,000 per month was Scott Grady.

48.    As explained by the Court of Appeal,  "[i]t turned out that a considerable amount of evidence was admitted about specific dollar amounts—in many millions of dollars—that Michaels and Grady looted from Reliant and took as their own personal assets. . . During the liability phase of the trial, the jury was provided the court's findings including that Michaels and Grady and their respective entities received at least $11.7 million in payments and distributions based on their position as owners of Reliant as of December 31, 2018." (Id at 47.) "The jury saw evidence that Reliant's annual net income for 2017 and 2018 was more than $3 million and $3.2 million, respectively, with more than $13 million in revenue each year." (Id at 47.)

49.    Judge Cotton in the Cooper Litigation made Conclusions of Law that (i) because of funds withdrawn by Grady and Michaels, Reliant suffered a "lack of capitalization" (Conclusions 12, 13); (ii) in 2018 Grady had diverted so much money from Reliant that the company had to withdraw funds from "savings accounts" to pay its monthly expenses (Conclusion 53); and, (iii) Judge Cotton awarded Cooper attorneys' fees in the amount of $1,021,620.42 (Conclusion 7).   A copy of Judge Cottons Conclusions is attached as **Exhibit KK**.

50.    Documents only produced by UMB in this litigation in January 2024 now confirm that the money that Judge Cotton referenced in his Findings of Fact and

Conclusions of Law as being money taken by Michaels and Grady from Reliant, and what the Court of Appeal described as "looting" by sending money to Michaels' and Grady's alter ego entities (Finding 56, Conclusion 12), paying attorneys' fees to both Reliant's and Cooper's attorneys' fees in the Cooper Litigation (Finding 61), and withdrawing money from "savings accounts" to fund Reliant's ongoing operating costs (Finding 53), was actually investors' funds held in UMB's trust accounts that UMB distributed at Grady's direction to benefit Reliant, Grady and Michaels.  As further set forth in paragraphs below, Plaintiffs, and each of them, were not aware of the misappropriation of trust funds until August 15, 2023 when the Receiver's Ex Parte Application was discovered filed in the Cooper Litigation.  A copy of the Receiver's August 14, 2023 Ex Parte Application is attached as **Exhibit M**.

51.     Plaintiff investors were unaware of the Cooper Litigation or the judgments entered thereon. Neither Reliant Defendants nor UMB, BOU or FWT informed investors of the Cooper Litigation or the judgment and amended judgment entered.

52.     Following entry of judgment in the Cooper Litigation, judgment creditor Cooper engaged in aggressive post-judgment collection proceedings that continued through 2023. On or about June, 2023 a receiver, Christopher Conway, was appointed as limited receiver of Reliant. On August 2, 2023 the receivership was expanded and enlarged to a full receivership. In the Receiver's first filing of August 14, 2023, an "emergency" ex parte (**Exhibit M**), it was publicly revealed for the first time that, not only was Reliant in financial distress, but the trust accounts had been depleted and the entire $177 million insurance portfolio was in "dire" risk of collapse for non-payment of premiums and that 8 of the 37 policies had lapsed without ability to reinstate. As a result of the depletion of the trust funds, and the lapse of the policies, more than $50 million in life insurance policies has been lost.  According to the Receiver's filing of December 22, 2023 to the state court, Reliant Defendants' misappropriation, including commingling of trust funds, and damage to the investors, is so massive that the only equitable way to proceed is "pool" all remaining trust assets (including the remaining life policies) into a

single fund.  A copy of the Receiver's December 22, 2023 report is attached hereto as **Exhibit N**. (See **Exhibit N**, 3:5-11)

### COMMON PROVISIONS OF THE TRUST AGREEMENTS

53.    The separate original trust agreements in which Reliant appointed UMB, BOU and FWT as trustees of each of the respective trusts were substantially the same, except for the name of the trustee. Each of the investors are Beneficiaries of the Reliant trusts. The trust agreements include a provision that allow the trustee to decline to engage in wrongdoing:  Section 4.9 of each Reliant trust agreement states:

> Trustee's Right Not to Act. Notwithstanding anything to the contrary contained herein, the Trustee shall have the right to decline to act in any particular manner otherwise provided for herein if the Trustee, being advised by counsel, determines in good faith that such action may not lawfully be taken or may subject it to personal liability or would be unduly prejudicial to the rights of the Grantor or any Beneficiary; and provided further, that nothing in this Agreement shall impair the right of the Trustee to take any action deemed in good faith proper by it hereunder.

54.    The trust agreements also contain a common provision in Section 5.4(a)(vi) of each Reliant trust agreement that requires the trustee to give written notice when trust assets within a "Series"[1] are dissipated:

> The duties of the Trustee shall include, among other things, in accordance with this Agreement:
>
> . . .
>
> (vi) **providing written notice to the Beneficiary of a Series and**

---

[1] As further alleged, each of the life policies sold to investors were identified in the trust agreements as a "Series" and sub-trust accounts were segregated for each "Series" to provide that investor funds were only commingle with co-owners of the same life policy.

**any applicable servicer of any disposition of any Trust Assets of such Series;** (Emphasis added.)

55.     There were no provisions in the trust agreements which permit the trustee to wire, dispose, dissipate or otherwise transfer funds from Reliant trust accounts except as permitted under the trust agreements. Further, as set forth above, under each of the identical trust agreements, written notice was required to the Beneficiary <u>of a Series</u> of any disposition of trust assets <u>of that Series</u>.  Plaintiffs are informed and believe that the purpose of this provision was to protect the Beneficiary from instances when the Grantor or trustee seeks to transfer investor funds from a trust sub-account for a Series to another sub-account of another Series within the same trust. This required the trustees to give written notice to the Beneficiary of the Series that funds were being dissipated.

56.     Plaintiffs are informed and believe that this provision of the trusts was designed to prevent investors from being the subject of the type of comingling or Ponzi-type schemes whereby funds are transferred out improperly without the Beneficiaries' knowledge. It was more than trivial term, but was a material term, given that an investor invests in a <u>specific life policy</u>, and invests <u>years of premium reserves to be "safeguarded" in a segregated trust account,</u> solely for the payment of premiums for the specific policy in that specific sub-account or "Series."

57.     In addition, the Reliant trust agreements did not authorize one Reliant trust to wire, dispose, dissipate or otherwise transfer funds <u>from one Reliant trust to another Reliant-related trust controlled by another entity</u>. Such would also be an unpermitted disposition of "Trust Assets of such Series."

58.     The Reliant trust agreements did not authorize Reliant or the trustee to sell the trust assets without written notice to the Beneficiaries.

### RELIANT DIRECTS TRUSTEES TO SEND TRUST ASSETS TO RELIANT AND ENGAGES IN PREMIUM CALLS

59.     As will be further alleged in detail below, documents produced by UMB, BOU and FWT confirm that Reliant Defendants wrongfully directed the three trustees to

distribute funds from their trust accounts for purposes other than paying premiums on the policies held by each trust.

60.     Plaintiffs allege that, beginning at least as early as January 2, 2019 Reliant and Grady sent "Direction Letters" to UMB Bank directing UMB to wire trust funds in irregular and atypical transactions including to wire funds directly to Reliant which was used for Reliant's operating expenses, or to fund Grady's extravagant lifestyle. Other Direction Letters directed UMB to make payments to Reliant's alter ego entities, to pay legal fees, including but not limited to the opposing parties' attorneys' fees in the Cooper Litigation.

61.     As a result of hundreds of transactions set forth in Direction Letters between 2019 and 2022, trust accounts at UMB, BOU and FWTB became depleted. When there were insufficient funds in FWT's premium reserve accounts to pay premiums on policies in FTW's trust, Grady and Reliant sent a series of Direction Letters to both UMB and BOU to wire funds to FTW's premium reserve accounts to enable FTW to make premium payments on policies in FTW's trust. Ultimately as a result Reliant's demand that trust funds be sent to Reliant's bank account and because of transfers to third parties and to other trusts from UMB' and BOU's trust accounts, the Reliant-UMB trust, holding 30 of the 37 policies did not have enough funds in the premium reserve accounts to make premium payments on the insurance policies held in the trusts. As a result in between 2019 and 2023 Reliant and Grady directed at least scores, if not hundreds of transfers from one Series to another in the same trust, or from one trust to another.  The massive comingling resulted in investor funds being dissipated without each Series Beneficiaries' knowledge, in violation of the trust agreements.

62.     When UMB and BOU trust funds were wrongfully depleted, Grady would send premium or "Capital Call Letters" to beneficiaries of the UMB trust, the BOU trust, and the FWT trust demanding that the beneficiaries send more money to make premium payments on the policies in which they had a fractionalized ownership interest, or they would forfeit their original investment and their fractionalized interest would be sold by

Reliant to other investors.

63. When Grady's plan to raise funds by Capital Calls from Beneficiaries failed because investors would not send more money, Grady then caused Reliant to sell their interests in the policies they had invested in to other investors.

64. As further detailed below, by April 2023, when Grady failed to raise enough money to pay premiums, Grady and BOU entered into a transaction to sell 13 policies with face values totaling $52.9 million to Superior Financial, LLC ("Superior Financial") for only $3.2 million. To do this Grady and BOU entered into a sham agreement with an alter-ego created by Grady to act as "successor Grantor". Because of Reliant and Grady's conduct in depleting the trust accounts from the UMB trust and the sale of trust assets by BOU at least eight (8) insurance policies held in the trusts with a total face value of $53,372,836 lapsed and could not be redeemed. Further detail regarding the Superior Life Finance transaction is set forth in specific facts re BOU below.

65. As alleged below, Defendants UMB, BOU and FWT, and each of them, aided and abetted Reliant Defendants in wrongful conduct by providing substantial assistance with knowledge of the wrongful conduct depleting of the trust accounts. Rather than safeguarding the funds the trustees commingled and dissipated trust funds, including exchanging trust funds with one another, without notice to the investor Beneficiaries. BOU did the same and ultimately sold over $50 million in investors' assets (13 policies) for $3.2 million in a transaction without written notice to the investor Beneficiaries. FWT was party to multiple transactions that put it on notice that Reliant and Grady were taking from trust accounts from one trust or one Series to pay premiums of other trusts or Series, giving knowledge of wrongful depletion of trust assets.

66. Had Reliant's wrongdoing been exposed and stopped at its inception, and the trust funds truly "safeguarded" by the trustees, Plaintiff would not have suffered the full impact of the harm. Plaintiff Prince and Plaintiff Sharma invested in 2022 and would not have invested at all had Defendants' conduct been known. Because of the massive commingling, as further alleged herein, and the loss of 1/3 of the value of the entire

portfolio, all investors have been harmed.

67.     The Reliant receiver now asserts that, given the massive comingling of investor funds, the only equitable way to proceed and attempt to save the remaining value of the portfolio, is to "pool" all assets into a single fund and work to stabilize the portfolio. (Exhibit N, 3:5-11)

## ADDITIONAL SPECIFIC FACTUAL ALLEGATIONS AGAINST DEFENDANT UMB BANK

68.     UMB served as trustee of the UMB trust for approximately seven (7) years, from June 15, 2015 to June 29, 2022. According to the materials UMB provided to Reliant to include in Reliant's Brochures, UMB is a sophisticated institutional trustee familiar with life settlement trusts and the risks associated with them.

69.     The original Relationship Manager ("RM") of UMB's trustee program for Reliant was Doug Hare. Later Vice President K. Scott Mathews ("Mathews") took over as RM in 2018. As RM, Mathews had routine day-to-day contact with Reliant and others including "servicers" involved in Reliant's operations.  Mathews also had periodic communications with investors by email and telephone.  Mathews had access to all of UMB's data related to the individual investors and all communications between Reliant and the investors who had an interest in the policies held in the UMB trust, and periodically spoke himself with Reliant investors.  In addition to his own email address of ███████████████████, he received and responded to an email address set up at UMB for the Reliant communications, at ███████████████████.

70.     ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

71.     Each life policy under the Reliant-UMB trust was designated as a "Series" under the trust and UMB established two accounts for each "Series", a "Collection account" and a "Policy Maintenance Reserve Account" also known as the "Premium

Reserve" account or "PRA").   The Collection Account held, among other things, funds from a life policy once matured and the death benefit paid to the trustee. ███████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████ ████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████ ███████████████

███████████████████████████████████████████

███████████████████████████ Under information and belief, assuming regular transactions, these type of transactions are the <u>only</u> expected disbursements that would be expected from the Policy Maintenance Reserve aka Premium Reserve Account.

72.   Detailed transaction documents produced in discovery by UMB confirm that Mathews and other UMB officers had access to and reviewed hundreds of transactions via Direction Letters sent by Reliant directing UMB to disburse funds from the UMB trust's escrow, collection and premium reserve accounts.

73.   Between at least January 1, 2019 and June 29, 2022 Reliant, Grady, and/or office manager Alma Ramirez or bookkeeper Nina Estrella under Grady's direction, sent Direction Letters to UMB requesting UMB make hundreds of disbursements which were irregular and atypical of a life settlement program and therefore suspicious. They requested small and large amounts of funds from UMB's trust accounts holding investor funds to be wired to Reliant's Wells Fargo Bank account and to other third parties unrelated to the policies held in the UMB trust.

74.   Internal UMB records confirm that Series trust accounts maintained by UMB held investor funds, including Collection and Premium Reserve Accounts. Plaintiffs are further informed and believe based on reviewing internal records produced by UMB that these transactions included hundreds of irregular and atypical transactions that put UMB

25

on inquiry notice that Reliant Defendants were improperly directing trust funds to be transferred out of the trust funds for improper or suspicious purposes, not related to paying premiums on policies held in the UMB trust, and all in violation of the trust documents.

75.    Specific irregular transactions include, beginning at least as early as January 2, 2019, Direction Letters from Reliant to UMB directing trust funds be wired to Reliant's bank account, examples of which are attached hereto as **Exhibit P**. From review of UMB's documents and transactions, Plaintiffs are informed and believe that Reliant Defendants issued the Direction Letters to UMB at times multiple times per week or even per day, and that many of the letters sought irregular transactions and that, each time, UMB transferred funds as requested. Plaintiffs are informed and believe that between 2019 and June 29, 2022 large amounts of dollars of invested funds on account at UMB were transferred to Reliant's bank accounts, or directed to be paid to third parties, to alter-egos or to attorneys for attorneys' fees.

76.



SECOND AMENDED CLASS ACTION COMPLAINT



77.     The irregular transactions include payment of UMB's premium reserve trust funds to the Client Trust Account of Reliant's attorneys at the Law Offices of Christopher Stevens. Copies of Direction Letters requesting the payments from UMB and UMB transaction records evidencing the payment to Steven's trust account are attached hereto collectively as **Exhibit R**.  Stevens was Reliant's attorney in the Cooper Litigation. Plaintiffs are informed and believe that UMB Relationship Manager Scott Mathews knew that Christopher Stevens was Reliant's attorney from Mathews' emails and telephone conversations with Stevens related to Reliant transactions. Plaintiffs are informed and believe that when Scott Grady signed the Direction Letters to UMB to pay trust funds to Reliant's attorneys' client trust account, he sought to mask the purpose of the transfer by referencing "Policy Servicing Fees" or "Policy Maintenance" on the Direction Letter as shown in **Exhibit R page 3**.

78.

1  ██████████████████████████████████████████████

2  ██████████████████████████████████████████████

3  ██████████████████████████████████████████████

4  ██████████████████████████████████████████████

5  ██████████████████████████████████████████████

6  ██████████████████████████████████████████████

7  ██████████████████████████████████████████████

8  ██████████████████████████████████████████████

9  ██████████████████████████████████████████████

10 ████████████████████████████████████

     79.    Other irregular transactions with UMB include Direction Letters requesting trust funds be wired to Reliant or third parties as "Policy Costs" or "Premium Financing." Plaintiffs are informed and believe that Reliant's repeated requests for funds to be wired to Reliant or third parties from trust accounts, using the term "Policy Cost," like the term "Policy Servicing Fees" was an obvious red-flag to a sophisticated trustee like UMB that Grady and Reliant were masking an improper request for trust funds.   Examples of Direction Letters requesting funds as "Policy Costs" are attached hereto as **Exhibit T**.

     80.    ████████████████████████████████████████

   ██████████████████████████████████████████████

   ██████████████████████████████████████████████

   ████████████████████████████████████████████ ██

   ██████████████████████████████████████████████

   ██████████████████████████████████████████████

   ██████████████████████████████████████████████

_____

[2] In Judge Cotton's Conclusion of Law 12 he states: "Here, the evidence established Michaels utilized Reliant and his entities PB Consulting, LLC. . . . as an extension of himself by disregarding corporate formalities, comingling money, and transferring assets without consideration; so much so that Reliant and the Michaels Entities are alter egos of Michaels."

█████████████ .

81.     Another type of irregular transaction consisted of Reliant's attempt to bypass the trustee to engage in the transfer of beneficial trust interests, which was under the trust, a function of the trustee. In this regard Reliant would send a Direction Letter to UMB stating that certain interests in a policy in the UMB trust had been sold by a beneficiary and that the beneficiaries who were the "Sellers" and "Buyers" in the transaction wished to remain "anonymous." Therefore, the Direction Letter would explain, Reliant had handled the transaction "in-house," rather than through UMB as trustee, responsible for tracking and maintaining the subject policy and issuing the Certificate to the Beneficiary. This scenario of "anonymous" transfers of beneficial interests bypassing the trustee, put UMB, a sophisticated trustee, on actual notice of improper atypical activity in the Reliant Life Share program. Repeatedly, Reliant used this excuse to engage itself as a "de facto" trustee of the UMB trust. Such Direction Letters are attached hereto as **Exhibit V.**

82.     Plaintiffs are informed and believe based on reviewing internal UMB records that the myriad of transactions requested funds be transferred out of the Series trust accounts by Reliant depleted the premium reserves of all of the 30 policies under UMB's trust. This relatively high percentage of policies in the portfolio with depleted reserves put Mathews and UMB on <u>actual notice</u> of the atypical and irregular transactions which resulted in depletion of the reserves, and the risk that the entire portfolio of policies in the UMB trust would collapse for failure to timely pay premiums.

83.     In response to the depletion of UMB held trust funds, and needing to pay increasing premiums, Grady repeatedly directed UMB to "transfer" funds from specific sub-trust accounts held for other Series Accounts in the UMB trust to cover the premium payments in the sub-trust accounts that had insufficient funds to make premium payments. The commingling transfers were labeled by Reliant in Direction Letters sent to UMB as "transfers" and "Temporary Funding" which UMB recorded in its internal transaction records. Based on reviewing documents produced by UMB, none of the many "transfers" and "Temporary Funding" were ever repaid. The transfers for "temporary

funding" to and from other Series trust accounts in the UMB trust established for other policies were repeated "red flags" that the Reliant was putting the Beneficiaries of the UMB trust at risk that the policies which they and bore the classic indicia of a Ponzi scheme. Examples of improper transfers labeled "Temporary Funding" or "Transfers" are attached hereto as **Exhibit W**.

84.     The Direction Letters and UMB Transaction Schedules establish that UMB was "transferring" and "temporarily funding" to other "Series" or policies within the UMB master trust by transferring funds out of "sub-trusts" or "Series" without disclosure to the investors in the Series whose funds were being transferred to another Series <u>as required by Section 5.4(a)(vi) of the UMB trust agreement.</u>

85.     The UMB Direction Letters and transaction ledgers also confirm that at the direction of Grady, UMB transferred funds <u>out of the Reliant-UMB master trust</u> the FWT trust to make premium payments on policies held in the FWT trust because reserves had been depleted in FWT's premium reserve accounts, without disclosure to the beneficiaries of the UMB trust, in violation of the Reliant-UMB trust agreement. Examples of Direction Letters and transaction ledgers transferring trust funds to the FWT trust are attached hereto as **Exhibit X**.

86.     The UMB Direction Letters and transaction ledgers also confirm that at the direction of Grady, UMB transferred funds out of the Reliant-UMB master trust the BOU GN4954 Trust to make premium payments on policies held in the BOU GN4954 trust because reserves had been depleted in its premium reserve accounts, without disclosure to the beneficiaries of the UMB trust, in violation of the Reliant-UMB trust agreement. Examples of Direction Letters and transaction ledgers transferring trust funds to the BOU trust are attached hereto as **Exhibit Y**.

87.     Based on reviewing internal UMB documents produced in discovery, during his tenure Vice-President Mathews, as UMB's Relationship Manager of Reliant's program, had actual knowledge of Grady's Direction Letters and all Reliant transactions. Based on information and belief, from his review of transactions, emails with Reliant and

UMB staff, and direct communications with investors who contacted UMB, Mathews became aware of the true nature of Reliant's Life settlement program. At least on or about May of 2021, if not earlier, based on his actual knowledge of UMB irregular distributions of funds in UMB's trust accounts, and from his direct communications with investors, Mathews became concerned with UMB's potential liability as a trustee to beneficiaries of the UMB trust. Mathews believed based on his actual knowledge of transactions from UMB's trust accounts and his own communications with investors, that the Reliant Life Shares investment program was "sketchy."

88.     Based on his interaction with Reliant investors, Mathews gained knowledge of misrepresentations made to investors regarding the risks associated with Reliant's Life Share program and Mathews believed that many investors did not understand UMB's role as trustee. In some cases, Matthew concluded, investors believed Mathews worked for Reliant.

89.     Plaintiffs are informed and believe based on review of UMB records, Mathews believed Reliant had high turnover and poor customer service. Some investors told Mathews that their Reliant sales agent did not fully disclose risk factors to them, which risk factors were not fully disclosed in Reliant marketing materials.

90.     ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
███████████████████████████████

91.     ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

SECOND AMENDED CLASS ACTION COMPLAINT

92.     Plaintiffs are informed and believe that shortly after Mathews' memo to the UMB executives, on or about June 4, 2021, UMB quietly tendered its Notice of Resignation to Reliant. However, UMB continued in its role as trustee for over a year until June 29, 2022 when it signed an agreement with Reliant and BOU whereby UMB relinquished its role as trustee and was replaced as trustee by BOU. (**Exhibit E**)

93.     Notwithstanding UMB's knowledge of Reliant Defendants' irregular and atypical transactions and massive commingling, and knowledge of Reliant's misrepresentations to investors, the depleted trust accounts, and the dissipation of "Trust Assets," UMB <u>continued to facilitate</u> Reliant and Grady's depletion of trust assets. Between Mathews' memo of May 15, 2021 and the formal end of UMB's role on June 29, 2022, (over 13 months), UMB <u>continued to undertake</u> irregular and atypical transactions at the request of Reliant and Grady. The number of Direction Letters requesting wire to Reliant's Wells Fargo Account actually <u>increased</u> between May 15, 2021 and June 29, 2022. (See **Exhibits S, W, X, Y**)  The taking of trust funds from UMB continued to increase such that, at the time of the BOU takeover, on or about June 29, 2022, almost all of the trust accounts were depleted leaving only small amounts in the Premium Reserve Accounts, less than what was necessary to make expected premium

payments.  (See **Exhibit E**, 6/29/22 Instrument of Resignation, Ex. B)

94.     After UMB's resignation became effective, Mathews expressed his relief at UMB's extrication, explaining in an email to a colleague at UMB that Reliant's program was "sketchy."

95.     Plaintiffs allege UMB's actual knowledge and material assistance by aiding and abetting Reliant Defendants was a proximate cause of the damage caused to Plaintiffs in the Class, including all Class members who have been commonly damaged by the commingling and collapse of Reliant and specifically Plaintiffs Prince and Daos and other Reliant investors/beneficiaries who had ownership interests policies in the UMB Subclass.   Because of the commingling and collapse of Reliant and the UMB trust the Receiver must "pool" all the trust assets into a common receivership and any distinction of the individual "Series" has been lost and all Class members damaged.

### ADDITIONAL SPECIFIC FACTUAL ALLEGATIONS AGAINST DEFENDANT BOU

96.     Plaintiffs incorporate the factual allegations as to UMB Bank as previously set forth herein related to UMB's transfers of funds from its trust accounts to BOU without providing any notice to beneficiaries of either the UMB trust or the BOU trust. (See **Exhibit Y**)

97.     Plaintiffs are informed and believe from review of records that during the relevant time period, BOU's relationship managers included Randy Hahn, who was Vice President & Trust Manager, Tammy Glover, who was Trust Administrator and Trust Officer, and Jennifer Vandenberg, who was Vice President and Trust Officer. Plaintiffs are further informed and believe that as managers, Hahn, Glover and Vandenberg had routine day-to-day contact with Reliant and others involved in Reliant's operations. The BOU managers had access to all of BOU's data related to the individual investors and communications between Reliant and the investors.

98.     Plaintiffs are informed and believe that BOU originally was appointed as a trustee appointed by Reliant as Grantor on or about December 1, 2014 of Reliant Trust

GN4954 (**Exhibit D**), and was later made the successor trustee of the UMB trust agreement when UMB's resignation became effective June 29, 2022 (**Exhibit E**). BOU was thereafter appointed by successor in an agreement entitled "Instrument of Termination, Appointment and Acceptance" for the FWT trust effective as of December 21, 2022. (**Exhibit F**)

99.    Plaintiffs are informed and believe that BOU kept a record of each transaction involving trust funds which were deposited into the BOU trust accounts at BOU and the BOU managers including but not limited to Randy Hahn and Tammy Glover as successor trustee to UMB had access to all of UMB's prior transactions and BOU's own transactions after it was appointed as successor trustee.

100.    Plaintiffs are informed and believe that prior to becoming successor trustee of the UMB trust on June 29, 2022, BOU, as trustee of Reliant GN4954 Trust, was aware of UMB's status as Reliant's trustee for the Reliant-UMB trust.  As the GN4954 trust reserves at BOU became depleted transactions occurred involving BOU and UMB that included disbursements from UMB to BOU which were irregular and atypical of a bona fide life settlement program and therefore suspicious. (See **Exhibit Y**)

101.    More specifically, as shown in Exhibit Y, even before BOU became a "Successor Trustee" of the UMB trust on June 29, 2022, the premium reserve account for Series GN4854 at BOU became depleted such that timely premium payment could not be made to keep the policy or policies owned by the BOU GN4954 trust in force. Plaintiffs are informed and believe that the depletion of the premium reserves put BOU on notice of inadequate reserves and the risk that policy would lapse.

102.    Plaintiffs are informed and believe that in response to the depletion of policy reserves at BOU, Reliant Defendants repeatedly directed the "transfer" of funds from specific sub-trust accounts held at UMB for the benefit of beneficiaries of the UMB trust to cover the premium payments for the GN4954 policy trust at BOU that had insufficient funds in its own premium reserve accounts.  (**Exhibit Y**) Many times transfers which were coded as "temporary funding" for the GN854 premium reserves at the BOU trust

from the UMB trust accounts were repeated "red flags" that Reliant, Grady and UMB had no regard for the terms in the Reliant trust agreements such as sub-section (a)(vi) of section 5.4 of both the UMB trust agreement and the BOU trust agreements that listed a duty of the trustee as "providing written notice to the Beneficiary and any applicable servicer of any disposition of any Trust Assets", and that the UMB and BOU trusts were in serious distress and bore the classic indicia of an illegal financial scheme.

103.   These transfers from the UMB trust to the BOU trust occurred on numerous dates, including but not limited to 2/10/2022, 3/8/2022, 3/25/2022, 4/11/2022, 5/5/2022 and 6/2/2022. (**Exhibit Y**)  As a professional trustee, BOU knew or should have known and have recognized that the classic red flags of wrongful financial scheme include the transfer or commingling of trust assets which was not permitted by the terms of either the UMB trust agreement or the BOU trust agreement.

104.   Again, at the time of these transfers BOU had knowledge of the UMB trust and its status. After June 4, 2021 when UMB Bank tendered its resignation as trustee of the Reliant-UMB trust, Reliant, Grady, UMB and BOU had communications regarding BOU becoming the Successor Trustee of the Reliant-UMB trust. As part of those communication, BOU became aware of the depleted status of UMB's trust accounts. For 13 months, between June 2021 and June 29, 2022, UMB and BOU had numerous communications regarding specific trust accounts and sub-trust accounts at UMB Bank. By June 29, 2022, when BOU executed an agreement to enlarge its trustee obligations to include as Successor Trustee of the Reliant-UMB trust, BOU was aware that almost all of the premium reserve accounts at the UMB trust for payment of premiums on policies in the UMB trust were seriously depleted without sufficient funds to pay scheduled premium payments on policies held in the UMB trust.

105.   Even after 6/29/22, when BOU became successor trustee of the Reliant-UMB trust, BOU engaged in the same type of improper transactions and commingling as alleged against UMB Bank.   Attached hereto as **Exhibit AA** are Direction Letter and

emails whereby Reliant Defendants directed BOU to make improper transfers as "Temporary Funding" of Series accounts from other trust funds.

106.  ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████

107.  BOU's knowledge that almost all of the thirty (30) policies in the UMB trust were at risk of lapse because of lack of premium reserves put BOU managers, including Randy Hahn and Tammy Glover, on notice of the potential collapse of a portfolio of policies that had face values worth over $100 million. As a sophisticated trustee of a life settlement program, the failure of such a high number of policies to have sufficient reserves in trust to pay premiums put BOU on further notice that the entire Reliant Life Settlement Program was based on inadequate reserves, was mis-managed and that misappropriation of trust funds had occurred.  The improper and irregular transactions, without disclosure to the Beneficiaries of those Series as required by Section 5.4(a)(vi) in violation of the Reliant trust agreements.

108.  Plaintiffs are informed and believe that BOU managers, including Hahn and Glover, were aware of Reliant's irregular and atypical transactions including the irregular transactions described above because they facilitated those transfers to aid and abet Reliant Defendants.

109.  Plaintiffs' allegations are corroborated by a report submitted by the Reliant Receiver on December 22, 2023 in the Cooper Litigation after the filing of Plaintiffs' FAC. (**Exhibit N**)

110.  Plaintiffs are informed and believe based on reviewing discovery, that in early 2023 BOU as successor trustee and Reliant engaged in communications regarding the depletion of the premium reserves in the BOU trust to pay scheduled premiums and the need to raise funds to meet premium obligations. BOU and Reliant discussed financial transactions, obtain a loan using trust assets as collateral.  Reliant, Grady and

BOU engaged with Steve Stanton ("Stanton"), owner of Superior Life Finance LLC ("Superior") regarding Superior lending funds to BOU be used to make premium payments, which loan would be secured by BOU's Trust Assets.

111.   In early 2023 Reliant and BOU provided confidential financial information and trust documents to Stanton at Superior, including policy information, for evaluation for possible financing transaction. Stanton at Superior evaluated the policies and communicated several issues that would have to be addressed before Superior would engage in a transaction with Reliant and BOU.

112.   One issue identified in the Transaction was that Superior would not be a lender.  Superior would only be a "buyer" and would only purchase certain policies in a buy-sell purchase agreement whereby Superior would purchase the policies for an agreed upon sum, however Superior would include in the agreement the right of BOU as the seller to repurchase the policies at a later time for an agreed upon price.  A second issue was that Superior insisted on clear title to the policies, which meant that Reliant and BOU had devise a way to divest the Beneficiaries who owned fractional interests in the policies to be sold to Superior as confirmed by their Beneficial Interest Certificates ("Certificates"); see **Exhibit L** attached hereto.

113.   Plaintiffs are informed and believe that in early 2023 Reliant and BOU agreed in principle to the terms for Superior to purchase 13 of the policies held in the BOU trust without notice to any of the investors, all who had Certificates confirming their status as a Beneficiary and owner of a fully paid fractional undivided interest in the policy.

114.   Plaintiff Sharma had a Certificate signed by BOU as trustee of the BOU trust confirming he had a fractional ownership in policy MH8921, which was one of the 13 policies BOU as trustee of the BOU trust sold to Superior. Plaintiff Daos has two Certificates signed by BOU as trustee of the BOU trust certifying that Daos had a beneficial fractional ownership in the HA7233 policy and the WV4951 policy which BOU as trustee of the BOU trust sold to Superior Financial. BOU breached Section

5.4(a)(vi) of the BOU trust agreement by not providing written notice to Plaintiffs Sharma, Daos and members of the BOU Subclass that their interest in a Series was sold to Superior Financial.

115.  Plaintiffs are informed and believe that both Reliant and BOU understood the then current terms of the BOU trust precluded such a transaction without disclosure to the Beneficiaries pursuant to Section 5.4(a)(vi) of the UMB trust agreement and the BOU trust. Grady, Reliant and BOU, in breach of BOU's duty of good faith and fair dealing owed to the Beneficiaries pursuant to Section 4.5(h) of both the UMB trust and the BOU trust, devised a plan for BOU to aide and abet Reliant and Grady's plan to limit liability to Beneficiaries by Reliant as the original Grantor entering into an agreement entitled Second Amended and Restated Agreement And Declaration of Trust to amend the BOU trust agreement and to name Defendant RLS, Grantor, LLC a "Successor Grantor", have the trust assets transferred to the new amended trust was a new grantor (also controlled by Grady) and then have Successor Grantor RLS, Grantor, LLC direct BOU as trustee of the BOU trust to transfer the 13 policies to Superior in a buy-sell Transaction. To enact the plan, on or about March 2023 Reliant prepared a new trust agreement entitled Second Amended and Restated Agreement and Declaration of Trust, a copy of which is attached hereto as **Exhibit CC**.

116.  To facilitate the Superior transaction Reliant and BOU entered into the new trust agreement naming a sham entity, "RLS Grantor, LLC, a California limited liability company" as the new Grantor of the BOU trust. The Amended and Restated Trust Agreement prepared by Reliant and BOU and executed by Scott Grady on behalf of Reliant and BOU Vice-President Randy Rahn on behalf of BOU as trustee of the BOU trust on March 16, 2023. No one signed on behalf of the sham entity, RLS Grantor, LLC. Pursuant to the Superior Purchase and Sale Agreement BOU as trustee of the Amended and Restated Reliant Life Shares Serious Statutory Trust agreed to sell to Superior Life 13 life insurance policies with a combined face value of $52.9 Million that were part of

the Reliant portfolio in exchange for Superior paying $3.2 million and Superior agreeing to pay premiums for those 13 policies.

117.   Because of Grady and Reliant's financial needs, including but not limited to fund premiums on policies in the BOU trust and FWT trust, to pay ongoing legal fees in the Cooper Litigation, and for Grady's own personal expenses, Stanton and Superior were directed by Grady to pay monies that would be owed under the Superior Transaction to different entities including directly to insurance carriers, or to Reliant, or to the sham entity RLS Grantor, LLC which was controlled by Scott Grady. Even before the final Transaction agreement was signed, Superior sent funds as directed by Grady.

118.   The Superior Life purchase agreement was signed by Tammy Glover on behalf of BOU as trustee of the BOU trust on April 20, 2023. (**Exhibit DD**). In the Superior Agreement BOU as trustee of the BOU trust falsely represented to Superior Financial  that BOU as the trustee of the BOU trust was "the sole legal and beneficial owner of the Assets" which were defined as "all rights, titles and interests as owner" of the 13 policies.

119.   Prior to the Superior Transaction, Defendants BOU and Grady failed to disclose the Transaction Agreement to the Beneficiaries of the BOU trust including Plaintiffs Sharma and Daos who both had an interest in certain of those 13 policies, that the policies they invested and had Certificates from BOU  were being sold for a fraction of their value, and that the reason for the Superior Transaction was because UMB and BOU at the direction of Grady had distributed funds from their respective premium trust accounts ("PRA") for improper purposes.

120.   As part of the Superior transaction, Superior agreed to pay premiums for the 13 policies purchased from BOU. However, on or about April 2023 disputes arose over title and transfer of the policies to Superior when the Receiver in the Cooper Litigation filed an Ex Parte application to prevent the Superior Transaction from going forward. Although some premium payments were made by Superior on behalf of certain of the 13 policies sold to Superior, other premium payments on other polices purchased by

SECOND AMENDED CLASS ACTION COMPLAINT

Superior were not made by Superior, which resulted in certain policies lapsing which could not be redeemed.

121.   Plaintiffs are informed and believe that Reliant, Grady and BOU knew that some policies that were subject to the Superior Transaction were at risk and that Superior would not pay premiums because of the failure to complete transfer the policies. As a result of the unresolved disputes with Superior at least three of the life settlement policies that were the subject of the BOU Superior transaction **lapsed without right to further reinstate as follows**:

| Insured | Ins. Company | Policy No. | Policy Benefit Amount |
|---|---|---|---|
| Roth | Security Mutual | 001308476 | $3,000,000.00 |
| Anderson | Equitable Financial | 159213789 | $2,000,000.00 |
| Christofferson | Ameritas Life | U00003278A | $5,000,000.00 |
| | | | $10,000,000.00 |

122.   Shortly thereafter, on or about June or July 2023 without any notice to Plaintiffs or the Class, or Beneficiaries of the trust, BOU tendered its resignation as trustee of the BOU trust to Scott Grady.  Plaintiffs are informed and believe the Reliant Receiver has yet to accept the resignations.

123.   Plaintiffs allege BOU's actual knowledge and material assistance by aiding and abetting Grady and Reliant was a proximate cause of the damage caused to Plaintiffs in the Class, including all Class members who have been commonly damaged by the commingling and collapse of Reliant and specifically  Plaintiffs Sharma and Daos and other Reliant investors/beneficiaries who had ownership interests in the 13 policies sold to Superior,   and fractional owners of the policies that lapsed.    Because of the commingling and collapse of Reliant and the trust the Receiver must "pool" all the trust assets into a common receivership and any distinction of the individual "Series" has been lost and all Class members damaged.

**ADDITIONAL SPECIFIC FACTS RELATED TO FIRST WEST TRUST BANK**

124.   Plaintiffs are informed and believe from a review of records that FWT acted as a trustee for Reliant's life settlement program from on or about June 16, 2015 to on or about December 21, 2022. (**Exhibits C, F**)

125.   Despite Plaintiffs' document request tendered October 31, 2023, Defendant FTW withheld most of its document production until February 13, 2024, approximately 72 hours before this Second Amended Complaint was ordered to be filed. However, reviewing transaction schedules produced by Defendants UMB and BOU, and a preliminary review of FWT's documents, Plaintiffs can trace transfers from UMB's trust accounts, including its premium reserve accounts, to FWT and transfers from BOU to FWT's trust accounts to enable FWT to make premium payments on policies held in the FWT trust.

126.   Plaintiffs are informed and believe from review of records that during the relevant time period, FWT's responsible manager included L. William Schmidt, Jr. who was Senior Trust Officer and Tim Morphy ("Morphy") who during the tenure of FWT's time as trustee of the FWT trust had the titles of Director of Wealth Management for First Western's Los Angeles office and President of First West Trust. Based on reviewing internal FWT internal documents produced by FWT in this case, Plaintiffs are further informed and believe that as managers of FWT relationship with Reliant, Schmid and Morphy had routine day-to-day contact with Reliant and others involved in Reliant's operations including Michael Lutterloh at Montage Financial Group, a "servicer" for Reliant. The FWT managers had access to all of FWT data related to the individual investors and communications between Reliant and the investors in Reliant Life Shares Program, and had actual knowledge of the transfers of trust funds from the UMB trust to the FWT as the direction of Grady.

127.   Plaintiffs are informed and believe that FWT kept emails and record of each transaction involving trust funds which were deposited by UMB and BOU at Reliant Defendant's direction into trust accounts at FWT to enable FWT to make premium

payments on policies held in the FWT trust- including Series 2014-1, the Series in which Plaintiffs James Reed and Carolyn invested, that were in danger of lapsing. As shown in emails to Morphy from Reliant Defendants and UMB, FWT was on notice of transfers by UMB and BOU.   Examples of emails and DL with FWT evidencing FWT's knowledge and participation in the commingling of investor funds are attached hereto as **Exhibit EE**.

128.   FWT and UMB Bank, were aware that each was also a trustee of a separate Reliant Trust based on the fact that UMB on a regular basis was directed by Scott Grady to transfer funds from UMB's trust accounts to to FWT trust accounts to enable FWT to make premium payments to prevent policies held in the FWT trust from lapsing. Examples of transfers from BOU's trust accounts to FTW's trust accounts include documents produced by FWT with the following FTWB bate numbers: 7642; 7679; 8784; 8828; 8839; 9254; 9260; 9276; 2147; 2352, 2364–2365, 2463–2464, 2466, 2478–2479, 2489–2491, 2505–2506, 2512–2513, 2538, 2553–2556, 2584–2589.

129.



130.   Plaintiffs are informed and believe based on reviewing internal FWT documents produced in this case that BOU was likewise aware that FWT was also a trustee of a separate Reliant trust based on the fact that on multiple occasions Reliant directed BOU to wire funds from BOU's trust accounts to FTW's trust accounts. A series of emails between Lutterloh at Montage and Reliant, BOU, and FWT in both 2022 and again in 2023 referenced that FTW did not have funds to make premium payments on Transamerica policy number 60163540 on the life of Zaid Sweiss which Reliant

SECOND AMENDED CLASS ACTION COMPLAINT

identified as "2014-1 Sweiss", (the Reed's investment) which would lapse on 12-16-2022. Reliant sent Direction Letters to BOU directing BOU to wire funds from its own trust accounts to FTW' premium reserve account to make premium payments on the Zaid Sweiss policy, which was accomplished on 12-16/2022 the last day before the Zaid Sweiss policy would lapse. (See FWTB documents bate numbered FWTB_002463 through 002584) The same fire drill to prevent the 2014-1 policy from lapsing again on 01/07/2023 with transfers from BOU's trust accounts to FWT's trust accounts. (FTWB-_002147)

131. Like the other trust agreements, section 5.4(a)(vi) of the FWT trust agreement states:

> "The Trustee shall perform its duties with respect to the Trust Assets in accordance with this Agreement . . . "(vi) **providing written notice** to the Beneficiary of a Series and any applicable servicer of any disposition of any Trust Assets of such Series."

132. Plaintiffs are informed and believe that Reliant directed FWT on numerous occasions to make transfers between Series of subtrusts held in the FWT trust. One example of this type of transaction occurred on April 4, 2019 when Reliant bookkeeper Nina Estrella sent a Direction Letter via email to Morphy at FWT directing Morphy to make a transfer between two different Series within the FWT trust (FWT_001863-001864). On each Direction Letter Reliant sent to Morphy Reliant put at the bottom of the letters an agreement to indemnify FWT for complying with Reliant's Direction Letter:

> Reliant agrees to hold the trust, the trustee and all officers of
> and employees harmless for any liability that may arise now or
> in the future, as a result of complying with this request.

133. A FWT trust ledger for Reliant Life Shares Series Statutory TR 2012-1 Premium Reserve account at FWT confirms that on 03/23/2023 Superior Life Finance, which contracted to purchase 13 polices from BOU wired $20,195.00 of funds which

pursuant to the terms of the Superior Purchase Agreement with BOU were supposed to be used to pay premiums on policies held at BOU were instead wired to FWT's premium reserve account to make a premium on a policy held in the FWT trust.

134.   Plaintiffs are informed and believe based on reviewing internal records produced by UMB and BOU that transactions involving FWT and UMB included transfers and disbursements which were irregular and atypical of a bona fide life settlement program and therefore suspicious. Plaintiffs are informed and believe from reviewing internal records that Series Trust accounts maintained by UMB held investor funds and certain transactions and disbursements to UMB included irregular and atypical transactions whereby funds of Beneficiaries of the Reliant-UMB trust were transferred to the FWT corporate trust for payment of premiums for policies held in trust by FWT not UMB. Such transactions put both UMB and FWT on inquiry notice that Grady was improperly requesting trust funds to be transferred out of the designated UMB trust funds for improper or suspicious purposes.

135.   Based on preliminary reviewing the documents produced to date by FWT in discovery and pleadings in this proceeding, Plaintiffs are informed and believe that between 2019 and 2022, FWT's premium reserves were also depleted. The depletion of reserves for FWT Series Trust accounts caused more irregular transactions to occur, as Reliant and Grady sought to obtain funds from certain Series Trust accounts within the UMB and BOU trust be transferred to other Series Trust accounts in the FWT to cover premiums payments for policies held in other Series Trust accounts within the FWT trust. Plaintiffs are informed and believe that FWT managers, including Tim Morphy were aware of Reliant's transactions including the irregular transactions described above.  In FWT trust account records it confirms transfers from UMB and BOU.  As example is the transaction ledger of Series 2014-1, the Series in which the Plaintiffs James Reed and Carolyn Reed invested, which identifies a transfer from UMB into the premium reserve accounts, attached hereto as **Exhibit FF**.

136.   Like UMB and BOU, FWT failed to take any action despite its knowledge of the commingling of Reliant investor funds and violation of the trust agreements. Based on documents produced in discovery, Plaintiffs are informed and believe that FWT had actual knowledge that Reliant was taking trust funds from Reliant investors in the UMB trust and wiring those funds to FWT to pay premiums on policies in the FWT trust and thereby, FWT knew and participated in the commingling of trust funds.  On or about December, 2022 FWT quietly resigned as trustee of the Reliant-FWT trust.

137.   Plaintiffs allege FWT actual knowledge and material assistance by aiding and abetting Reliant Defendants was a proximate cause of the damage caused to Plaintiffs and the Class, including all Class members who have been commonly damaged by the commingling and collapse of Reliant and specifically Plaintiffs Reed and other Reliant investors/beneficiaries who had ownership interests policies in the FWT Subclass.   Because of the commingling and collapse of Reliant and the Reliant trusts the Receiver must "pool" all the trust assets into a common receivership and any distinction of the individual "Series" has been lost and all Class members damaged.

## RELIANT RECEIVER'S FILINGS CONFIRM THE ALLEGATIONS OF COMMINGLING AND DISPOSITION OF TRUST ASSETS

138.   In the Cooper Litigation, on August 14, 2023 the Receiver filed an emergency ex parte application entitled Receiver Christopher Conway's Ex Parte Application For Authority To Sell Certain Policies And For Miscellaneous Relief. ("Receiver's Ex Parte"). A copy of the Receiver's Ex Parte is attached hereto as **Exhibit AA**. The Receiver's Ex Parte reveals significant findings based on the Receiver's recent examination of Reliant's business and financial records. The following are excerpts from the Receiver's Ex Parte Application:

### INTRODUCTION & EMERGENCY NATURE OF MOTION

At present, Reliant Life Services, LLC ("Reliant") is in Receiveship. The current focus of this case revolves around 38

45

1   life insurance policies with an aggregate face value of death
2   benefits in excess of $177,000,000. While these policies
3   represent valuable assets of the receivership, the Receiver states
4   he currently has insufficient funds to pay any necessary business
5   operating expenses or to continue paying the premiums that are
6   due on these policies for longer than 3-4 weeks. Without the
7   ability to pay the premiums, the Receiver informs the Court in
8   the Cooper Litigation that these policies will lapse, and the
9   Receivership Assets will be lost. The Receiver states this
10  outcome will be catastrophic—not only to the
11  Defendant/Judgment-Creditor Cooper, but also to thousands of
12  innocent investors, many of whom have invested a significant
13  amount of their savings in life settlement contracts in which
14  Reliant was involved.

15  Receiver's Ex Parte, 2:4-14

16          Reliant has insufficient reserves available to pay these
17  premiums, and almost all of the policies in the Portfolio are
18  currently in grace. Reliant does not have any current income
19  stream or available funds from its business operations that can be
20  used to pay the premiums. But if these premiums are not paid,
21  then it is almost certain that all of the policies in the Portfolio
22  will lapse, and the entire value of the Portfolio will be lost.

23  Receiver's Ex Parte, 3:1-5

24          Since his initial appointment, the Receiver has been acting
25  to fulfill his duties pursuant to the Order in the Cooper Litigation
26  appointing him as a Receiver. The Receiver recognized at the
27  outset of his appointment that there was an immediate problem
28  of insufficient reserves held by the Bank of Utah, as Trustee of

SECOND AMENDED CLASS ACTION COMPLAINT

the Reliant Life Shares Series Statutory Trust Second Amended and Restated Agreement and Declaration of Trust dated March 16, 2023 ("Trust") to cover the premium payments due on the policies in the Portfolio. At the time the Receiver took over management, policies with death benefits exceeding $8 Million had lapsed without possibility of reinstatement, and the remainder of the $169 million were in grace with exhausted reserves. Additionally, policies with death benefits exceeding $ 25 Million were going to lapse without immediate action by Receiver. The Receiver alleges that he has done his best to address this problem by seeking and obtaining authority from the Court in the Cooper Litigation since his initial appointment in order to borrow from existing reserve accounts within the Portfolio (even if allocated to other policies) to be able to make premium payments for which there are no reserves or insufficient reserves. However, the Receiver states that even those efforts are now exhausted, and there simply are not enough funds to keep the Portfolio from collapsing.

Reliant appears to have conducted its operations through numerous limited liability companies, trusts, individuals, and relationships with third parties operating within the life settlement industry. Its operating structure was convoluted at best. Despite the Receiver's efforts to get a handle on Reliant's business operations (and that of the Trust and all related entities), to obtain a complete and accurate accounting of the policies in the Portfolio, and to take control of and marshal the Receivership Assets for the benefit of Defendant Cooper, as well as Reliant's other creditors and investors, the only thing clear is that Reliant

SECOND AMENDED CLASS ACTION COMPLAINT

did not keep accurate or detailed records for each respective investor, and there are vast discrepancies between the information the Receiver has obtained from Reliant, its servicer, and the Trustee. It also appears Reliant routinely co-mingled funds between and among investor accounts, as well as between Grady's own personal account, and various affiliated accounts he controls (e.g., Laforce Holdings and Old Ranch Road Business Services). All of these issues— which standing alone are significant, have only been exacerbated by Reliant's failure to establish and/or implement the high level of management required to maintain this Portfolio in good standing.

The unfortunate reality is that Reliant did not retain sufficient funds in escrow, and in the last several years, it allowed Grady and his affiliates to withdraw and abscond with funds belonging to the company or investors that should have been used to pay policy premiums or basic business expenses. Reliant currently is unable to pay the premiums for the Portfolio. It has dozens of creditors. Additionally, the company has been named in administrative cease and desist proceedings and in multiple civil lawsuits alleging fraud and misrepresentation, violations for various securities law violations, among other things. The situation is dire.

Receiver's Ex Parte 3:6-4:15

The bottom line is this: **There is no money available to pay premiums as Reliant has all but ceased business operations, and no other funding sources are currently available to Receiver that will provide the necessary funds in time to prevent irreparable harm from failure to pay**

SECOND AMENDED CLASS ACTION COMPLAINT

**premiums other than to sell some of the policies**.1 The only viable solution is for the Receiver to sell 2 or 3 of the most marketable policies from the Portfolio free and clear of any investor claims in order to obtain funds to move forward. The Receiver has substantial experience with trying to obtain financing as it relates to managing the Portfolio. If the Receiver believed that there was another readily available source of funds, he certainly would have pursued it. But there are no other options available, and the Receiver is out of time. Simply stated, if the policy premiums are not paid and the Receiver cannot sell the policies identified below, then the entire Portfolio will be lost. This means Cooper will receive nothing, there will be no funds to pay any other creditors or the Receiver, and all of the remaining investors will lose the entire value of their investments, and the Portfolio will collapse.

Receiver's Ex Parte 6:4-16 (emphasis in original)

On December 22, 2023 the Receiver filed another report with the state court in the Cooper Litigation stating that there were no funds remaining to pay premiums and eight (8) policies had lapsed, and all the other remaining polices were in danger of lapsing:

Based upon the analysis completed by Receiver, the premium reserve accounts established by Reliant for each of the individual policies (held in sub-trust accounts established for each policy in the Portfolio) were and are insufficient to cover premiums owed for the policies until each of those policies mature. The policy reserve accounts with the Bank of Utah were already exhausted at the time of Receiver's appointment. Prior to that, Reliant had already been using funds raised from investors holding interests in policies for which premiums were not yet due to pay unfunded premiums

SECOND AMENDED CLASS ACTION COMPLAINT

due immediately for other policies in the Portfolio, and to fund some of the Company's operating expenses and some of Mr. Grady's personal expenses. Although the transfer of certain funds may have been permitted by the current Trust Agreement, this meant that a substantial portion of the funds raised from investors (regardless of whether from the sale of fractionalized interests or to fund premiums for policies covering the lives of insureds who had outlived the initial reserves) were and have been commingled in various sub-trust accounts for each individual policy for a substantial period of time. The commingled funds were used to cover shortfalls as they arose, but also to fund the company's operations and Mr. Grady's lifestyle and personal expenses, such that some of the Policies would not lapse while others did and Reliant could continue trying to sell fractional interests forfeited by some investors to newly identified investors (i.e., some fractional interests had been "churned" to generate revenue for Reliant to fund operations and expenses). It appears this has been done for several years. Unfortunately, this means the majority of the funds raised through premium calls in recent years were likely commingled and thereafter used by Reliant and/or Grady in an ad hoc manner that benefited some investors, but not others. Given the extensive co-mingling of investor funds, the difficulties associated with accounting for separate sub-trusts and tracking individual policy interests, and the fact that certain policies now have been lapsed with no hope of reinstatement, the Receiver believes that the pooling together of the remaining Receivership assets in the Portfolio is the most equitable way to move forward.

**Exhibit N**, 2:13-3:11.

### PLAINTIFFS DELAYED DISCOVERY / EQUITABLE ESTOPPEL

139.   The first public knowledge of problems with Reliant's Life Shares Program was the California Department of Financial Protection and Innovation's ("DFPI") Desist and Refrain Order issued on December 14, 2022, which disclosed that the DFPI alleged that Reliant was selling securities in violation of Corporation Code Section 25401. That public notice did not mention any problems with UMB,' BOU' or FWT's trust accounts.

140.   On 12/06/2022 attorney John Murrin filed his first complaint entitled Ed Baeza et al. v. Reliant Life Shares, LLC et al. case number 2:22STCV38080 in the Los Angeles Superior Court with class action allegations in paragraph 237. Named as defendants in Mr. Murrin's original complaint were, inter alia. Reliant, Grady, Michaels, UMB Bank, Bank of Utah and First West Trust Bank. Attorney Murrin's subsequently filed a First and Second Amended Complaint in Case Number 2:22STCV38080. The effect of that original Baeza complaint was to toll applicable statutes of limitation for investors in Reliant Life Shares.

141.   On August 17, 2023, Plaintiffs James and Carolynn Reed filed their class action complaint with the Los Angeles Superior Court, case number 23STCV19790, naming Reliant UMB Bank, Bank of Utah and First West Trust Bank as defendants. That action was subsequently removed to the Federal District Court for the Central District of California.

142.   As previously alleged, Defendants UMB, FWT and BOU had direct knowledge of the problems with the Reliant Life Shares Programs for years because they processed dozens of transfers of funds between Series of trusts within their own respective trusts, but they failed to comply with their duties in Section 5.4(a)(vi) of each of their respective trust agreements by failing to send written notices to the beneficiaries whose polices were in the Series that had its funds dissipated by complying with Reliant's Direction Letters.

143.   As previously alleged, Defendants UMB, BOU and FWT also had direct knowledge of the scores of transfers of funds from their respective collection and premium reserve accounts pursuant to Direction Letters from Reliant Defendants, which

transfers depleted the Series within UMB' and BOU's own respective trusts, again without notifying beneficiaries of their respective trusts that the beneficiaries' policies in a Series within the UMB trust and the BOU trust had been compromised by reducing the funds in their premium reserve accounts as UMB and BOU were required to do by Section 5.4(a)(vi) of their respective trust agreements.

144.    Instead of notifying the beneficiaries of their respective trusts of the distributions from each Series in their respective trusts to FWT so that FWT could make premium payments on policies in the FWT trust, UMB, FWT and BOU quietly resigned as trustees of their respective trusts, and insisted that Reliant represent and warrant to UMB and BOU in the agreements confirming their resignations that Reliant would remove UMB' and BOU's names from Reliant's websites and marketing brochures.

145.    Plaintiffs are informed and believe Defendant BOU when it undertook the duties as successor trustee for both the UMB Trust and FWT trust received the files from UAB and TWT and then had actual knowledge that UMB and BOU had transferred funds from their respective trust accounts to FWT's own depleted trust accounts. FWT also had actual knowledge of those transactions because FWT had received wire confirmations identifying UMB and BOU as the party wiring the funds into FWT's trust accounts.

146.    Further, Defendants UMB, BOU, and FWT failed to disclose to investors significant facts which Defendants UMB, BOU and FWT knew or should have known related to Defendants UMB, BOU and FWT including, but not limited to, that Defendant Grady was formerly licensed as an attorney in the State of California but was disbarred in 2008 for failing to comply with State Bar probation requirements associated with his 2006 State Bar suspension after allegations of comingling of client funds.

147.    Further, Defendants UMB, BOU, and FWT failed to disclose a dispute which resulted in the Cooper Litigation among the owners of Reliant that put the entire portfolio of policies in the UMB trust, the BOU trust, and the FWT trust at risk. Defendants UMB and BOU had actual knowledge of the Cooper Litigation because both UMB and BOU

received Direction Letters from Reliant directing UMB and BOU to distribute money from their respective trust accounts to pay both Cooper's attorneys' fees and Reliant's attorneys' fees in the Cooper Litigation. Defendants UMB and BOU failed to disclose that in 2015 Reliant adopted an amended operating agreement attempting to force out co-owner Daniel Cooper and that on December 21, 2015 Reliant filed a lawsuit against Daniel Cooper who was a member and 1/3 owner of Reliant. Cooper filed a cross-complaint against Reliant, Grady and Michaels, alleging, among other things, fraud and mismanagement. Defendants further failed to disclose that for years Grady and Michaels engaged in self-dealing and improper dissipation of trust assets.

148.  Plaintiffs are informed and believe that in an effort to conceal their wrongdoing from investors, Reliant Defendants, Grady and Michaels used money received from investors from the sale of new life settlements to pay premiums on life settlement investments sold years earlier, which had not matured in that the named insured had not died but had exhausted the "premium reserves" created by Reliant to make premium payments to keep the life insurance policies it purchased and then sold fractionalized interests on those policies to investors. Plaintiffs are informed and believe that Reliant, Grady and Michaels engaged in this conduct to create the false appearance that the life settlements they structured and sold had minimal risk and would pay off within the expected period in order to continue to solicit new investors and to prevent current investors from learning that Reliant's life settlements were sold by way of the wrongdoing herein alleged and rescinding their investments. In addition, Plaintiffs are informed and believe that Reliant, Grady and Michaels also used investors funds that were earmarked as trust assets to pay Cooper to partially satisfy a judgment against them and the attorneys' fees they were ordered to pay Cooper's attorney as alleged herein.

149.  The earliest date Plaintiffs y could begin to discover the basis of the claims alleged herein was when the California Department of Financial Protection and Innovation ("Department") issued a Desist and Refrain Order December 14, 2022, which Desist and Refrain Order stated:

1
2
3
4
5
6
7

Based on the forgoing findings, the Commissioner is of the opinion that Reliant offered or sold securities in California by means of oral and written communications which included untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, in violation of Corporations Code section 25401.

8  A true and correct copy of the Desist and Refrain Order is attached hereto as

9  **Exhibit K**.

10  150.   That Desist and Refrain Order would only have put Plaintiffs on notice that

11  misrepresentations had been made to them in induce them to invest in Reliant Life Shares,

12  it would not have put them on notice that Defendants UMB, BOU and FWT had

13  dissipated their respective premium reserve accounts and could no longer make premium

14  payments on the policies in which they invested.

15  151.   Plaintiffs could only have discovered the additional facts alleged herein that

16  UMB, BOU and FWT's premium reserve accounts had been dissipated no earlier than

17  August 15, 2023 after a court appointed receiver filed an ex parte emergency application

18  with the Los Angeles Superior Court in Reliant v. Cooper, Case Number B313602 on

19  August 14, 2023 ("Cooper Litigation") divulging in a public record that Reliant had no

20  funds to further operate or to pay premiums and is in "dire" risk of imminent collapse and

21  the loss of all the amounts invested by all Class members. A true and correct copy of the

22  Receiver's August 14, 2023 Ex Parte Application ("the Receiver's Ex Parte") is attached

23  hereto as **Exhibit M**.

24  152.   Plaintiffs James Reed, Carolynn Reed, Charles Prince, Brij Sharma and

25  Bernard Daos had no knowledge of the facts as alleged herein related to the dissipation

26  of the funds held in the UMB trust, the BOU trust, and the FWT trust until after the filing

27  of this action on August 17, 2023 in the Los Angeles Superior Court.

28  153.   Plaintiffs and other members of the putative class were precluded from

discovering the alleged claims pled in this SAC prior to December 14, 2022 because Defendants Reliant, Michaels, Grady, aided and abetted by Defendants UMB, BOU and FWT, concealed from Plaintiffs and the members of the Class the mismanagement of the four Reliant Trust, which held the insurance portfolio, as well as the true risks and the true nature of the investments, concealing, among other things, information regarding likely annual returns, the risks that investors would have to make future, out-of-pocket payments to keep the policies in force to protect their principal, the amount of expected future premiums, the data utilized in choosing the life insurance policies to be sold to investors as investments, and the fact that Defendants Grady and Michaels were looting Reliant and using investors funds which were supposed to be deposited into an account for the Reliant Trust to make future premium payments.

154.   Plaintiffs discovered on or about August 15, 2023 in the Receiver's Ex Parte, that Defendants **concealed the wrongdoing for "several years"**. (Emphasis added.) (**Exhibit M**, 4:9-15) The Receiver states in his Ex Parte application: "The unfortunate reality is that Reliant did not retain sufficient funds in escrow, and in the last several years, it allowed Grady and his affiliates to withdraw and abscond with funds belonging to the company or investors that should have been used to pay policy premiums or basic business expenses. Reliant currently is unable to pay the premiums for the Portfolio. It has dozens of creditors. Additionally, the company has been named in administrative cease and desist proceedings and in multiple civil lawsuits alleging fraud and misrepresentation, violations for various securities law violations, among other things. The situation is dire."

## **CIVIL CONSPIRACY / ALTER EGO ALLEGATIONS**

155.   As set forth in California law, specifically CACI Jury Instruction 3600, "mere knowledge of a wrongful act without cooperation or an agreement to cooperate is insufficient to make [name of defendant] responsible for the harm." However, "a conspiracy may be inferred from circumstances, including the nature of the acts done, the relationships between the parties, and the interests of the alleged coconspirators."   A

plaintiff "is not required to prove that [name of defendant] personally committed a wrongful act or that [he/she] knew all the details of the agreement or the identities of all the other participants."   As further explained in the *Sources and Authority* of CACI 3600, "Conspiracy is not a cause of action, but a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration. By participation in a civil conspiracy, a coconspirator effectively adopts as his or her own the torts of other coconspirators within the ambit of the conspiracy. In this way, a coconspirator incurs tort liability co-equal with the immediate tortfeasors." CACI 3600, *Sources and Authority*, citing *Applied Equipment Corp. v. Litton Saudi Arabia Ltd*. (1994) 7 Cal.4th 503, 510–511.

156.   Plaintiffs are informed and believe and based thereon allege, as detailed in the preceding paragraphs, that Reliant Defendants, aided and abetted by Defendants Cristina Trust, UMB, BOU and FWT, engaged in a civil conspiracy to commit the conduct alleged in this Second Amended Complaint ("SAC"), including but not limited to engage in the misrepresentations, omissions, suppression of facts, commingling and misappropriation of trust funds, by individuals and entities who were fiduciaries to Plaintiffs and the Class, who were  bound to disclose those facts or who gives information of other facts that which are likely to mislead for want of communication of those facts (Civil Code Sections 1709, 1710) and breach of duties alleged herein, and aiding and abetting Defendant Reliant's violations of Corporation Code Section 25401.

157.  Plaintiffs and all those similarly situated were harmed by the acts of Defendants, and each of them, resulting in damages. Based on the existence of the conspiracy to commit the wrongdoing alleged herein, each defendant is vicariously liable for the wrongful acts of the other defendants.

## FIRST CAUSE OF ACTION

## NEGLIGENCE

**By Plaintiffs James Reed, Carolynn Reed, Charles Prince, Brij Sharma and**

**Bernard Daos for Themselves and the Class Against Reliant, RLS Grantor LLC, Scott Grady, Sean Michaels, and Does 1-20**

158.   Plaintiffs reallege and incorporate by reference the preceding paragraphs in this SAC, save and except any allegations that could be interpreted and/or construed to allege gross negligence, intentional or willful conduct. This cause of action is intended to only allege negligent acts committed by Reliant and Defendants UMB, BOU and FWT. Moreover, this cause of action is pleaded in the alternative to the gross negligence and intentional torts alleged in this SAC.

159.   Defendant Reliant held itself out on its website and in its marketing materials provided to potential investors as having special expertise in the Life Settlements industry to provide investors in evaluating and structuring life settlement transactions ("Life Settlements") for potential investment, and therefore was required to exercise the skill and knowledge normally possessed by individuals and companies offering investments in Life Settlements. Additionally, because Life Settlements are securities regulated by the California Department of Corporations pursuant to Corporations Code section 25401, Defendant Reliant had a statutory duty to provide truthful, accurate, and complete disclosures in the sale of Life Settlement investments.

160.   However, Defendant Reliant in performing their services for Plaintiffs and other investors failed to use reasonable care, and their conduct fell below the reasonable standard of care in choosing appropriate Life Settlement investments for its investors including utilizing Life Expectancy Evaluations from knowledgeable independent third parties with a background, education, training and experience in actuarial evaluations. Instead, Reliant relied upon life expectancy evaluations prepared by brokers who offered to sell life insurance policies to Reliant.

161.   Plaintiffs are informed and believe that Defendants Reliant, Grady and Michaels either (1) negligently comingled and negligently transferred investor funds that were required to be placed in the trust accounts, and/or (2) negligently authorized and/or directed Defendants to UMB, BOU and FWT to distribute to Reliant, Michaels and Grady

amounts that were supposed to be used to purchase insurance policies and adequately fund reserve accounts in the Trusts to pay premiums to keep the policies held by the Reliant Trusts from lapsing.

162.  When there were not sufficient funds in the reserve accounts to pay premiums, Defendants Grady and Michaels utilized capital calls on the investor Beneficiaries to make the premium payments.

163.  Defendant Reliant was making specific affirmative representations in its Closing Packages, on its website, and in its marketing Brochures to potential investors about the Trustee Defendants to induce investors to invest in Reliant Life Shares. Those affirmative representations were that: (1) Trustee Defendants would serve as an "independent escrow agent and trustee." (2) That "Life Shares are structured to protect the client's holdings from any external threat through a trust structure . . ." (3) that the Trustee Defendants would "Hold all client monies in a separate escrow." (4) That "The Trustee receives all investor funds into a subscription escrow account and upon direction from the investor places funds into each trust which holds the specific policy that the investor chooses to invest into." (5) That "By using an independent and professional Trustee/Escrow Agent, client monies are only disbursed as directed in the purchase agreements."

164.  As alleged in the preceding paragraphs the Reliant and its principals were unlicensed, untrustworthy, engaged in irregular transactions outside the parameters of the applicable trust.

165.  Reliant was negligent in not safeguarding investors' funds as represented in Reliant's Closing Packages, Reliant's website and Brochures by following instructions from Defendants Grady and Michaels to transfer investor funds from Reliant to themselves in excess of what had been disclosed to investors, which allowed Grady and Michaels to make unauthorized distributions to themselves which depleted investors' funds should have been held in the Reliant Trusts to make premium payments on insurance policies held by the Reliant Trusts.

166.   As a direct and proximate cause of Defendants' negligence, Plaintiffs and the Class Members were damaged in an amount to be proven at the time of trial.

## SECOND CAUSE OF ACTION

## GROSS NEGLIGENCE

**By Plaintiffs James Reed, Carolynn Reed, Charles Prince, Brij Sharma, and Bernard Daos for Themselves and the Class Against**

**Reliant, RLS Grantor LLC, Scott Grady, Sean Michaels, and Does 1-20**

167.   Plaintiffs reallege and incorporate by reference the preceding paragraphs, save and except any allegations that could be interpreted and/or construed to mean intentional or willful conduct. Moreover, this cause of action is pleaded in the alternative to the regular negligence and intentional torts alleged in this Second Amended Complaint.

168.   Reliant made  misrepresentations in Reliant's Closing Packages, on Reliant's website, and in Reliant's marketing Brochures that held the Trustee Defendants out as providing services to investors in a profession, as a professional trustee of Life Settlement trusts, and, therefore, the Trustee Defendants were required in acting as trustees of the Reliant Trust to exercise the skill and knowledge normally possessed by members of that profession. (Restatement 2nd of Torts, §299a.) Those statements made by the Reliant Defendants which were authorized by the Trustee Defendants caused investors to reasonably believe that the "trust structure" utilized by the Reliant Defendants would "ensure safekeeping of the assets placed in trust" and the Reliant Defendants authorized the Trustee Defendants "to act as custodian and trustee with sole signatory authority on the trusts' bank accounts.

169.   Plaintiffs are informed and believe that rather than safeguard investor funds Defendants Reliant Grady and Michaels were directing the Trustee Defendants to distribute to them personally million dollars of investors' funds which were supposed to be used to purchase insurance policies and adequately fund reserve accounts held in the Trusts to pay premiums to keep the policies held by the Reliant Trusts from lapsing. When there were not sufficient funds in the reserve accounts to pay premiums, Defendants

Reliant Grady and Michaels utilized capital calls on the investor Beneficiaries to make the premium payments.

170.   Defendant Reliant was making specific affirmative representations in its Closing Packages, on its website, and in its marketing Brochures to potential investors that Reliant was using the Trustee Defendants as independent professional trustees with experience working in the Life Settlements Industry and a trust structure to "ensure safekeeping of the assets placed in trust" and the Reliant Defendants authorized the Trustee Defendants "to act as custodian and trustee with sole signatory authority on the trusts' bank accounts" to induce investors to invest in Reliant Life Shares. Those affirmative representations were that: (1) Trustee Defendants would serve as an "independent escrow agent and trustee." (2) That "Life Shares are structured to protect the client's holdings from any external threat through a trust structure . . ." (3) that the Trustee Defendants would "Hold all client monies in a separate escrow." (4) That "The Trustee receives all investor funds into a subscription escrow account and upon direction from the investor places funds into each trust which holds the specific policy that the investor chooses to invest into." (5) That "By using an independent and professional Trustee/Escrow Agent, client monies are only disbursed as directed in the purchase agreements."

171.   Plaintiffs are informed and believe that Defendants Reliant, RLS Grantor, LLC, Grady and Michaels were grossly negligent, engaged in willful misconduct, acted in bad faith and breached their duties under the covenant of good faith and fair dealing in engaging in unauthorized distributions of investors' funds intended to be deposited into the Trusts' reserve accounts to pay insurance premiums to prevent policies held in the Trusts from lapsing.

172.   Defendant Reliant misrepresentations in Reliant's Closing Packages, on Reliant's website, and in Reliant's marketing Brochures that held the Trustee Defendants out as providing services to investors in a profession, where designed to induce investors to invest based on  a belief that the "trust structure" utilized by the Reliant Defendants

would "ensure safekeeping of the assets placed in trust" and the Reliant Defendants authorized the Trustee Defendants "to act as custodian and trustee with sole signatory authority on the trusts' bank accounts.

173.   Based on the foregoing, Defendants Reliant, Reliant Grantor, LLC, Grady and Michaelsacted with want of even scant care and/or extremely departed from the ordinary standard of conduct.

174.   Defendants were grossly negligent, engaged in wrongful conduct and breached the covenant of good faith and fair dealing.

<u>**THIRD CAUSE OF ACTION**</u>

<u>**VIOLATION OF CORPORATE CODE §§ 25401 & 25501**</u>

**By Plaintiffs James Reed, Carolynn Reed, Charles Prince, Brij Sharma and Bernard Daos for Themselves and the Class Against**

**Reliant Defendants, Scott Grady, Sean Michaels and Does 1-20**

175.   Plaintiffs incorporate by reference the preceding paragraphs including each wrongdoing, and lack of disclosure already alleged in the previous paragraphs of this Complaint.

176.   As admitted by Defendant Reliant in **Exhibit I,** Purchase Agreement, fractionalized life shares are securities, and as such are subject to the California Corporations Code.

177.   Defendant Reliant by reason of the of above mentioned facts as set forth herein and contained in allegations subsequently pled in this Third Cause of Action sold Plaintiffs and all members of the Class securities in violation of Corp. Code § 25401, which prohibits offers or sales of securities including investment opportunities by means of a written or oral communication that contain: "Untrue statement[s] of a material fact or omits to state a material fact necessary in order to make the statement[s] made, in light of the circumstances under which they were made, not misleading."

178.   The State of California Business, Consumer Services and Housing Agency's Department of Financial Protection and Innovation ("Department of Financial

Protection") issued a Desist and Refrain Order ("Order") to Defendant Reliant on December 14, 2022, a true and correct copy of which is attached hereto as **Exhibit D**. In that Order the Commissioner found that:

> In connection with the offer or sale of securities, Reliant and its agents made untrue statements of material fact and material omissions to potential investors, including but not limited to the following:
>
> a.    That the risk of a premium call was close to zero or just about zero, that 97% of policies pay out on time, that policy payout periods would range anywhere from a few months to a maximum of five years and that very seldom did Reliant have someone living past the 5-year mark, and that the company was almost always right on life expectancy. These statements misrepresented, or omitted material facts, about Reliant's actual performance.
>
> b.    Stating in Reliant's sales materials that "The history of actual maturities for life settlement policies shows that, like a bell curve, approximately half of all policies mature before the expected life expectancy date, and half after." This statement implied to investors that Reliant had the same performance when it did not.

179.    The Order summarized the Commissioner's findings:

> Based on the forgoing findings, the Commissioner is of the opinion that Reliant offered or sold securities in California by means or oral or written communications which included untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, in

violation of Corporations Code section 25401.

180.   Attached as **Exhibit A** to this Second Amended Complaint is a true and correct Copy of a Reliant Marketing Brochure which was provided to Plaintiffs James and Carolyn Reed, and the Class. On page 9 of that Brochure it states the same language with the Commissioner found to be misleading in the Order:

> "The history of all maturities for life settlement policies shows that, like a bell curve, approximately half of all policies mature before the estimated life expectancy date, and half after. This outcome is an indication of the quality of estimates used. It also further supports the investment strategy of a diversified portfolio of fractional interests in life settlements."

181.   The areas of untrue statements, concealment and or violations that also go to the elements of breach of fiduciary duty and wrongdoing, include inter alia:

a.   Defendant Reliant did not properly portray the statistics associated with prior Reliant's investments concerning its ability to meet its life expectancy estimates after a decade of being in business and not portraying truthfully the consequences of what happens when the life expectancy premium reserves are exhausted leaving no funds to pay premiums.

b.   Defendants Reliant, Michaels and Grady failed to provide the information to investors required by Cal Corporate Code §25102(q) about the issuer and or information about the issuer important to know including but not limited to the information required in Corporate Code §25102(q) (3) (A—G)-especially omitted were the names directors, officers, partners, members, or trustees of the issuer. In effect Defendants fail to explain who owned and operated Reliant as required by law.

c.   Defendant Reliant failed to disclose Defendant Scott Grady, who was an owner, member and manager of Reliant, had been disbarred by the California

State Bar.

d. Defendants Reliant, Michaels and Grady failed to disclose that Defendant Reliant was not licensed by the Insurance Department of the State of California, and therefore were not permitted to sell life settlements in California.

e. Defendants Reliant, Michaels and Grady made written misrepresentations to potential investors in the Purchase Agreements, on Reliant's websites, and in Reliant's marketing Brochures that the investors funds would be safeguarded by using a "trust structure" with independent trustees who had sole signatory authority of the several Reliant Trusts' bank accounts and in in Section 2.3 of each of the trusts agreements that the "purpose" as applicable to the Trust Assets associated with each Series of the Trusts were "for the sole benefit of those Persons that become Beneficiaries with respect to such Series and Trust Assets."

f. Defendants Reliant, Grady and Michaels omitted disclosing that they were routinely directing the Trustee Defendants to issue large checks to Grady and Michaels, which payment were rendering Reliant insolvent such that there were not sufficient funds in the Trusts' bank accounts to make premium payments on the insurance policies owned by the Trusts, which resulted in Reliant sending letters to investors that they had to pay additional funds for premium payments or they would lose their investments in the policies in which they had a fractionalized interest.

182. Defendants Reliant, Grady and Michaels sold fractional life settlements by making false and misleading statements as set forth above and the Trustee Defendants knew or should have known that the statements made by Reliant and its principals were false and/or that they were concealing material facts when Defendants Reliant, Grady and Michaels directed the Trustee Defendants to make irregular transactions and when premiums could not be paid. Defendants Reliant, Michaels and Grady knew or should

have known that there were important facts that needed to be known to make a proper informed decision on the investments. As a result, the investments were portrayed in a false light and Plaintiffs and Class members did not have sufficient material facts to make an informed decision about investing in Reliant Life Shares.

183.  It was also an improper to do the above and take investor's money under the circumstances set forth in this First Amended Complaint. Plaintiffs are informed and believe that Defendants Reliant, Michaels and Grady failed to describe the investment truthfully especially when describing how debilitating the premiums can become as the insured ages, and how the rising premiums affects the rate of return.

184.  Selling securities and/or an investment opportunity like this under these pretenses or while omitting material facts is a deception and involved misrepresentation of material facts in violation of California Corp Code §25401.

185.  Plaintiffs and members of the Class relied upon the above misrepresentations and failures to disclose material facts to make their investments in Reliant Life Shares. The reliance was reasonable and justified based upon the circumstances.

186.  By reason of the above, Plaintiffs and members of the Class are entitled to rescission and damages, and or the damages set forth in Civil Codes §25501 or 25501.5, or according to all remedies available by law.

187.  Defendants Reliant, Michael and Grady's conduct was in reckless disregard for the rights and safety of Plaintiffs and all Class members and constitutes oppression, fraud, and malice such that punitive and / or exemplary damages are appropriate pursuant to either Civil Code section 3294, section 3345 or both.

188.  Plaintiffs seek all damages allowed by law for the above-described wrongdoing including costs of suit, investigation, and attorneys' fees if provided by statute.

## **FOURTH CAUSE OF ACTION**
## **BREACH OF FIDUCIARY DUTY**

**by all named Plaintiffs on behalf of themselves and the members of the Class**

**against Defendants Reliant, Michaels and Grady and Does 1-20**

189.   Plaintiffs incorporate by reference the preceding paragraphs of this SAC as though set forth in full at this point.

190.   By virtue of the terms in the UMB trust agreement, the BOU trust agreement, and the FWT trust agreement defendants Reliant, Grady and Michaels gained and maintained complete control of the funds invested by Plaintiffs and all members of the Class. In each of the trust agreements for the trusts administered by Defendants UMB, FWTB and BOU it defines "Beneficiary" as the "registered owner of a beneficial interest in a Series as set forth in the Security Register." (See **Exhibit L** attached to this SAC). Each investor received a "Certificate" signed by a trustee in the form attached as Exhibit C to each trust agreement.

191.   A copy of a Certificate issued to class member Brij Sharma signed by Defendant UMB as trustee is attached to this SAC as **Exhibit L**.

192.   In each of the three separate trust agreements which Reliant created, Reliant as "Grantor" retained sole authority to direct each trustee to act, and trustees Cristina trust, UMB, BOU and FWT had no discretion to act without the written direction of the Grantor. Section 4.1 (e), entitled "Powers and Authority of Trustee is states:

> (e) To establish and maintain one or more Trust Accounts in the name of each Series of the Trust; to deposit into such Trust Accounts payments received in respect of the Trust Assets of such Series, and to make deposits into and cause disbursements to be made from such Trust Accounts in accordance with the terms and provisions of this Agreement; for the avoidance of doubt, the Trustee shall not be responsible for handling any funds relating to insurance premium payments and/or any other payments to be made in respect of the Policies held directly or indirectly by any Series, it being understood that the Grantor shall have sole and exclusive responsibility for such payments

SECOND AMENDED CLASS ACTION COMPLAINT

and all matters related thereto.

193.    The effect of Section 4.1(e) is that each trustee was to establish a "Premium Reserve Account" ("PRA") and to deposit the investors funds into that PRA to pay future premiums on the insurance policies held by the trust, but the trustee would not be responsible for the handling of the funds in the PRA as the Grantor had "sole and exclusive responsibility for providing direction to the trustee in relation to such payments."

194.    In the last paragraph in Section 4.1 of each trust agreement it states:

> Except as otherwise specifically provided in this Agreement, the Trustee shall not have any discretionary powers or authority with respect to the Trust or the administration of this Agreement, and shall in all respects act at the direction of the Grantor as provided herein. Neither the power to give directions to the Trustee or any other Person, nor the exercise of such power by any Person (including the Beneficiaries) shall cause such Person to have any duties (including fiduciary duties) or any liabilities related thereto to the Trust or to any Beneficiary thereof.

195.    The effect of these identical paragraphs in the UMB trust agreement, the BOU trust agreement, and the FWT trust agreement was to totally restrict the trustees UMB,' BOU' and FWT's discretion with respect to the Trust Assets and to require trustees UMB, BOU and FWT to perform their duties as trustees and engage in activities exclusively as directed by Reliant, Grady and Michaels.

196.    As *defacto* trustees, Reliant, Grady and Michaels owed Plaintiffs and each member of the Class a fiduciary duty under California law, including the duties of loyalty, honesty and full disclosure of all material facts regarding the Reliant Life Shares Program.

197.    Defendants Reliant, Grady and Michaels breached their fiduciary duties to Plaintiffs and all members of the Class by making misrepresentations on Reliant's

website and in Reliant's marketing brochures that the investors' funds would be "safeguarded" by defendants UMB, BOU and FWT because those trustees had sole signatory authority over each trusts' bank accounts. That was a uniform misrepresentation made to all class members.

198.   Defendants Reliant, Grady and Michaels breached their fiduciary duties to Plaintiffs and all Class members by (i) transferring funds in Series within the UMB trust, and the BOU trust without providing written notice to the beneficiaries that their funds were being dissipated.

199.   Plaintiffs and all Class members have been damaged by the breaches of fiduciary duties as alleged in this cause of action in an amount to be proved at trial.

200.   Because the conduct of Defendants Reliant. Grady and Michaels was malicious, oppressive and fraudulent Plaintiffs and all members of the Class are entitled to an award of exemplary damages and punitive damages according to proof at the time of trial.

## FIFTH CAUSE OF ACTION
## FOR FINANCIAL ELDER ABUSE
**By Plaintiffs James Reed, Charles Prince and Brij Sharma against Defendants Reliant, Grady, Michales and Does 1-20.**

201.   Plaintiffs James Reed, Charles Prince and Brij Sharman incorporate all prior paragraphs of this SAC at this point as though set forth in full.

202.   As an "elder," within the meaning of Welf. & Inst. Code § 15610.27, Plaintiff James Reed and members of the Elder Abuse Subclass were entitled to the heightened rights and special statutory protections provided by California's Elder and Dependent Adult Civil Protection Act set forth in Welf. & Inst. Code § 15600 et sec.

203.   Under Welf. & Inst. Code § 15610.30, a person is liable for financial elder abuse or for assisting financial elder abuse if they obtained the elder's property when they knew or should have known that the conduct is likely to be harmful to the elder, including: (1) hiding, taking, retaining, obtaining and/or misappropriating Plaintiff's property,

which is what has been alleged in this Complaint, or (2) by the Trustee Defendants assisting and aiding and abetting Defendants Reliant, Michaels and Grady in harming the members of the Elder Abuse Subclass.

204.   Defendants Reliant, Grady and Michaels conduct in selling Plaintiff James Reed and the other members of the Elder Abuse Subclasses Reliant Life Share investments was a predatory practice employed to take advantage of a vulnerable elderly persons for their own financial gain or if not intended to do so, it had that effect, and after knowing this, these Defendants kept doing it, implying total purposeful intent to take advantage instead of protecting these individuals.

205.   Because Plaintiff James Reed, Charles Prince, and Brij Sharma and each Elder Abuse Subclass member were required to include their date of birth in their respective Reliant Purchase Agreements, Defendants Reliant, Michaels, Grad knew which investors were over the age of 65 at the date they invested in Reliant Life Shares. Despite being in possession of the above facts, Defendants Reliant, Michaels, Grady, knowingly committed Financial Elder Abuse on Plaintiff James Reed and the members of the Elder Abuse Subclass.

206.   The conduct of Reliant, Michaels and Grady, as previously alleged, was in reckless disregard for the rights and safety of Plaintiffs and the members of the Elder Abuse Subclass and proximately caused economic and non-economic damages to Plaintiffs James Reed Charles Prince, Brig Sharma and to the members of the Elder Abuse Subclass.

207.   The damages to Plaintiffs James Reed, Charles Prince, Brij Sharma and the Elder Abuse Subclasses are to be trebled, and attorney's fees allowed by statute between the parties. Defendants Reliant,' Michaels,' and Grady's conduct was in reckless disregard for the rights and safety of the James Reed, Charles Prince, Brij Sharma and Elder Abuse Plaintiffs and constitutes oppression, fraud, and malice such that exemplary damages are appropriate and requested under either Civil Code sections 3294 or 3345 or both.

# SIXTH CAUSE OF ACTION

## FOR VIOLATION UNFAIR BUSINESS PRACTICES

### (Bus. & Prof. Code §§ 17203 et seq.,)

**By all Plaintiffs for themselves and the Class Against All Defendants Reliant, Grady and Michaels and Does 1-20**

208.   Plaintiffs incorporate by reference all the above paragraphs as though fully set forth herein, including negligence, wrongdoing, deceit, and lack of disclosure already alleged in the general allegations section of this SAC and such allegation in any previous cause of action.

209.   At all times relevant hereto, California Business and Professions Code §§17200, et seq., were in full force and effect. Section 17200 of the Business and Professions Code provides, in relevant part, that "unfair competition shall mean and include any unlawful, unfair, or fraudulent business act or practice. . ."

210.   Defendants Reliant, Grady and Michaels and Does 1-20, and each of them, are "persons" as defined under Business and Professions Code §17021. Each of the directors, officers, and/or agents of Defendants, are equally responsible for the acts of the other directors, officers, employees and/or agents as set forth in Business and Professions Code §17095.

211.   Plaintiffs and all members of the Class have suffered injury in fact and have lost money as a result of the conduct of Defendants Reliant, Grady and Michaels as previously alleged. As alleged herein above, Defendants Reliant, Grady and Michaels engaged in an unfair, unlawful and deceptive business practices in the sale of Reliant investments.

212.   The conduct of Defendants Reliant, Grady and Michaels and those acting in the course and scope of their agency of Defendants, in making negligent misrepresentations regarding Reliant to the public, was wrongful. Defendants Reliant, Grady and Michaels failed to conduct due diligence prior to making the uniform representations about Reliant and its program that were repeated to Plaintiffs and

members of the Class on websites and in Reliant's marketing brochures when soliciting Plaintiffs to invest in Reliant's program. Defendants Reliant, Grady and Michaels failed to adequately train and supervise agents as alleged in the DFPI's Refrain and Desist Order.

213.   Defendant Reliant, Grady and Michaels failed to adequately train and supervise agents, to prevent them from encouraging from purchasing life settlements in reliance on uniform misrepresentations and failures to disclose material facts on Reliant's website and in Reliant's marketing brochures.

214.   Through their actions alleged herein, Defendants Reliant, Grady and Michaels have engaged in unfair competition within the meaning of California Business & Professions Code § 17200, because their conduct constituted an unfair business practice perpetrated against members of the general public.

215.   Business and Professions Code §17203 provides that the Court may take those steps necessary to prevent such unfair conduct and may order Defendants to pay restitution to an aggrieved party.

216.   Section 17202 of the California Business and Professions Code states: "Notwithstanding Section 3369 of the Civil Code, specific or preventive relief may be granted to enforce a penalty, forfeiture, or penal law in a case of unfair competition."

217.   As the actual and proximate cause of Defendants Reliant, Grady and Michaels engaging in unfair business practices in violations of California Business & Professions Code section 17200, et seq., Plaintiffs have lost, or are likely to lose their investments totaling an amount to be established at trial. Plaintiffs seek all equitable remedies available, including but not limited to restitution, disgorgement and an equitable accounting.

## SEVENTH CAUSE OF ACTION

## NEGLIGENCE

**By all named Plaintiffs and members of the Class against Defendants Christiana UMB Bank, Bank of Utah, and First West Trust Bank and Does 1-20.**

218.   Plaintiffs reallege and incorporate by reference all preceding paragraphs in this SAC, save and except any allegations that could be interpreted and/or construed to mean gross negligence, intentional or willful conduct. This cause of action is intended to only allege negligent acts committed by Defendants Christiana UMB, FWT, and BOU. Moreover, this cause of action is pleaded in the alternative to the gross negligence and intentional torts alleged in this SAC.

219.   Defendant Reliant held itself out on its website and in its marketing Brochures provided to potential investors as having special expertise in the Life Settlements industry to provide investors in evaluating and structuring life settlement transactions ("Life Settlements") for potential investment, and therefore was required to exercise the skill and knowledge normally possessed by individuals and companies offering investments in Life Settlements. Additionally, because Life Settlements are securities regulated by the California Department of Corporations pursuant to Corporations Code section 25401, Defendant Reliant had a statutory duty to provide truthful, accurate, and complete disclosures in the sale of Life Settlement investments. However, Defendant Reliant in performing their services for Plaintiffs and other investors failed to use reasonable care, and their conduct fell below the reasonable standard of care in choosing appropriate Life Settlement investments for its investors including utilizing Life Expectancy Evaluations from knowledgeable independent third parties with a background, education, training and experience in actuarial evaluations. Instead, Reliant relied upon life expectancy evaluations prepared by brokers who offered to sell life insurance policies to Reliant.

220.   Plaintiffs are informed and believe that the Trustee Defendants UMB, BOU and FWT as trustees of the separate Reliant Trusts had actual knowledge that the amount of premium reserves established by Reliant at the UMB trust, the BOU Trust, and the FTW trust chronically were not sufficient to pay premiums on the policies held in the UMB trust, the BOU Trust, and the FWT trust because Reliant was regularly causing UMB and BOU to transfer funds to the FTW trust.

221.   Plaintiffs are informed and believe that Defendants UMB, BOU and FWT, as trustees of their respective Reliant Trusts, negligently permitted and authorized Defendant Reliant to make representations in Reliant's Closing Packages, on Reliant's websites related to UMB and BOU, in Reliant's marketing brochures touting BOU and UMB, and in Reliant's Closing Packages that held Defendants UMB, BOU and FWT out as providing services to investors in a profession, as a professional trustee of Life Settlement trusts, and, therefore,  Defendants UMB, BOU and FWT were required in acting as trustees of the Reliant Trust to exercise the skill and knowledge normally possessed by members of that profession. (Restatement 2nd of Torts, §299a.) Those statements made by the Reliant Defendants which were authorized by Defendants UMB and BOU on Reliant's websites and marketing brochures, and in the UMB, BOU and FWT Closing Packages  caused investors to reasonably believe that the "trust structure" utilized by the Reliant Defendants would "ensure safekeeping of the assets placed in trust" and the Reliant Defendants authorized  Defendants UMB and BOU "to act as custodian and trustee with sole signatory authority on the trusts' bank accounts.

222.   Plaintiffs are informed and believe that Defendants Reliant, Grady and Michaels either (1) comingled and misappropriated investor funds that were required to be placed in the trust accounts, and/or (2) authorized and/or directed Defendants UMB, BOU and FWT to distribute investors funds in collection accounts, escrow accounts, and premium reserve accounts that were supposed to be used to purchase insurance policies and adequately fund premium reserve accounts in the UMB trust, the BOU trust, and the FWT trust to pay premiums to keep the policies held by each trust from lapsing.

223.   As professional trustees with experience in administering life settlement trusts pursuant to the each of the trust agreements, Defendants UMB, BOU and FWT had a duty to Plaintiffs and members of the Class, who were beneficiaries of their respective trusts to notify the Beneficiaries that funds that were supposed to be used to pay premiums were being looted by Defendants Reliant, Grady and Michaels.

224.   Plaintiffs are informed and believe that Defendants UMB, BOU and FWT

knew that Defendant Reliant was making specific affirmative representations in its Closing Packages as to UMB, BOU, and FWT, on its website as to UMB and BOU, and in its marketing brochures as to UMB and BOU to potential investors about Defendants UMB, BOU and FWT to induce investors to invest in Reliant Life Shares. Those affirmative representations were that: (1)  Defendants UMB and BOU would serve as an "independent escrow agent and trustee." (2) That "Life Shares are structured to protect the client's holdings from any external threat through a trust structure . . ." (3) that Defendants UMB, BOU and FWT would "Hold all client monies in a separate escrow." (4) That "The Trustee receives all investor funds into a subscription escrow account and upon direction from the investor places funds into each trust which holds the specific policy that the investor chooses to invest into." (5) That "By using an independent and professional Trustee/Escrow Agent, client monies are only disbursed as directed in the purchase agreements."

225.  As alleged in the preceding paragraphs Defendants Cristiana, UMB, BOU and FWT knew or should have known that Reliant and its principals were unlicensed, untrustworthy, engaged in irregular and atypical transactions outside the parameters of the applicable trust agreements which named UMB, BOU, and FWT as trustees.

226. Defendants Christiana, UMB, BOU, and FWT were negligent in not safeguarding investors' funds as represented in Reliant's Closing Packages, Reliant's website and brochures as to Defendants UMB and BOU by following instructions from Reliant Defendants, transfer investor funds from their respective collection, escrow and premium reserve accounts to Reliant, violation of trust agreements and in excess of what had been disclosed to investors, which allowed Reliant Defendants to themselves and to pay third parties, including attorneys' fees to both Reliant and Grady attorney Stevens and to Coopper's attorney Buchalter in the Cooper Litigation.  The commingling and misappropriation depleted investors' funds that should have been held in the UMB trust, the BOU trust, and the FWT trust to make premium payments on insurance policies held by their respective trusts.

227.   As a direct and proximate cause of Defendants' UMB,' BOU' and FWT's negligence, Plaintiffs and the Class Members were damaged in an amount to be proven at the time of trial.

## EIGHTH CAUSE OF ACTION
## GROSS NEGLIGENCE

**By all named Plaintiffs and members of the Class against Defendants Christiana, UMB Bank, Bank of Utah, First West Trust Bank and Does 1-20.**

228.   Plaintiffs incorporate by reference at this point all prior allegations in this SAC except the allegations in the Seventh Cause of Action that Defendants UMB, BOU and FWT were negligent.

229.   Defendant Reliant held itself out on its website and in its marketing brochures provided to potential investors as having special expertise in the life settlements industry to provide investors in evaluating and structuring life settlement transactions ("Life Settlements") for potential investment, and therefore was required to exercise the skill and knowledge normally possessed by individuals and companies offering investments in Life Settlements. Additionally, because Life Settlements are securities regulated by the California Department of Corporations pursuant to Corporations Code section 25401, Defendant Reliant had a statutory duty to provide truthful, accurate, and complete disclosures in the sale of Life Settlement investments. However, Defendant Reliant in performing their services for Plaintiffs and other investors failed to use reasonable care, and their conduct fell below the reasonable standard of care in choosing appropriate Life Settlement investments for its investors including utilizing Life Expectancy Evaluations from knowledgeable independent third parties with a background, education, training and experience in actuarial evaluations. Instead, Reliant relied upon life expectancy evaluations prepared by brokers who offered to sell life insurance policies to Reliant. Discovery is ongoing and it is not yet known whether Reliant fully funded the premium reserves at Defendants UMB, BOU and FWT as recommended by the third parties that prepared the life evaluations which were provided to potential investors.

230.   Plaintiffs are informed and believe that Defendants UMB, BOU, and FWT as trustees of the UMB trust, the BOU trust, and the FWT trust were grossly negligent in permitting and authorizing Defendant Reliant to make representations in Reliant's Closing Packages, on Reliant's website as to Defendants UMB and BOU, and in Reliant's marketing brochures as to Defendants UMB and BOU that held out Defendants UMB, BOU and FWT as providing services to investors in a profession, as a professional trustee of life settlement trusts, and, therefore, Defendants UMB,  BOU, and FTW were required in acting as trustees of the Reliant trusts to exercise the skill and knowledge normally possessed by members of that profession. (Restatement 2nd of Torts, §299a.) Those statements made by the Reliant Defendants which were authorized by the Defendants UMB and BOU on Reliant's website and Reliant's marketing brochures  and in Reliant's Closing Packages as to Defendants UMB, BOU and FWT caused investors to reasonably believe that the "trust structure" utilized by the Reliant Defendants would "ensure safekeeping of the assets placed in trust" and the Reliant Defendants authorized Defendants UMB and BOU "to act as custodian and trustee with sole signatory authority" on the UMB, and BOU' trust accounts.

231.   Plaintiffs are informed and believe that Defendants Reliant, Grady and Michaels either (1) comingled and misappropriated investor funds that were required to be placed in the trust accounts, and/or (2) authorized and/or directed Defendants UMB, BOU and FWT to distribute to Reliant, Michaels and Grady and third parties  amounts that were supposed to be used to purchase insurance policies and adequately fund reserve accounts in the trusts administered by UMB, BOU and FWT to pay premiums to keep the policies held by the UMB trust, the BOU trust and the FWT trust from lapsing.

232.   When there were not sufficient funds in the premium reserve accounts to pay premiums, Defendants Reliant, Grady and Michaels utilized Capital Calls on the investor beneficiaries to make the premium payments. As professional trustees with experience in administering life settlement trusts, pursuant to the trust agreements themselves, UMB, BOU, and FWT had a duty to Plaintiffs and members of the Class, who were beneficiaries

76

SECOND AMENDED CLASS ACTION COMPLAINT

of the UMB trust, the BOU trust, and the FWT to notify the beneficiaries that funds that were supposed to be used to pay premiums were being dissipated by Defendants Reliant, Grady and Michaels, and that caused depletion in their respective premium reserve accounts such that UMB, BOU and FWT could not make premium payments on policies held in their respective trusts.

233.   Defendants UMB, BOU and FWT had actual knowledge that Defendant Reliant was making specific affirmative representations in its Closing Packages, on its website at to UMB and BOU, and in its marketing brochures as to UMB and BOU to potential investors about Defendants UMB, BOU, and FWT to induce investors to invest in Reliant Life Shares. Those affirmative representations were that: (1) Trustee Defendants would serve as an "independent escrow agent and trustee." (2) That "Life Shares are structured to protect the client's holdings from any external threat through a trust structure . . ." (3) that Defendants UMB, BOU and FWT would "Hold all client monies in a separate escrow." (4) That "The Trustee receives all investor funds into a subscription escrow account and upon direction from the investor places funds into each trust which holds the specific policy that the investor chooses to invest into." (5) That "By using an independent and professional Trustee/Escrow Agent, client monies are only disbursed as directed in the purchase agreements."

234.   As alleged in the preceding paragraphs Defendants UMB, BOU and FWT knew or should have known that Reliant and its principals were unlicensed, untrustworthy, engaged in irregular transactions outside the parameters of the applicable trust agreements for which UMB, BOU, and FWT were trustees.

235.   Defendants UMB, BOU and FWT were grossly negligent in not safeguarding investors' funds as represented in Reliant's Closing Packages, Reliant's website and brochures as to UMB and BOU, by following instructions from Defendants Reliant, Grady and Michaels to transfer investor funds from UMB', BOU', and FWT' trust accounts to Reliant, Grady and Michaels and third parties in excess of what had been disclosed to investors, which allowed Reliant, Grady and Michaels to make unauthorized

distributions to themselves, their alter ego entities, and third parties which depleted investors' funds should have been held in the UMB trust, the BOU trust, and the FWT to make premium payments on insurance policies held by UMB in the UMB trust, on policies held by BOU in the BOU trust, and policies held by FWT in the FWT trust.

236.   As a direct and proximate cause of Defendants UMB,' BOU and FWT's gross negligence, Plaintiffs and the Class Members were damaged in an amount to be proven at the time of trial.

## NINTH CAUSE OF ACTION
## BREACH OF FIDUCIARY DUTY

**By all named Plaintiffs against Defendants UMB, BOU, FWT and Does 1-20**

237.   Plaintiffs incorporate by reference all prior causes of action in this SAC at this point as set forth in full.

238.   Defendant Reliant was not licensed by the State of California to sell Life Settlements in the State of California to California residents. On each Beneficial Interest Certificate ("Certificate") signed by Defendants UMB, BOU and FWT as trustee there was a legend in capital letters which stated:

> IN ADDITION, THIS CERTIFICATE HAS NOT BEEN AND
> WILL NOT BE REGISTERED UNDER CALIFORNIA
> SECURITIES LAWS. THE HOLDER HEREOF, BY
> ACQUIRING THIS CERTIFICATE AGREES THAT THIS
> CERTIFICATE MAY ONLY BE OFFERED, SOLD,
> PLEDGED OR OTHERWISE TRANSFERRED IN
> COMPLIANCE WITH CALIFORNIA SECURITIES LAWS
> AND, IN PARTICULAR ONLY TO "QUALIFIED
> PURCHASERS" AS DEFINED IN THE CALIFORNIA
> CORPORATIONS CODE.

239.   In each Class members Risk Disclosure, which was an addendum to each of their Purchase Agreements in the Closing Packet each investor received from Reliant it

stated that California law would apply. Each investor had to represent too Reliant in the Investor's Purchase Agreement that they were a resident of the State of California.

240.   Attached to each investors' Purchase Agreement was a document entitled "Risk Disclosure," which document had a legend in bold typeface which stated that California law applied to the investor's transaction:

**WARNING: Do not sign this Agreement unless you wish to be Legally bound. This Agreement is subject to the laws of the State of California and the United States . . .** (Emphasis in original)

241.   Each investors' Purchase Agreement contained an arbitration agreement stating that any disputes would be arbitrated at the Judicial Arbitration & Mediation Services in Los Angeles, California.

242.   Based on reviewing Reliant's websites, its marketing brochures, and all the documents Reliant provided to Class members there was no disclosure to investors that Connecticut law would apply to the UMB trust, the BOU trust, or the FWT trust.

243.   Based on reviewing Class members documents, no Class member was provided with a copy of the UMB trust agreement, the BOU trust agreement, or the FWT trust agreement.

244.   The legislative history for the statute that permits life settlements to be sold in California states that California has a public interest in enforcing its laws related to the sale of life settlements.

245.   Under California law Defendants UMB, BOU, and FTW by serving as trustees of the UMB trust, the BOU trust, and the FWT trust owed fiduciary duties to Plaintiffs and all members of the Class and the UMB Subclass, the BOU Subclass and the FTW Subclass.

246.   Defendant UMB breached its fiduciary duties to Plaintiffs Prince, Daos, James Reed and Carolyn Reed and all members of the UMB Subclass for which they are class representatives as set forth in this Ninth Cause of Action.

247.   Defendant BOU breached its fiduciary duties to Plaintiffs Sharma and Daos

and all members of the BOU Subclass for which Plaintiffs Sharma and Daos are the class representative as set forth in this Ninth Cause of Action.

248.   Defendant FWT breached its fiduciary duties to Plaintiffs James Reed and Carolynn Reed and all members of the FTW Subclass for which Plaintiffs James and Carolynn Reed are the class representatives as set forth in this Ninth Cause of Action.

249.   Defendant Reliant through its statements in its Closing Packages as to UMB, BOU and FWT, Reliant's website and marketing brochures as to Defendants UMB and BOU, encouraged Plaintiffs and all Class members to repose trust and confidence in UMB as the trustee of the UMB trust, in BOU as trustee of the BOU trust, and FTW as trustee of the FTW trust. Plaintiffs and all Class members were justified in reposing trust and confidence in UMB, BOU, and FWT based on the statements made about UMB, BOU, and FWT by Reliant in the Closing Packages as to UMB, BOU and FWT, on Reliant's website and its marketing brochures as to UMB and BOU. The Reed Plaintiffs and all members of the FWT Subclass which they represent were justified in reposing trust and confidence in Defenant FWT by virtue of Reliant sending them letters informing them that FWT was a successor trustee to the Cristina Trust which held the policies in the Reeds and the members of the FTW Subclass had a beneficial fractionalized interest.

250.   Defendants UMB, BOU, and FWT voluntarily undertook duties to the beneficiaries of the trusts for which they agreed to serve as trustees while acting as trustees. Those duties included the duty to act with integrity, competence, and diligence and in an ethical manner with the beneficiaries of the UMB trust, the BOU trust, and the FWT trust as participants in the life settlement markets.

251.   In versions of its Fractionalized Life Settlement Purchase Agreement Reliant referenced it was a member of the Life Insurance Settlement Association ("LISA"), a lobbying group for the Life Settlement Industry. On the first page of LISA's  website it references BOU as a "Strategic Partners."

252.   LISA's Code of Ethics available on its website states that LISA members must: "Act with integrity, competence, diligence, respect, and in an ethical manner with

the public, clients, prospective clients and colleagues in the life settlement industry, and other participants in the life settlement markets", and "Place the integrity of the life settlement industry and the interests of clients above their own personal interests," and "Use reasonable care and exercise independent professional judgment when conducting an analysis of potential life settlement transactions on behalf of clients, making recommendations to clients or potential clients regarding life settlement transactions and engaging in other professional life settlement activities", and "Comply with applicable state laws governing the life settlement markets."

253.   An additional duty that Defendant BOU voluntarily undertook as a member of LISA was to "use reasonable care and exercising independent judgment when conducting an analysis of potential life settlement transactions" and "comply[ing] with applicable state laws governing life settlement markets."

254.   Defendants UMB, BOU, and FWT failed their duty of due diligence owed to the beneficiaries of the UMB trust, the BOU trust, and the FWT in engaging with Reliant and its principals. If UMB and BOU did not inspect Reliant's website and marketing brochures  while UMB and BOU were acting as trustees of the UMB trust and the BOU trust respectively it was a breach of their fiduciary duties to the members of the UMB Subclass and the BOU Subclass. If UMB and BOU had inspected Reliant's website and marketing brochures they would have discovered the written misrepresentations and failures to disclose material facts to potential investors, including the fact that UMB and BOU were acting to "safeguard" the investors' investments and had "sole signatory authority" over the UMB and BOU trusts' escrow, collection and premium reserve accounts.

255.   Pursuant to the UMB trust agreement, the BOU trust agreement, and the FWT trust agreement UMB,  BOU and FWT had actual knowledge that their respective trust agreements were not provided to the beneficiaries of the UMB trust, the BOU trust, and the FWT trust. Defendants UMB, BOU and FWT in their trust agreements disclaimed the duty to serve as "independent escrow officers and trustees" for the benefit of the

beneficiaries of the trusts. Defendants UMB and BOU had actual knowledge that they did not in fact have "sole signatory authority" over their respective escrow accounts, collection accounts and premium reserve accounts.

256.   If Defendants UMB, BOU and FWT had done minimal due diligence by checking with the California Insurance Department they would have discovered that Reliant was not licensed to sell fractionalized life settlements in California. If UMB, BOU or FTW had done a Google search on Defendant Grady they would have discovered that his license to practice law in California was suspended on multiple occasions and he was ultimately disbarred for violations of regulations related to his client trust account.

257.   Pursuant to Section 4.5(h) of the UMB trust agreement, the BOU trust agreement, and the FTW trust agreement Defendants UMB, BOU and FTW knew they each had a duty of good faith and fair dealing to the beneficiaries of the UMB trust, the BOU trust, and the FTW trust. That duty of good faith and fair dealing required UMB, BOU, and FTW to disclosure to the beneficiaries of their respective trusts all material facts and to act in the best interest of the beneficiaries.

258.   As previously alleged, Defendants UMB, BOU and FWT breached their fiduciary duties and duty of good faith and fair dealing owed to the beneficiaries of their respective trusts by failing to disclose to investors and potential investors, among other things, that:

   a. Investor funds were commingled in violation of trust documents and disposed of without written notice as required by Section 5.4(a) (vi) of the UMB trust agreement, the BOU trust agreement and the FWT trust agreement;

   b. That Investor funds were transferred out of trust accounts at UMB and BOU and wired to Reliant Defendants or third parties, or alter egos, in violation of trust agreements in under false pretenses;

   c. that Reliant was transferring investors funds between Series within the UMB trust, the BOU trust, and the FWT trust which resulted in the dissipation of

Trust Assets;

d.   that UMB, BOU, and FWT were resigning as trustees based on the atypical and irregular acts of Reliant, Michaels and Grady which breached the UMB trust agreement, the BOU trust agreement and the FTW trust agreement by depleting the premium reserve accounts at the UMB trust, the BOU trust, and the FTW trust.

259.   Pursuant to Sections 25506 and 25507 of the California Corporations Code, Plaintiffs had five years and two years respectively to seek rescission of their investments based on Reliant', Michaels' and Grady' misrepresentations and failures to disclose material facts on Reliant's website and  its marketing brochures as to Defendants UMB and BOU and in its Closing Packages as to UMB, BOU, and FWT. Therefore, from the moment that the particular class member, including Plaintiffs, remitted their consideration to Reliant to be deposited in the premium reserve accounts at the UMB trust, the BOU trust and the FWT trust, had Defendants UMB, BOU and FTW as trustees of their respective trusts timely disclosed to the beneficiaries of their respective trusts pursuant to Section 5.4(a)(vi) of each of their respective trust agreements that Reliant, Grady and Michaels were diverting and dissipating the investors funds which compromised the ability of UMB, BOU and FWT to make premium payments on the policies in which the investors had a fractionalized ownership interest, the beneficiaries could have timely exercised their rights to rescind their investments in Reliant Life Shares.

260.   Defendants had a duty to disclose to class members, including Plaintiffs, that misrepresentations and omissions were made to them, and class members, including Plaintiffs, could have, within the statutory period under Sections 25506 and 25507 rescinded their investments.

261.   As a direct and proximate result of the above conduct by Reliant and Defendants UMB, BOU, and FWT, Plaintiffs and Class members were damaged in an amount to be proven at trial.

SECOND AMENDED CLASS ACTION COMPLAINT

262.   By performing the foregoing acts, Defendants acted with malice, oppression, and fraudulently. Alternatively, the acts of Defendants UMB, BOU, and FTW performed were despicable and in conscious disregard of the probability of damage to Plaintiffs and the rest of the putative Class members and support an award of punitive damages pursuant to Civil Code section 3294 in an amount designed to punish Defendants UMB, BOU, and FWT and to deter such conduct in the future.

263.   To the extent that such acts by Defendants UMB. BOU and FWT were conducted through their employees or agents, those employees were either its officers, directors or managing agents of Defendants UMB. BOU, and FWT, or such officers, directors or managing agents were aware in advance that such conduct would occur, exhibited conscious disregard for the rights of others in employing the employee, or directed or ratified such conduct by its employee(s) and agents.

## TENTH CAUSE OF ACTION FOR

## VIOLATION OF CALIFORNIA CORPORATIONS CODE § 25504.1

**By Plaintiffs James Reed, Carolynn Reed, Charles Prince, Brij Sharma, and Bernard Daos for themselves and the Class Against Defendants UMB, BOU, FWT and Does 1-20.**

264.   Plaintiffs incorporate by reference all the paragraphs in the General Allegations and the Specific Additional Allegations against Defendants UMB, BOU and FWT, and the allegations in the Third Cause of Action against Defendants Reliant, Grady and Michaels for Violation of Corporations Code Sections 25401 and 25501 alleging wrongdoing by Defendants Reliant, Grady, Michaels and lack of disclosure of material facts and misrepresentations in this Tenth Cause of Action of this Second Amended Complaint.

265.   California Corporations Code § 25504.1 provides that "Any person who materially assists in any violation of section 25401…with intent to deceive or defraud, is jointly and severally liable with any other person liable under this chapter for such violation."

266. As alleged above, Defendants Reliant, Michaels and Grady violated California Corporations Code § 25401 based on misrepresentations and omissions of material facts.

267. Plaintiffs are informed and believe based on the fact that both UMB and BOU required Reliant to represent and warrant in their respective Instrument Of Resignation, Appointment And Acceptance agreements that Reliant would remove all references to UMB and BOU from its website and marketing brochures.  Plaintiffs are informed and believe Defendants UMB and BOU had actual knowledge that Reliant was touting on its website and its marketing brochures that Reliant was representing in writing to potential investors that Reliant used a "trust structure"  with UMB and BOU acting as independent escrow agents and trustees with sole signatory authority on UMB and BOU's respective trust accounts.

268. Defendant Reliant's factual statements on its website regarding the "trust structure" and in the marketing brochures touting the fact that Reliant had appointed UMB and BOU as trustees to "safeguard" the investors funds and that UMB and BOU were the "sole signatory" on their respective escrow, collection, and premium reserve accounts were false and failed to disclose to investors that pursuant to the terms of the  UMB trust agreement and the BOU trust agreement, which trust agreements were not provided to the investors,  that Reliant as Grantor could "direct" UMB and BOU as trustees  to wire funds or send checks from the UMB' trust accounts and the BOU's trust accounts  directly to Defendants Reliant, Grady and Michaels and/or their alter ego entities and third parties to pay attorneys' fees unrelated to the UMB trust and the BOU trust.

269. In an addendum to each investors' Purchase Agreements naming UMB, BOU, and FTW as trustees, Reliant disclosed an "Insolvency Risk" which was mitigated by the fact that Reliant named an independent trust to protect the investor:

> The possibility exists that Reliant Life Shares, LLC could become insolvent. While Reliant considers that we enjoy a prosperous and growing position in our industry, we, like all businesses are

exposed to events which may be beyond our control and which could alter our destiny. We take comfort in the fact that our business practices employ the concept of naming an independent trust established on the investor's behalf as the direct beneficiary of the death benefit purchased. This means that the obligation to pay rests solely on the life insurance company and the independent trustee and not on Reliant. Further, the premium reserves established for the payment of the premiums are held in a premium reserve account under the control of a third-party Trustee. (Page 18 of Purchase Agreement.)

270.   That written representation in the addendum to the Purchase Agreement was false, and failed to inform the investor that in the Trust Agreement, which was not provided to the investor, Reliant could direct Defendants UMB. BOU and FWT to pay funds from the premium reserve accounts at UMB, BOU, and FWT to Defendants Reliant, Grady, Michaels, their alter ego entities, and third parties not related to paying premiums on the policies held in the UMB trust, the BOU trust, and the FWT trust.

271.   Plaintiffs are informed and at all times when Defendants Reliant, Michaels and Grady were making these material misrepresentations and omissions of material facts in investors' Closing Packages, Purchase Agreements, Reliant's website and marketing brochures as to Defendants UMB and BOU (Plaintiffs have not yet discovered evidence that FTW permitted its name to be used on Reliant's websites or marketing brochures) about the benefit of having an independent third party Trustee and Escrow Officer protect and safeguard the investors' funds, UMB, BOU and FWT knew that Defendants Reliant, Michaels and Grady were making material misrepresentations and omissions because UMB, BOU and FWT had actual knowledge that Defendants Grady and Michaels were engaged in irregular transactions, using investors' funds to make excessive distributions from the fund entrusted to UMB, BOU and FWT as trust funds to themselves and to pay creditors of Reliant, Michaels and Grady, which distributions rendered Reliant insolvent and UMB, BOU and FWT ultimately did not have sufficient funds in their respective

premium reserve accounts to make premium payments on the policies held by the UMB trust, the BOU trust, and the FWT trust. The result was that Reliant made capital calls on investors to obtain funds to make premium payments, which would not have been needed if Defendants Grady and Michaels had not looted the premium reserve accounts at UMB trust, BOU trust, and FWT trust. As a result, the Receiver for Reliant has filed pleadings with the Court in the Cooper Litigation that eight (8) insurance policies have lapsed and cannot be reinstated and 13 insurance policies were sold to Superior Financial.

272.   The conduct of Reliant Defendants looting Reliant and the trust accounts at the UMB and BOU trust, aided and abetted Reliant, Michaels, and Grady with knowledge and intent by Defendants UMB, BOU and FWT to continue to earn lucrative trustees' fees from their respective trusts, which dissipation of "Trust Assets" in the UMB trust, the BOU trust and the FWT trust ultimately led to the court in the Cooper Litigation to appoint a receiver to liquidate Reliant's assets to pay off the judgment against Reliant, Michaels, and Grady in favor of Cooper.

273.   Defendants UMB, BOU and FWT which hold themselves out on their websites as being "professional trustees" with experience in the life settlement industry, and in the case of BOU as member of LISA, which required the Defendant BOU to comply with LISA's Code of Ethics, by reviewing Defendant Reliant's website and marketing brochure knew or should have known that the statements made by Reliant in the marketing brochure about the "bell curve" was misleading in that many of the insureds whose policies where held by the Defendant Trustees were living longer than Reliant had projected, which was causing a serious depletion of UMB', BOU', and FWT's premium reserve accounts.

274.   As a direct and proximate result of the above conduct by Defendants UMB, BOU, and FWT, as previously alleged in this complaint,  aiding and abetting the wrongful and illegal conduct of Reliant Defendants and Class members have been damaged in an amount to be proven at trial.

275.   The causes of action based on California Corporations Code violations against Defendants UMB, BOU and FWT  are equitably estopped from contending that the California Corporations Code violations are barred by the statute of limitation because UMB, BOU and FWT aided and abetted Defendants Reliant, Michaels and Grady in concealing from Plaintiffs and the Class members that they had been sold  securities through fraudulent and deceitful means which was not known until the DFPI issued its Order to Reliant to cease and desist from making misrepresentations and failures to disclose in marketing its Life Settlement Program  on December 14, 2022.

276.   Additionally, Plaintiffs are informed and believe that Defendants UMB, BOU and FTW had actual knowledge that Defendants Michaels and Grady were fraudulently commingling and misappropriating investors funds, all as previously alleged, rendering Reliant insolvent because Reliant Defendants were directing UMB and BOU to wire funds to them, in violation of trust agreements. Defendants UMB, BOU and FWT had knowledge that by transferring funds among their accounts and commingling investor funds all investors were being damaged.

277.   Plaintiffs on behalf of themselves and the Class seek all damages as allowed by law, including but not limited to the amount of their initial investments in Reliant Life Shares, any additional premiums they had to make to keep policies in force, and prejudgment interest on those amounts.

278.   Defendants Reliant, Michael and Grady's conduct aided and abetted by Defendants UMB, BOU and FWT was in reckless disregard for the rights and safety of Plaintiffs and all Class members and constitutes oppression, fraud, and malice such that punitive and / or exemplary damages are appropriate pursuant to either Civil Code section 3294, section 3345 or both.

///

## ELEVENTH CAUSE OF ACTION
## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY,  AND AIDING AND ABETTING BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING
### By Plaintiffs James Reed, Carolynn Reed, Charles Prince, Brij Sharma, and Bernard Daos for themselves and the Class Against Defendants UMB, BOU, FWT and Does 1-20

279.   Plaintiffs incorporate all prior allegations set forth in this SAC, with the exception of the First Cause of Action for Negligence and the Seventh Cause of Action for Negligence.

280.   As alleged in the Fourth Cause of Action in this SAC, Defendants Reliant, Michaels, and Grady owed fiduciary duties to Plaintiffs and all putative class members as *de facto* trustees of the UMB trust, the BOU trust, and the FWT trust which fiduciary duties Defendants Reliant, Michaels and Grady breached.

281.   Under California law, "[l]iability may ... be imposed on one who aids and abets the commission of an intentional tort if the person ... [1] knows the other's conduct constitutes a breach of duty and [2] gives substantial assistance or encouragement to the other to so act." *Alumnicaste Fundicion De Mex. S. De RL CV v. Yu Fen Shen*, 2017 U.S. Dist. LEXIS 206763, *28-30, citing Saunders v. Superior Court, 27 Cal. App. 4th 832, 846.

282.   With respect to whether plaintiff adequately alleges actual knowledge, actual knowledge of the underlying fraud "may be averred generally." *Allstate Ins. Co. v. Countrywide Fin. Corp*., 824 F. Supp. 2d 1164, 1188 (C.D. Cal. 2011) (citing Fed. R. Civ. Proc. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.")); see also *In re First Alliance Mortgage Co*., 471 F.3d 977, 993 (9th Cir. 2006) ("Although the California decisions on this subject may not be entirely consistent, we agree ... that aiding and abetting liability under California law, as applied by the California state courts, requires a finding of actual knowledge, [but] not specific

intent."). Although "this obviates the necessity of pleading detailed facts supporting allegations of knowledge, it does not relieve a pleader of the burden of alleging the nature of the knowledge a defendant purportedly possessed." *Neilson v. Union Bank of California*, 290 F. Supp. 2d 1101, 1119 (C.D. Cal 2003). When pleading an aiding and abetting claim, "this must be actual knowledge of the primary violation." Id. (citation omitted).

283.   In this case, as set forth previously in this Complaint, and below, Plaintiffs set forth specific facts that show each of the Trustee Defendants, UMB Bank, Bank of Utah and FTW had actual knowledge of Reliant, Michaels and Grady's wrongful activity and breaches of fiduciary duty.

284.   The facts here are analogous to cases in which the plaintiff was found to have alleged actual knowledge with sufficient particularity. See, e.g. *Gonzales v. Lloyds TSB Bank*, PLC, 532 F. Supp. 2d 1200, 1207 (C.D. Cal. 2006) ("Because Rule 9(b) provides that 'malice, intent, knowledge, and other condition of mind may be averred generally,' and because Plaintiffs have alleged facts in support of their allegation of knowledge, the Court finds that Plaintiffs have more than adequately satisfied Rule 9(b)'s pleading requirements for knowledge."); *Mosier v. Stonefield Josephson, Inc*., No. CV 11-2666 PSG EX, 2011 U.S. Dist. LEXIS 124058, 2011 WL 5075551, at *8 (C.D. Cal. Oct. 25, 2011) (distinguishing *Casey v. U.S. Bank Nat'l Ass'n*, 127 Cal. App. 4th 1138, 1152-53, (2005) and finding that plaintiff adequately pled actual knowledge of the underlying intentional tort); see also *Neilson*, 290 F. Supp. 2d at 1120-21 ("[The complaint] alleges, in particular, that the Banks utilized atypical banking procedures to service defendant's accounts, raising an inference that they knew of the Ponzi scheme and sought to accommodate it by altering their normal ways of doing business. This supports the general allegations of knowledge.").

285.  Defendants UMB, FWT, and BOU aided and abetted the breaches of fiduciary duties owed by Reliant Defendants to the beneficiaries of the UMB trust, the BOU trust, and the FWT Trust by, *inter alia*, providing substantial assistance to Reliant

by offering Reliant a "trust structure" for marketing to investors to create an illusion that trust were secure and "safeguarded" by institutional trustees that had sole authority as trustee of trust funds.  Plaintiffs are informed and believe that the credibility of an institutional trustee was critical to Reliant's operation to induce new investors to invest. Further as set forth previously UMB, BOU and FWTB had actual knowledge of Reliant and Grady's operation as evidence by the numerous irregular transactions that depleted trust accounts.

286.   In addition, UMB, BOU and FWT assisted by  (i) accepting and acting upon directives from Reliant Defendants to distribute to Reliant Defendants and third parties trust funds for improper purposes out of the escrow, collection and premium reserve accounts of the UMB trust, the BOU trust, and the FWT trust that UMB, BOU and FWT as trustees were responsible for maintaining, (ii) by failing to inform the beneficiaries that Defendants Reliant, Michaels, and Grady had transferred funds between Series in the UMB trust, the BOU Trust, and the FWT trust dissipating the UMB trust accounts, the BOU trust accounts, and the FWT trust account, without notifying beneficiaries in writing of the dissipation of the Trust Assets (iii) failing to take action with their actual knowledge that Reliant was directing UMB and BOU, and FWT to dispose of trust assets in violation of the UMB trust agreement, the BOU trust agreement, and the FWT trust agreement, transferring funds as directed by Reliant and Grady from their trust's own premium reserve accounts to other accounts without providing written notice to the beneficiaries whose Series was compromised by those transfers as required by Section 5.4(a)(vi) of the UMB trust agreement, the BOU trust agreement, and the FWT trust agreement; (iv) by Defendant BOU selling 13  insurance policies held by the BOU trust to Superior Financial for which it was the trustee without informing the beneficiaries as required by Section 5.4(a)(vi) of the BOU trust agreement.

287.   The UMB trust agreement, the BOU trust agreement and the FWT trust agreement each had the same provision in Section 4.1 that Defendant Trustees UMB, FWTB and BOU were to sign checks to distribute funds from their respective trusts'

Collection Account and premium reserve accounts as directed by Defendant Reliant as Grantor. Plaintiffs are informed and believe based on reviewing documents produced by Defendants UMB, FWT and BOU that many of the checks and distributions wired out of their respective trust accounts by Defendants UMB, BOU and FWT based on directives from Reliant, Grady, and Michaels were for atypical and irregular transactions which put Defendants UMB, FWT and BOU on actual notice that Reliant was dissipating trust funds held in their respective trusts' collection accounts and premium reserve accounts for other than legitimate trust expenses. With actual knowledge of the atypical and irregular transactions, Defendants UMB, FWT and BOU signed checks and wired funds as directed by Defendants Reliant, Michaels and Grady. The wrongful diversion of beneficiaries funds by Reliant, Michaels and Grady could not have taken place but for Defendants UMB, FWTB and BOU aiding and abetting Reliant, Michaels, and Grady's breach of fiduciary duty owed to the beneficiaries by signing the checks or wiring funds as directed by Reliant and Grady because Defendants UAB, FWTB and BOU were the sole signatories on their respective escrow accounts, collection Accounts and premium reserve accounts.

288.   Plaintiffs and all putative class members were damaged by Defendants UMB, BOU, and FWT aiding and abetting the breaches of fiduciary duties of Reliant Defendants owed to Plaintiffs and all putative class members in an amount according to proof at the time of trial.

289.   The wrongful actions by Defendants UMB, FWT and BOU in aiding and abetting Reliant Defendants breach of fiduciary duties to Plaintiffs and all putative class members as alleged in this SAC were fraudulent, oppressive and malicious, and Plaintiffs and all putative class members are entitled to an award of punitive damages against Defendants UMB, FWT and BOU for aiding and abetting Reliant', Michael' and Grady's breaches of fiduciary duties pursuant to Civil Code Section 3294 as determined by the jury at trial.

**DOUGLASS ALLEGATIONS AGAINST DEFENDANT ANDREW MURPHY**

290.   At all times herein, PLAINTIFF GWENDALYN DOUGLASS is the daughter of Raymond E. Douglass and Trustee of RAYMOND E. DOUGLASS REVOCABLE TRUST (now an irrevocable trust). She is also the executor of Raymond E. Douglass' estate. GWENDALYN DOUGLASS sues both as trustee and as successor in interest pursuant to CCP §377.11. When the term "Plaintiff" is utilized, it often refers to Raymond E. Douglass as the purchaser, his actions, or doings even though his daughter technically is the actual Plaintiff, as the successor in interest now that Raymond E. Douglass has passed away.

291.   At all times herein, Defendant ANDREW MURPHY (hereinafter MURPHY) was a salesperson of various life settlement policies sold to Raymond E. Douglass. He was also a high-level employee/agent and controller of RELIANT. MURPHY was also a decision-maker and chief salesperson acting as "Chief Executive Officer of Reliant Life Shares" during relevant periods that resulted in Plaintiff losing his investments. MURPHY controlled some of the events herein. He was supposed to supervise others who also sold more of the above product to Raymond E. Douglass that should not have been sold to him. MURPHY has ratified, allowed, or maintained all the wrongful conduct set forth in this Complaint. Although he was the seller of these products, he was not licensed to sell investments, this was not disclosed to Raymond E. Douglass, and to do so was illegal.

**DOUGLASS' GENERAL ALLEGATIONS AGAINST MURPHY PARTIES**

292.   In 2017, Raymond E. Douglas was 83 years old, in the throes of serious health difficulties and not of sound mind. He suffered from dementia, uncontrolled diabetes, and other health issues and was vulnerable and susceptible to suggestions because he was living alone and lacked companionship. He had long since retired. Raymond E. Douglas was not a suitable candidate, being elderly himself, to purchase over a million dollars in "life settlement" investments in approximately 21 separate transactions mostly between 2017 and 2018. See **Exhibit 118** and for a list of policies

Raymond E. Douglas invested in. Raymond E. Douglas died in 2020, just two years after his last purchase of these investments.

293.    Raymond E. Douglas was sold two separate Life settlement investments in a policy on a 62-year-old male, see **Exhibit 117**, one investment on October 13, 2017, of $33,000 and another investment in the same policy on March 1, 2018, of $120,000. The insured was 21 years younger than Raymond E. Douglass. There is no way that Raymond E. Douglass could benefit from this investment on a 62-year-old insured. This would only saddle Mr. Douglass' heirs with premiums for years to come until the policy matured.

294.    MURPHY knew that Raymond E. Douglass was ill while making these sales. MURPHY is seen in a photo taken in November 2018, at Mr. Douglass' home, surrounded by filth. See **Exhibit 6**. MURPHY also signed an Agent of Record Certification. In that document MURPHY certified that he explained all the risks to Raymond E. Douglass and that Raymond E. Douglass was a suitable candidate to invest $600,000 on March 1, 2018. MURPHY signed and initialed several times on a form that he "made sure the investor understood" the terms, and that "I have acted in the best interest of the client making this purchase recommendation and have not made any misleading statements to the client." In addition, he signed that he "fully explained the potential impact to the client of any premium calls should the insured live past the premium reserve escrow period." Unfortunately, this was fabricated and a manipulation. It was not true for the reasons hereinafter alleged.

295.    After Raymond E. Douglass died, one of the policies matured and Mr. Douglass' payout was supposed to be $34,000. Plaintiff GWENDALYN DOUGLASS, as Trustee of RAYMOND E. DOUGLASS REVOCABLE TRUST never received the check. Mark Sansoucy ("Sansoucy") instead stated that the money would need to be used for premium calls on the other policies that Raymond E. Douglass purchased. Between January 2021 and January 2022, Plaintiff GWENDALYN DOUGLASS, as Trustee of RAYMOND E. DOUGLASS REVOCABLE TRUST (hereinafter the Plaintiff Trustee) was not able to get a clear picture of how many policies her father had invested, and what

premiums were due. See **Exhibit 119** for an email trail of unfulfilled requests for documents lasting one year from Reliant staff, namely Sansoucy and GRADY.

296.   Had Raymond E. Douglass known the truth, had he been of sound mind and capable of understanding the truth, he would not have invested over a million dollars. False statements employed regularly on Raymond E. Douglass and /or negligence allowed the sales to proceed. Douglass' investment losses set forth herein in Exhibit 120, shows over a million dollars.

297.   Reputable securities dealers would not sell these investments to Raymond E. Douglass for many reasons. Raymond E. Douglass was not suitable for these investments. Raymond E. Douglass was over 20 years older than one of the insured (mentioned above), and he was approximately the same age as other insureds. The chances of an 83-year-old diabetic Raymond E. Douglass outliving most of these insured, especially the 62-year-old insured, was questionable at best. There was no justification to require an 83-year-old to use his liquid assets, which he needed for his own future, to invest in an illiquid investment. In addition there was a risk of losing his principal and the policies subject to forfeitures if the future premium obligations were not paid. Raymond E. Douglass, at age 83, needed liquidity for future medical needs. Raymond E. Douglass, or subsequently, his heirs, were not appropriate candidates to be saddled with sizable future premium obligations to safeguard the principal in the investment. Again, reputable investment advisors would not recommend this investment to a person such as Raymond E. Douglass. The real odds of how well a person will do in Defendants' investment was not properly conveyed to the investors by MURPHY, nor are the problems inherent in the program fully disclosed.

298.   MURPHY used Reliant materials to sell Raymond E. Douglass these investments, where such material characterized the investments as better than mainstream investments, providing double-digit returns, and a guaranteed fixed rate of return, which caused investors such as Raymond E. Douglass to believe there was no risk of loss. In fact, the materials used by MURPHY say, "no market risk." MURPHY knew that

customers would take this to mean no risk. There is a risk of loss of principal if the premium reserves are depleted and future premiums not paid. See Exhibit 7, para 4. Again, MURPHY represented or allowed Reliant' s staff to represent that "the risk of a premium call was close to zero or just about nil."

299.   MURPHY used Reliant materials to sell Raymond E. Douglass these investments, where such material characterized the investments as similar to what big-time investors were investing. One of the names given was Warren Buffet and Buffet's picture is displayed prominently in the promotional materials and used by MURPHY. This is deception because, first of all, Buffet does not invest in fractionalized life settlements investments like the Defendants sell, for reasons discussed hereinafter. MURPHY used Warren Buffet and also Bill Gates names to bolster RELIANT'S credibility wrongfully and illegally and it is alleged upon information and belief that RELIANT has not received permission to do so, and the way these high-profile names are used in their sales materials is confusing and deceptive. See Exhibit 101. Investors like Gates and Buffet would only invest in huge quantities of policies to obtain the needed benefit to make the investment worthwhile. They would not invest in a fractional share of a life settlement of the kind that Raymond E. Douglass was sold by MURPHY. MURPHY knew the difference and did not disclose it.

300.   MURPHY used RELIANT materials to sell to Raymond E. Douglass these investments, where such material claimed RELIANT actuaries have 90%- 98% accuracy in predicting life span of the insured whose policy is the subject of RELIANT investments. It is believed this statement is false and deceptive. See Exhibit 7 and Exhibit 110.

301.   MURPHY knew the investments he sold to Raymond E. Douglass was not a good buy-and-hold investment strategy suitable for retirement or a long-term investment for a person such as Raymond E. Douglass, because if one holds the investment past the reserve period of the prepaid premiums, the insured's premiums get more and more expensive as the insured gets older. Mr. Douglass's heirs are now saddled with premium

calls on dozens of policy positions purchased by Raymond E. Douglass. No salesperson could recommend an investment that saddles an older person such as Raymond E. Douglass and/or his heirs with this onerous future obligation, which if not paid, as is now the case, is now subjecting Mr. Douglass' heirs to substantial loss. MURPHY did this and knowingly so.

302.   Another deception perpetrated by MURPHY (as seen in the RELIANT website and elsewhere, and used by MURPHY) or MURPHY represented or allowed Reliant' s staff to represent that investors can "withdraw their money any time without a penalty." See Exhibit 1. This turned out to be false and MURPHY knew it. Plaintiff Trustee (for Raymond E. Douglass's Trust) indicated she would accept the return of principal in lieu of bringing the suit, but Defendants were not able to perform within a reasonable amount of time and did not commit to a satisfactory agreement to do so. If the statement on the website and elsewhere were true, this suit would have been averted. Months of negotiations happened but the money could not be produced in any timely or suitable basis, indicating the possibility that RELIANT had a liquidity problem. These liquidity issues were also not disclosed by MURPHY or underlings he was supposed to supervise at the time of sale. This is an omission of a material fact, which is a violation of the law and another area of deception. MURPHY knew that RELIANT had a history of reneging on such payback promises to other investors, another material fact not properly disclosed.

303.   MURPHY passed off RELIANT as a financial company of substantial assets comparable to an insurance company. This is a false comparison and confuses investors and confused Raymond E. Douglass. In fact it is specifically asserted that MURPHY was aware that Reliant' s financial status was shaky and problematic and that there were internal conflicts within RELIANT stemming from Daniel Cooper's dispute with the other owners, namely Shawn Michaels and Scott Grady. MURPHY was specifically aware that such conflicts posed a risk to the company and jeopardized the life insurance policies of all investors. If this information leaked out, it could cause past investors to

pull out and not pay premiums and it would cause future investors to not invest in this product. This would cause the policies to become at risk for default, and if the policies defaulted, investors would receive no payouts. That is what happened but these facts were not disclosed by MURPHY to Raymond E. Douglass who knew all this. MURPHY was cognizant of these known risks.

304.   In addition to the aforementioned risks, it was also known that Investors needed to know this because when an insured individual continued to live beyond what money was available in reserves to pay premiums, it meant the investors had to pay extra. Such circumstances need to be disclosed because if some investors stopped paying their premiums, others would become inclined to not pay their premiums. If enough investors do not pay the premiums, then the others have to cover for those that do not pay premiums. Eventually this can create a domino effect which leads to more investors not paying their premium and causing more and more investors to pick up the difference. There is a limit on how many remaining investors will be inclined to pay larger premiums for those who will not pay their premiums. Therefore there is a risk of a total default of the investment when those investors fail to pay the premiums. That is actually what has happened but none of that was explained by MURPHY. It is also the reason this investment is not suitable for Raymond E. Douglass and many other investors. It is also a reason it was negligent for MURPHY to sell this investment to Raymond E. Douglass. It was specifically known by MURPHY that many investors were not paying their premium payments so MURPHY had no excuse for not advising that and it was negligent not to do so. Investors were only told that they might lose their investment if they did not pay additional premiums, they were not told the whole investment was in jeopardy if a critical mass of investors did not pay the premiums. MURPHY did not explain that RELIANT would not have the wherewithal to cover these premiums if it came down to a mass exodus.

305.   The PLAINTIFF initiates this lawsuit with the aim of recovering the funds invested by Raymond E. Douglass in RELIANT and other damages that flow. Raymond

SECOND AMENDED CLASS ACTION COMPLAINT

E. Douglass was informed that this investment was guaranteed, prompting him to invest a significant amount. However, as outlined above, the investment was not guaranteed for the reasons stated above and including if the investors are unable to pay premiums if their finances deteriorate. Moreover, if an individual insured reaches the age of 100, most of these policies are not required to make any payout. None of the above was disclosed. Additionally, as discussed above, it is not a guaranteed investment, if the investor, such as Raymond E. Douglass, being older than most insured, dies before the insured's die.

306.   This product was marketed and sold on the belief that the investment was flexible, allowing investors to retrieve their principal at any time if they changed their minds. This claim is substantiated on the RELIANT website, which states that investors can "withdraw their money anytime without a penalty." As noted above, the trustee requested money back, but despite assurances, the return of the money invested did not materialize. This appears to be a deceptive and fraudulent tactic.

307.   MURPHY failed to give all necessary, relevant, and material information about this product necessary for a reasonable investor to properly evaluate this investment including providing 1) overall rate of return historically, 2) the percentage of time RELIANT estimated the life expectancy (reserves) correctly, 3) the average age of death of an insured historically, 4) the number of these investments that have gone full circle, 5) the number of repeat customers, 6) the number and percentage of people and all their investment that made money, 7) the load on the investment, 8) the number of persons that put money in a RELIANT program or the fact that people did invest and took losses to get out of the program. MURPHY failed to provide basic truthful statistics and information regarding how many customers had to pay premiums, or how RELIANT justifies using life expectancy more than social security life expectancy to create the false impression that the investment is better than it is. MURPHY failed to provide information as to how many insureds exceeded RELIANT's disclosed life expectancy, which is a basic fact RELIANT should know and disclose. A reasonable investor needs to know information like this.

SECOND AMENDED CLASS ACTION COMPLAINT

308. MURPHY failed to advise Raymond E. Douglass that the RELIANT investment program failed to meet all of the requirements of the Corporate Code §25102(q) and other provisions of California law. RELIANT continued to operate when it knew it could not claim the exemption according to the code.

309. MURPHY did not verify whether or not Raymond E. Douglass had a large enough portfolio so that Douglass's total investments in these policies did not exceed 10% of his portfolio. In fact, the million dollars invested in the policies exceeded 10% of Douglass's overall wealth portfolio, so MURPHY selling this many policies to Raymond E. Douglass or allowing this large dollar amount to be sold to Raymond E. Douglass violated state and thus company requirements.

310. Upon information and belief, certain other investors were excused from having to pay premiums while other investors were not. This was not disclosed by MURPHY, and it was unfair and created the risk of default or the risk that the remaining investors will have to pay more to make up for the needed premiums. This creates a conflict of interest, and it is an unpredictable arrangement created at the whim of the promoter. This was not disclosed to Raymond E. Douglass at the outset.

311. Raymond E. Douglass was not told by MURPHY that RELIANT manipulated reviews, and that reviews did not represent a true status of the RELIANT situation. Raymond E. Douglass bought on the basis of reviews and/or MURPHY's interpretation of these reviews or what other people's experience was, which was all false.

312. MURPHY knew that RELIANT had a tortured history where dishonesty was part of the culture of RELIANT and the culture of the Life settlement Industry. This is depicted in a detailed declaration of Gloria Wolk which contained material information that MURPHY knew about and should have disclosed to Raymond E. Douglass. Without disclosing this and other information about the industry and without disclosing prior litigation involving RELIANT and the Industry, MURPHY was not properly representing the product which means he was not giving a fair and balanced picture of this investment in compliance with securities law. This was also below the standard of care of the

investment industry not to give a full and fair disclosure of all aspects of the product and those involved with the product. MURPHY had a background that itself needed to be disclosed. Also MURPHY needed to disclose the prior litigation involving this product including RELIANT'S own prior litigation involving American General Insurance Policy PSH 20052L. The above failure to disclose resulted in Raymond E. Douglass buying a product that he would not have otherwise bought. Not having this information hindered Raymond E. Douglass' ability to evaluate the program. If he had known the history and all the above material information, Raymond E. Douglass would not have invested in this product.

313.   MURPHY also had knowledge and was instrumental in RELIANT engaging in endeavors to hide bad reviews of this product. Anything deemed negative for sales is scrubbed from the internet by RELIANT. RELIANT, under the auspices of MURPHY, hire companies to purge their bad reviews, which purging is designed to and does deprive investors of material information which a reasonable investor needs to know prior to investing. This is contrary to what is required, which is a full, fair, and balanced disclosure where the investors have access to all the material facts. MURPHY's lack of disclosure of all the above facts is anathema of what should be allowed and is an indicator of negligence or intent to deceive on the part of MURPHY. Raymond E. Douglass himself relied upon the product being properly represented by MURPHY, which it was not.

314.   It was negligent and/or fraudulent for MURPHY to suggest that an elderly person buy so many of these policies so late in his life out of his retirement money. MURPHY knew it was not in Raymond E. Douglass' best interest to buy these policies at his stage in life and so many of the same product, but he sold it to himself for his own financial gain. No reasonable salesmen or ethical broker dealer or issuer would or should have allowed this especially since Raymond E. Douglass was suffering from dementia, diabetes and other health issues that made in particularly vulnerable and susceptible to suggestion.

315.   Raymond E. Douglass, born on February 19, 1934, passed away at the age of

85 on January 1, 2020. During the sales transactions conducted by and supervised by MURPHY, Raymond E. Douglass was grappling with dementia and serious diabetes. Witnesses and photographs demonstrate that MURPHY was invited to visit Raymond E. Douglass 's disheveled home, MURPHY is shown in the pictures interacting with Raymond E. Douglass while Raymond E. Douglass was giving himself insulin shots in his leg with his pants down, indicating a visibly unwell and demented person. Despite this, money was still extracted from Raymond E. Douglass by MURPHY. MURPHY even manipulated Raymond E. Douglass into repurchasing policies from others, which RELIANT needed to re-sell to placate unsatisfied investors. MURPHY was in charge of overseeing the Raymond E. Douglass sales process, obtaining checks to buy the RELIANT product he sold to Raymond E. Douglass. MURPHY knew Raymond E. Douglass could write a check immediately and took advantage of Raymond E. Douglass at his home. There is also no indication that any three-day cooling-off opportunity was given Raymond E. Douglass to cancel as required by law for home solicitation. The photograph reveals disorganized surroundings, indicative of dementia.

316.   The financial industry demands high commercial ethics, honor, and adherence to just trade principles which were not exhibited by MURPHY.

317.   Raymond E. Douglass could have afforded to purchase an entire viatical, which would have been a more advantageous than to be saddled with fractional interests in many insurance policies through RELIANT. It was unethical for MURPHY to encourage Raymond E. Douglass to invest in multiple policies at the fractional level when he could have purchased his own entire viatical.

318.   It is alleged Raymond E. Douglass was not of sound mind nor was he a proper candidate for this investment. His investment money would be better if left in a liquid form. MURPHY did not properly evaluate Plaintiff and his needs.

319.   Under MURPHY's guidance, the following statement was told to Raymond E. Douglass and other investors, "The history of actual maturities for life settlement policies shows that, like a bell curve, approximately half of all policies mature before the

estimated life expectancy date and half after." This suggested that these investments had predicable attributes and could provide a quick turnaround. Also contrary to what MURPHY represented, RELIANT'S life expectancy projection were not accurate nor was the amount needed for premium reserves accurate. MURPHY also neglected to disclose that this investment did qualify as an exempt security.

320.   MURPHY failed to disclose or have a process in forms and disclosures that disclosed that Scott Grady, an owner of RELIANT t, was a disbarred attorney and was in an ownership position with RELIANT.

321.   Plaintiffs sent via certified mail to key Defendants giving them the required 30 days to correct, repair or rescind, and or do any of the things allowed or required by California Civil Code §1770 et seq. Defendants have not done anything. They still have the chance to make good as Plaintiffs will give any defendant served herewith 30 days from the date this is served upon them to comply with California Civil Code §1770 et seq. Assuming this is not done, Plaintiffs therefore are entitled to the damages and remedies set forth in California Civil Code §1780 and related sections against all Defendants.

322.   MURPHY was not properly licensed and RELIANT was not properly registered. This was not disclosed. It is alleged MURPHY sold product to Raymond E. Douglass directly and indirectly. Indirectly refers to sales by persons he supervised, approved or ratified. It is alleged all sales to Raymond E. Douglass were either a result of MURPHY making the actual sale or MURPHY sending out salesmen under his supervision to make the sale which MURPHY ratified and approved.

## ELEVENTH CAUSE OF ACTION

## VIOLATION OF CORPORATE CODE §§ 25401 & 25501

## BY DOUGLASS AGAINST MURPHY

323.   PLAINTIFF incorporates by reference all the above paragraphs as though fully set forth herein as well as all paragraphs from subsequently alleged causes of action.

324.   Defendant MURPHY sold Raymond E. Douglass securities in violation

Corporate Code § 20541, which prohibits offers or sales of securities including investment opportunities by means of a written or oral communication containing: "untrue statement[s] of a fact or omits to state a material fact necessary in order to make the statement[s] made, in light of the circumstances under which they were made, not misleading."

325.   DEFENDANT MURPHY was a key figure in selling in excess of $1 million of the beneficiary interest in the death benefits packaged by RELIANT (hereinafter sometimes referred to as the "Investment" or the "Product") and sold to Raymond E. Douglass.

326.   In addition to the above set forth in the General Allegations of this complaint, MURPHY is liable for violations of Corporate Code §§ 25401 & 25501 for the following reasons:

327.   DEFENDANT MURPHY failed to describe various aspects of this investment to Raymond E. Douglass that made the investment unsuitable or not in his best interest. This is the failure to advise him of the true impact of the premiums due and how that effects viability and profitability of this investment.

328.   DEFENDANT MURPHY represented or allowed the sales to go through to Raymond E. Douglass knowing that the investment was represented or portrayed as a viatical of the kind that Warren Buffett and Bill Gates possesses and knowing this was not true.

329.   DEFENDANT MURPHY represented or allowed the sales to go through to Raymond E. Douglass knowing there was a lack of appropriate disclosure of the dark history behind this industry and RELIANT and that as a result, the investment was problematic. In particular, the information set forth in the Gloria Wolk's declaration was purposely not disclosed to investors. This Declaration was provided RELIANT in a previous case. All this is a material lack of full disclosure and material omissions of fact that needed to be disclosed and was purposefully not.

330.   DEFENDANT MURPHY represented or allowed to be represented to

Raymond E. Douglass that RELIANT investments were better for him than the stock market. This was communicated to convince Raymond E. Douglass to invest. This was not true and MURPHY knew it.

331.   DEFENDANT MURPHY failed to properly portray statistics about prior investments and real returns to Raymond E. Douglass before consummating the sale or sales to Raymond E. Douglass. Therefore Raymond E. Douglass did not have the true picture of the investment and its potential or lack thereof. MURPHY did this on purpose.

332.   DEFENDANT MURPHY failed to disclose his unlicensed status (both as a securities agent and as a life settlement agent) and RELIANT'S lack of registration status both to sell insurance but also to be a broker dealer, depriving Raymond E. Douglass of the opportunity to evaluate the products based upon what information that is required of registered and licensed persons. It also deprived Raymond E. Douglass of the ability to deal with persons with high commercial honor and persons obligated to provide just and equitable principles of trade. None of the above was provided. It also deprived Raymond E. Douglass of the protections that would have been available had RELIANT registered its security properly and used licensed salespersons. This was done purposely by MURPHY to make it easier to sell to Raymond E. Douglass regardless of suitability, and the best interest of the customer, Raymond E. Douglass.

333.   DEFENDANT MURPHY allowed information to be communicated to Raymond E. Douglass and other prospective clients including information on the website that was false including representing falsely the ability of a customer to be able to obtain their money back without penalty. Raymond E. Douglass , through the Plaintiff Trustee Gwen Douglass requested the money back to no avail, which was not provided as described above, proving this was just a sales gimmick. Such an insinuation was purposefully vague and misleading and used to facilitate the sales to Raymond E. Douglass which sales he otherwise would not have considered.

334.   DEFENDANT MURPHY failed to see that RELIANT provided proper audited reports to Raymond E. Douglass and others as required by law, and necessary for

understanding the investment.

335.   DEFENDANT MURPHY failed to see that its customers knew that RELIANT'S president, GRADY, was a disbarred attorney and was also an owner, member and manager of RELIANT.

336.   DEFENDANT MURPHY failed to see that RELIANT advised Raymond E. Douglass of information required by law including who his fellow investors' were and who was running the organization he invested in.

337.   DEFENDANT MURPHY failed to advise Raymond E. Douglass of how the insurance premiums increased over time and the consequences of a having a limited reserve fund. These rising premiums caused and contributed to the losses suffered by Raymond E. Douglass.

338.   DEFENDANT MURPHY failed to advise Raymond E. Douglass that RELIANT allowed some select persons to invest without meeting the minimum net worth requirements, making the investment riskier for the rest of the investors including Raymond E. Douglass. This special treatment led to the downfall of the investment as described above when unqualified investors could not pay additional premiums.

339.   DEFENDANT MURPHY orchestrated or allowed RELIANT to manipulate reviews and ratings on their website, and or knew this was going on, a fact that MURPHY kept from Raymond E. Douglass and MURPHY allowed Reliant's staff to keep from Raymond E. Douglass and other investors.

340.   DEFENDANT MURPHY failed to disclose RELIANT'S policy of preventing investors' knowledge of important facts and who was involved in the organization and their history, thus thwarting transparency and full disclosure.

341.   DEFENDANT MURPHY represented or allowed RELIANT'S staff to represent that the risk of a premium call was close to zero. This was misleading and untrue and its falsity is precisely what brought down the investment because it was not true and MURPHY knew it.

342.   DEFENDANTS MURPHY applied coercive and unfair sales practices on

Raymond E. Douglass taking advantage of his age, illness, and diminished condition. MURPHY knew Raymond E. Douglass was not a candidate for this product, it was not suitable, and not in Raymond E. Douglass and his family's best interest, and MURPHY sold it to Raymond E. Douglass anyway.

343.   MURPHY violated all the other items set forth in the General Allegations of this complaint.

344.   Defendant MURPHY did not properly portray the statistics associated with prior RELIANT'S investments concerning RELIANT'S ability to be accurate in its life expectancy estimates after a decade of being in business. MURPHY did not portray truthfully or allow to be portrayed truthfully what happens when premium reserves are exhausted leaving no funds to pay premiums.

345.   Defendant MURPHY failed to provide the required information to mandated by Cal Corporate Code §25102(q) where an issuer must provide the information required in Corporate Code §25102(q) (3) (A—G)-especially omitted were the names of directors, officers, partners, members, or trustees of the issuer. In effect Defendants fail to explain who owned and operated RELIANT as required by law.

346. DEFENDANT MURPHY knowingly made the above statements and representations, He knew they were false and/or that they were part of an elaborate concealment of essential information that Raymond E. Douglass and other investors were entitled to know and needed to know to make an investment in this product. This concealment amounted to concealing material facts, resulting in the investments being portrayed in a false light. It was improper, deceitful, or negligent conduct for DEFENDANT MURPHY to take Raymond E. Douglass' money under the circumstances set forth in this Complaint. If Defendants did not know the above was false or misleading they should have.

347.   Selling securities and/or an investment opportunity such as MURPHY did under the above pretenses or while omitting material facts is a deception and involved misrepresentation of material facts in violation of Corp Code §25401.

348.   Raymond E. Douglass relied upon the above misrepresentations or lack thereof to make investments in RELIANT Life Settlements. This reliance was reasonable and justified based upon the circumstances.

349.   By reason of the above, Raymond E. Douglass is entitled to rescission and damages, and or the damages set forth in Civil Codes §25501 or 25501.5, or according to all remedies available by law.

350.   Defendant MURPHY's conduct was in reckless disregard for the rights and safety of Raymond E. Douglass and Plaintiff. Said conduct constitutes oppression, fraud, and malice such that punitive and / or exemplary damages are appropriate pursuant to either Civil Code section 3294, section 3345 or both.

351.   Plaintiffs seek all damages allowed by law for the above-described wrongdoing including costs of suit, investigation, and attorneys' fees if provided by statute.

## TWELFTH CAUSE OF ACTION
### BREACH OF FIDUCIARY DUTY
### (DOUGLASS AGAINST ANDREW MURPHY)

352.   PLAINTIFF incorporates by reference all the above paragraphs as though fully set forth herein as well as all paragraphs from subsequent causes of action.

353.   Raymond E. Douglass trusted and relied upon RELIANT and its sales staff, particularly MURPHY, to provide reliable and trustworthy information on life settlement investments, which is what MURPHY represented was his expertise. A fiduciary duty was created as between MURPHY and Raymond E. Douglass, who acted like an investment advisor to him. California law imposes a fiduciary duty on all salesmen of securities and imposes fiduciary duties on operators of investments, which MURPHY

SECOND AMENDED CLASS ACTION COMPLAINT

also did in operating RELIANT. If there was not a fiduciary relationship created initially, one developed after the first RELIANT sale, as from then on, MURPHY used Raymond E. Douglass as a go-to prospect for various RELIANT products. There was further fiduciary duties created because Raymond E. Douglass was a vulnerable person with the above health and dementia problems he was suffering from that were obvious to the sales persons like MURPHY.

354.   For all of the reasons set forth in the General Allegations, section of this complaint and for the reasons set forth in the first cause of action at paragraph 39 (a) – (s), incorporated by reference, MURPHY violated and breached his fiduciary duties these sections imposed upon him. MURPHY had no right as a fiduciary to sell these investments to Raymond E. Douglass and breached fiduciary duties by doing so by not being candid, open and honest. Further it was a breach of MURPHY's fiduciary duty to oversell this product to Raymond E. Douglass putting him into an overconcentration position and selling product not suitable for him. It was also a breach of fiduciary duty for MURPHY to sell these investments to Raymond E. Douglass in Raymond E. Douglass's diminished, vulnerable capacity and in his challenged health state. No reasonable salesperson would make these sales to a person in Raymond E. Douglass' state of mind. Raymond E. Douglass was not of sound mind. His problematic health and mental state was easily discernible because MURPHY visited him firsthand and therefore was exposed to his disheveled, filthy living conditions, caused by his compromised health status. MURPHY saw Raymond E. Douglass 's medication and observed his incoherent speech, which was a huge red flag MURPHY ignored. MURPHY put his own interest above his customer, Raymond E. Douglass.

355.   It was further a breach of fiduciary duties for MURPHY to cause Raymond E. Douglass to lose access to liquid money by using Raymond E. Douglass's liquid money to invest in this illiquid product.

356.   It was a violation of MURPHY's fiduciary duty to sell these products to Raymond E. Douglass just to make a sale or to have a backup prospect over when it was

not in the customer's best interest. MURPHY allowed an over concentration and an unsuitable sale to occur in Raymond E. Douglass' portfolio so MURPHY could personally benefit and make more money at Raymond E. Douglass' expense. Further MURPHY knew that Raymond E. Douglass did not have the net worth to justify buying these RELIANT products that MURPHY sold Raymond E. Douglass. MURPHY knew these investments which he sold to Raymond E. Douglass would saddle Raymond E. Douglass and his heirs with future unknown and escalating premiums that would be burdensome and not in their best interest, yet MURPHY made the sales anyway to make more income for himself.

357.   The above breaches of fiduciary duty includes the conduct set forth in the General Allegations of this Complaint and in the first cause of action at paragraph 39 (a) – (s), incorporated by reference.

358.   The above-mentioned breaches of Fiduciary duties by MURPHY are the direct and proximate cause of harm to PLAINTIFF, including the loss of Raymond E. Douglass ' investment.

359.   By reason of the above breach of Fiduciary duties, PLAINTIFF seeks all damages allowed by law and/or the return of all money Raymond E. Douglass ' invested plus interest, reimbursement of professional services needed to unravel the matter, and pain, suffering and mental suffering. PLAINTIFF also seeks pain suffering and mental anguish caused by the above.

360.   MURPHY's conduct was in reckless disregard for the rights and safety of PLAINTIFF, and constitutes oppression, fraud, and malice such that punitive damages are appropriate and requested.

## THIRTEENTH CAUSE OF ACTION
### FINANCIAL ELDER ABUSE
### (DOUGLASS AGAINST MURPHY)

361.   PLAINTIFF incorporates by reference all the above paragraphs as though fully set forth herein as well as all paragraphs from paragraphs from subsequent causes

1    of action.

2       362.   As an "elder," within the meaning of Welf. & Inst. Code § 15610.27, Plaintiff

3    Raymond E. Douglass is an Elder Abuse entitled to the heightened rights and special

4    statutory protections provided by California's Elder and Dependent Adult Civil

5    Protection Act set forth in Welf. & Inst. Code § 15600 et sec.

6       363.   Under Welf. & Inst. Code § 15610.30, a person is liable for financial elder

7    abuse for assisting financial elder abuse if they obtained the elder's property when they

8    knew or should have known that the conduct is likely to be harmful to the elder, including:

9    (1) hiding, taking, retaining, obtaining and/or misappropriating Plaintiff's property,

10   which is what has been alleged in this Complaint, or (2) by the Defendants like MURPHY

11   assisting and aiding and abetting Defendants Reliant, Michaels and Grady in harming

12   Raymond E. Douglass .

13      364.   MURPHY's conduct in selling Raymond E. Douglass these products was a

14   predatory practice employed to take advantage of a vulnerable elderly person for his own

15   financial gain or if not intended to do so, it had that effect, and after knowing this,

16   MURPHY kept doing it, implying a total purposeful intent to take advantage of, instead

17   of protecting Raymond E. Douglass.

18      365.   For reasons alleged and due to MURPHY's visits to Raymond E. Douglass'

19   home and its state of affairs and Raymond E. Douglass' obvious health issues and obvious

20   inability to carry on a train of thought, MURPHY had notice Raymond E. Douglass was

21   older and was vulnerable. To make a sale, or supervise a sale which MURPHY did many

22   times, he would have access to date of birth which is required information on qualifying

23   documents for making sales. Despite being in possession of the above facts and

24   information, Defendant MURPHY knowingly assisted, aided, and abetted Reliant,

25   Michaels and Grady and himself in committing Financial Elder Abuse on Plaintiff

26   Raymond E. Douglass.

27      366.   The conduct of MURPHY, aided and abetted by Reliant, Michaels and

28   Grady, was in reckless disregard for the rights and safety of Raymond E. Douglass and

proximately caused economic and non-economic damages to Raymond E. Douglass .

367.   The damages to Plaintiff Raymond E. Douglass for the above are to be trebled, and attorney's fees allowed by statute. Defendants MURPHY's conduct was in reckless disregard for the rights and safety of the Raymond E. Douglass ' and therefore constituted oppression, fraud, and malice such that exemplary damages are appropriate and requested under either Civil Code sections 3294 or 3345 or both.

## FOURTEENTH CAUSE OF ACTION

## SELLING UNREGISTERED SECURITIES AND INSURANCE

## (DOUGLASS AGAINST MURPHY)

368.   PLAINTIFF incorporates by reference all the above paragraphs as though fully set forth herein as well as all paragraphs from subsequent causes of action.

369.   The above-mentioned facts show, and it is alleged that the DEFENDANT MURPHY sold Raymond E. Douglass unregistered or unqualified securities in violation of Corporations Code, particularly §§ 25110, 25130, & 25102(q), and/or in violation of other provisions of federal law requiring registration of securities. As described above, DEFENDANT claimed exemptions that did not exist as the excuse for having an unregistered security.

370.   It was below the standard of care for a seller to sell unregistered securities in this manner. When an unregistered security is sold, the transaction must be unwound, and rescission be mandated and/or damages allowed.

371.   By reason of the above, DEFENDANT MURPHY is liable to PLAINTIFF, and PLAINTIFF is entitled to get the money back through rescission or damages for violating the allegations of this cause of action.

372.   It was also improper, illegal, deceitful, or negligent to sell unregistered or unqualified securities to Raymond E. Douglass and take Raymond E. Douglass' money under these circumstances.

373.   By reason of the above, and as a proximate result of selling unregistered or unqualified securities, PLAINTIFF has been harmed because if the securities were

registered or qualified, there would have been more protections and disclosures provided to allow an investor to make a more informed investment decision. Even if PLAINTIFF would have been no better off, DEFENDANT'S failure to register or qualify this security automatically allows for damages or rescission with or without showing prejudice. It is illegal and against the law to sell unregistered or unqualified securities. By reason of the above, PLAINTIFF is entitled to rescission and damages. PLAINTIFF seeks PLAINTIFF's money back with interest thereon. Additionally, PLAINTIFF seeks all damages allowed by law for DEFENDANT'S selling unregistered/unqualified securities including that they be trebled as allowed by Ca. C.C.P. 1029.8.

374.   By reason of the above-mentioned conduct, PLAINTIFF is entitled to treble damages and attorneys' fees and costs at the discretion of the Court, which PLAINTIFF requests.

375.   DEFENDANTS' conduct was in reckless disregard for the rights and safety of PLAINTIFF and constitutes oppression, fraud, and malice such that punitive damages are appropriate, and hereby requested.

376.   PLAINTIFF seeks attorney fees as provided by the parties' contract and also by statute.

## FIFTEENTH CAUSE OF ACTION

### NEGLIGENCE

### (DOUGLASS v MURPHY)

377.   PLAINTIFF incorporates by reference all the above paragraphs as though fully set forth herein as well as all paragraphs from subsequent causes of action.

378.   PLAINTIFF Raymond E. Douglass trusted and relied upon RELIANT and its sales staff, particularly MURPHY, to provide a reliable and trustworthy investment advice. MURPHY breached it by violating the items set forth in the first DOUGLAS V. MURPHY cause of action at paragraph 39 (a) – (s), incorporated by reference.

379.   For all of the reasons set forth in the above paragraph, MURPHY acted below the standard of care in selling these investments or allowing RELIANT to sell these

investments to Raymond E. Douglass. These investments were not suitable for Raymond E. Douglass. It was negligent for MURPHY to sell these investments to Raymond E. Douglass in his diminished mental state and health challenged state of health. No reasonable and ethical salesperson would make these sales to a person in Raymond E. Douglass' state, which was not a sound mind, and especially when said fact was easy to discern because MURPHY was exposed to Raymond E. Douglass' disheveled, filthy living conditions, and his rambling discourse.

380.   It was negligent for MURPHY to cause Raymond E. Douglass to lose access to liquid money by facilitating Raymond E. Douglass to invest that money into the RELIANT investments that did not allow Raymond E. Douglass' to have any access to his money.

381.   It was negligent for MURPHY to sell these products to Raymond E. Douglass just to make a sale or to have a backup prospect in the wings when a sale was not in the customer's best interest.

382.   MURPHY was negligent to allow Raymond E. Douglass to be over concentrated in life settlement investments. MURPHY sold more life settlement investments that caused Raymond E. Douglass to have an over concentrated portfolio of life settlements. Raymond E. Douglass did not have the net worth to justify buying these RELIANT products that MURPHY sold Raymond E. Douglass. These investments needlessly saddled Raymond E. Douglass and his heirs with premiums that were not in their best interest, yet MURPHY made the sales anyway to make more income for himself, at the expense of Raymond E. Douglass and his heirs. MURPHY was not properly licensed to sell these investments himself.

383.   It is also negligent and below the standard of care for MURPHY to sell an investment that is not suitable to Raymond E. Douglass when he was not of sound mind and good mental health and being too old to take advantage of this kind of investment.

384.   It was negligent for MURPHY to sell RELIANT products to Raymond E. Douglass for all of the reasons set forth in the Raymond E. Douglass General Allegations

SECOND AMENDED CLASS ACTION COMPLAINT

set forth above.

385.   The above negligence of MURPHY was the direct and proximate cause of harm to Raymond E. Douglass. It directly caused Raymond E. Douglass and now his trustee, the Plaintiff herein, to lose all the money which is the subject of this suit.

386.   By reason of the above Negligence, PLAINTIFF seeks all damages allowed by law and/or the return of the money. This includes pain, suffering and mental suffering caused thereby and cost of suit.

///

SECOND AMENDED CLASS ACTION COMPLAINT

**PLAINTIFFS' PRAYER FOR RELIEF FOR THEMSELVES AND THE CLASS**

Wherefore, Reed Plaintiffs, on their own behalf and on behalf of the Class, pray for:

1.    First and Second Causes of Action for Negligence **against Reliant Defendants**:

      (i)    General and special damages pursuant to Civil Code §3281 according to proof at trial;

      (ii)    Prejudgment interest pursuant to Civil Code §3287.

2.    Third Cause of Action for violation of Corp Code §§25401 and 25501 **against Reliant Defendants**:

      (i)    General and special damages pursuant to Civil Code §3281 according to proof at trial.

      (ii)    Prejudgment interest pursuant to Civil Code §3287

      (iii)    Punitive and Exemplary Damages pursuant to Civil Code §3294.

3.    Fourth Cause of Action for Breach of Fiduciary Duty **against Reliant Defendants**:

      (i)    General and special damages pursuant to Civil Code §3281 according to proof at trial.

      (ii)    Prejudgment interest pursuant to Civil Code §3287;

      (iii)    Punitive and Exemplary Damages pursuant to Civil Code §3294.

4.    Fifth Cause of Action – Financial Elder Abuse **against Reliant Defendants**:

      (i)    General damages, special damages and attorney's fees and costs pursuant to Welf. & Inst. Code § 15600 et seq.;

      (ii)    Punitive and exemplary damages pursuant to Civil Code 3294 or 3345 or both

      (iii)    For reasonable attorneys' fees and costs;

5.    Sixth Cause of Action – Unfair Business Practices **against Reliant Defendants**:

      (i)    An order, ordering Reliant Defendants, their agents, servants, and

employees, and all persons acting, directly or indirectly, in concert with them, to restore all funds acquired by means of any act or practice declared by this Court to be unlawful, unfair, or fraudulent and therefore constitute unfair competition under Section 17200, et seq. of the California Business and Professions Code;

(ii)    For injunctive relief pursuant to California Business & Professions Code §17203, consisting of, inter alia: (a) a declaration that Defendants have engaged in unlawful and unfair and fraudulent business acts and practices in violation of California Business & Professions Code §17200, et seq.; (b) a preliminary and/or permanent injunction enjoining Defendants and their respective successors, agents, servants, officers, directors, employees and all other persons acting in concert with them from pursuing the policies, acts and practices complained of herein and prohibiting Defendants from continuing such acts of unfair and illegal business practices;

(iii)    For an equitable accounting; and,

(iv)    Restitution, or restitution like recovery, including, but not limited to, Plaintiffs' principal amounts.

6.    **Seventh and Eighth Cause of Action for Negligence and Gross Negligence– Against Trustee Defendants**:

(i)    General and special damages pursuant to Civil Code §3281 according to proof at trial;

(ii)    Prejudgment interest pursuant to Civil Code §3287; and

7.    Ninth Cause of Action – Breach of Fiduciary Duty **Against Trustee Defendants:**

(i)    General and special damages pursuant to Civil Code §3281 according to proof at trial.

(ii)    Prejudgment interest pursuant to Civil Code §3287;

8.     Tenth Cause of Action for violation of Corp Code §25504.1 **against Trustee Defendants**:

    (iv)   General and special damages pursuant to Civil Code §3281 according to proof at trial.

    (v)   Prejudgment interest pursuant to Civil Code §3287

    (vi)   Punitive and Exemplary Damages pursuant to Civil Code §3294.

9.     Eleventh Cause of Action – Aiding and Abetting Breach of Fiduciary Duty **Against Trustee Defendants:**

    e.   Aiding and Abetting Breach of Fiduciary Duty

    (i)   General and special damages pursuant to Civil Code §3281 according to proof at trial;

    (ii)   Prejudgment interest pursuant to Civil Code §3287; and

    (vii)   Punitive and Exemplary Damages pursuant to Civil Code §3294.

<u>**FOR ALL CLASS ACTION CAUSES OF ACTION**</u>

1.     For an order certifying the case as a class action naming Plaintiffs as Class Representatives and Plaintiffs' counsel as Class Counsel;

2.     For prejudgment interest;

3.     For attorneys' fees pursuant to applicable law, including but not limited to Civ. Code §1021.5;

4.     For costs of suit; and,

5.     For such other relief as may be appropriate.

<u>**PRAYER FOR ALL DOUGLASS v. MURPHY CAUSES OF ACTION**</u>

**WHEREFORE,** Plaintiff Douglass prays for:

1.     General and special damages pursuant to Civil Code §3281 according to proof at trial;

2.     Prejudgment interest pursuant to Civil Code §3287.

SECOND AMENDED CLASS ACTION COMPLAINT

3. Exemplary Damages pursuant to Civil Code §3294.

4. For general damages, special damages and attorney's fees and costs pursuant to Welf. & Inst. Code § 15600 et seq.;

5. For attorneys' fees pursuant to applicable law, including but not limited to Civ. Code §1021.5;

6. For costs of suit; and for such other relief as is just and proper.

PLAINTIFFS REQUEST A JURY TRIAL.

Dated: February 15, 2024      **FOLEY BEZEK BEHLE & CURTIS, LLP**
                                          **DONAHOO & ASSOCIATES, PC**

                               By: _*/s/ Thomas G. Foley, Jr.*_
                               ___*/s/ Richard E. Donahoo*_____
                                   Thomas G. Foley, Jr.
                                   Richard E. Donahoo
                             Counsel for James Reed, Carolynn Reed and as Interim Class Counsel for the Class

Dated: February 15, 2024      **MURRIN LAW FIRM**

                               By: _J. Owen Murrin_____
                                   J. Owen Murrin
                             Counsel for Gwendolyn Douglass as Trustee of RAYMOND E. DOUGLASS REVOCABLE TRUST, executor of Raymond E. Douglass' estate, and as successor in interest

*James Reed, et al. v. Reliant Life Share, LLC, et al.*
**USDC – Central District –Case No. 2:23-cv-08577-SB-AGR**

STATE OF CALIFORNIA, COUNTY OF ORANGE

  I am employed in the County of Orange, State of California.  I am over the age of 18 and not a party to the within action.  My business address is: 440 West First Street, Suite 101, Tustin, CA  90720

On **March 15, 2024**, I served the foregoing document(s) described as:

**SECOND AMENDED COMPLAINT**

(   ) BY MAIL - As follows: I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with U.S. Postal Service on that same day with postage thereon fully prepaid at Irvine, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

(X) BY E-MAIL – I caused a true copy of the foregoing document(s) to be served by electronic email transmission at the time shown on each transmission, to each interested party at the email address shown below. Each transmission was reported as complete and without error to the following email addresses:

| | |
|---|---|
| Thomas G. Foley, Jr., SBN 65812<br>Kevin Gamarnik, SBN 273445<br>FOLEY, BEZEK, BEHLE & CURTIS, LLP<br>15 West Carrillo Street<br>Santa Barbara, CA 93101<br>Telephone: (805) 962-9495<br>Facsimile: (805) 962-0722 | David A. Berkley (Bar No. 260105)<br>Elizabeth Campbell (admitted *pro hac vice in Reliant Life Shares v. Daniel Cooper, et al. LASC Case No. BC604858*)<br>**WOMBLE BOND DICKINSON (US) LLP**<br>400 Spectrum Center Dr, Suite 1700<br>Irvine, CA 92618 |

1  Email:
   tfoley@foleybezek.com
2  kgamarnik@foleybezek.com
3  *Attorneys for Plaintiff*
4  *James Reed and Carolyn*
   *Reed*
5
6  J. Owen Murrin SBN
   75329
7  7040 E. Los Santos Drive
8  Long Beach, California
   90815
9  Phone: 562-342-3011
10 Fax: 562-724-7007
11 E-mail:
   jmurrin@murrinlawfirm.com
12
13 *Attorneys for Douglass*
   *Plaintiffs*
14
15
16
17
18
19

20
21
22
23
24
25
26
27
28

Telephone: (714) 557-3800
Facsimile: (714) 557-3347
Email:
David.Berkley@wbd-us.com
Email:
Elizabeth.Campbell@wbd-us.com
*Attorneys for Receiver*
*Christopher Conway*

Richard Walton
Walton & Walton, LLP
13700 Marina Pointe
Drive, Suite 920
Marina del Rey, California
90292
Tel: (310)363-7321
Fax: (310)464-3057
Email:
rwalton@taxtriallawyers.com
*Attorneys for Defendant,*
*RELIANT LIFE SHARES,*
*LLC*

Matthew Orme
Matt.orme@dentons.com
Stephen A. Watkins (SBN
205175)
stephen.watkins@dentons.com
DENTONS US LLP
601 South Figueroa Street,
Suite 2500
Los Angeles, California
90017-5704
Telephone: (213) 623-

9300
Facsimile: (213) 623-9924
*Attorneys for Defendant*
*BOU Bancorp*

Dean A. Olson
Clark Hill LLP
555 South Flower Street,
24th Floor,
Los Angeles, CA 90071
(213) 417-5132 (office)
(213) 488 1178
*Attorneys for Defendant*
*UMB Bank, N.A.*

Christopher Stevens
Law Offices of
Christopher Stevens
1475 Island Avenue #1905
San Diego, Ca 92101
Tel. (310) 990-0459
cms@cmoorestevens.com
*Attorneys for Defendant*
*Scott Grady*

(X) FEDERAL - I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

*/s/ Richard E. Donahoo*